**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| PROGRESSIVE SOUTHEASTERN INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| MOUNTAIN TRUCK LINES, INC., and COYOTE LOGISTICS, LLC | ) ) ) |
| Defendants, | ) |

Case No.: 23-cv-15280

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff, PROGRESSIVE SOUTHEASTERN INSURANCE COMPANY (hereinafter "Progressive"), by and through its undersigned attorneys, SUDEKUM, CASSIDY & SHULRUFF, CHTD., and for its Complaint for Declaratory Judgment against Defendant, MOUNTAIN TRUCK LINES, INC., ("Mountain Truck") and COYOTE LOGISTICS, LLC ("Coyote"), states as follows:

### INTRODUCTION

1.     This is an action for declaratory judgment pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure. Progressive seeks a judgment declaring Progressive does not owe insurance coverage to Defendant Mountain Truck for defense or indemnification in the lawsuit styled, *Coyote Logistics, LLC, v. Mountain Truck Lines Inc. an Illinois corporation*, Case No. 1:23-cv-00616, pending in the Northern District of Illinois, Eastern Division Federal Court ("the underlying lawsuit").

### PARTIES

2.     Plaintiff Progressive is a Florida corporation with its principal place of business in Indiana. At all relevant times, Progressive was and is authorized to issue policies of insurance in the State of North Carolina.

3.    Defendant Mountain Truck is a North Carolina corporation that transports freight in interstate commerce and conducts business in this District, with its principal place of business in North Carolina.

4.    Defendant Coyote is a Limited Liability Company authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to arrange for the transportation of freight by motor carriers in interstate and foreign commerce with its principal place of business in Chicago, Illinois.

## JURISDICTION

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1337, 49 U.S.C. § 14706 as the underlying lawsuit is premised in the liability of a motor carrier transporting freight in interstate commerce and conducts business in this District.

6.    Venue is also appropriate in this District because the plaintiff and defendant in the underlying lawsuit, i.e., Coyote, and Mountain Truck, respectively entered into a Broker-Carrier Agreement that requires all legal action between Coyote and Mountain Truck to be brought and maintained in Cook County, Illinois.  A true and correct copy of the Broker-Carrier Agreement is attached hereto as **Exhibit A**.

## FACTS COMMON TO ALL COUNTS

7.    On February 1, 2023, Coyote, filed a complaint in the underlying lawsuit against Mountain Truck. (The "underlying Complaint"). A true and accurate copy of the underlying Complaint is attached hereto as **Exhibit B**.

8.    The underlying Complaint sets forth two causes of action against Mountain Truck:

Count I:    Carmack Amendment Liability; and

Count II:   Breach of Indemnification Agreement

9.      Coyote entered into a Broker-Carrier agreement with Mountain Truck. (**Exhibit A**).

10.     On or about November of 2021, Coyote as a freight broker and on behalf of its customer, the Kraft Heinz Company ("Kraft Heinz"), tendered a load of cream cheese to Mountain Truck for transportation in interstate commerce from Union City, Georgia to Robert, Louisiana with Bill of Lading Number 2068871220. A true and accurate copy of the Bill of Lading is attached hereto as **Exhibit C**.

11.     At the time the cargo was tendered to and received by Mountain Truck, it was in good order and condition as acknowledged on the Bill of Lading issued for the shipment. (**Exhibit C**).

12.     Mountain Truck failed to deliver the cargo in good order and condition and donated the cargo without the authorization of Kraft Heinz or Coyote. A true and accurate copy of a donation receipt from Mississippi Food Network to Mountain Truck Lines dated November 3, 2021, attached hereto as **Exhibit D**.

13.     The value of the cargo, as shown on the damage claim issued by Kraft Heinz was $53,201.30.

14.     Coyote alleges in the underlying Complaint that Coyote paid $53,201.30 to Kraft Heinz in exchange for an assignment of rights to pursue the claim. (**Exhibit B**, ¶9; Exhibit 1).

15.     Coyote seeks to recover $53,201.30, plus attorney's fees and costs, from Mountain Truck for the non-delivery of the shipment of cream cheese. (**Exhibit B**, Wherefore Clauses).

16.     Progressive issued a policy of insurance to Mountain Truck, bearing policy number 02607617, with coverage effective from September 10, 2021, to September 10, 2022 (the "Policy"). A true and accurate copy of the Policy is attached hereto as **Exhibit E**.

17.     The Policy affords cargo liability coverage to Mountain Truck pursuant to the terms and conditions set forth in the Policy.

18.     Progressive seeks a declaration pursuant to 28 U.S.C. §2201 and Rule 57 of the

Rules of Federal Civil Procedure that Progressive has no duty under the Policy to defend or

indemnify Mountain Truck in the underlying lawsuit for the following reasons:

i.      When Mountain Truck donated the cream cheese load it was no longer in due course of transit and therefore the policy would no longer provide coverage to Mountain Truck for the cream cheese;

ii.     Consequential damages are excluded perils in the Policy and the act of donating the load was consequential damage as it was not a direct physical loss to covered property or business equipment; and

iii.    The non-delivery exclusion under the Policy affords no coverage for Mountain Truck's decision to donate the cream cheese.

**COUNT I**
**PROGRESSIVE HAS NO DUTY TO DEFEND OR INDEMNIFY MOUNTAIN TRUCK PURSUANT TO THE DUE COURSE OF TRANSIT LANGUAGE OF THE POLICY**

19.     Progressive incorporates by reference the allegations of Paragraphs 1-18 as if fully

set forth herein.

20.     The Policy provides, in pertinent part, as follows:

**MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT**

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

**INSURING AGREEMENT – LOSS TO COVERED PROPERTY**

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage.  For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1.      while **in due course of transit** in, on, or attached to an **insured auto**; or

2.      during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement.  However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply.  **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

***

21.     When Mountain Truck donated the cream cheese, the cream cheese was no longer in due course of transit.

22.     Because the cream cheese was no longer in due course of transit, the loss of the cream cheese is not and cannot be covered under the Policy.

23.     As the loss of cream cheese is not and cannot be covered under the Policy, Progressive owes no duty to defend or indemnify Mountain Truck for any judgment entered against it in the underlying Complaint.

WHEREFORE, Progressive hereby seeks a declaration pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure that Progressive owes no duty to defend or indemnify Mountain Truck for any judgment entered against it in the underlying Complaint as the subject cargo was no longer in due course of transit at the time of the loss, and therefore excluded from coverage pursuant to the conditions of the Policy, and for other such further relief this Court deems just and appropriate.

## COUNT II
### PROGRESSIVE HAS NO DUTY TO DEFEND OR INDEMNIFY MOUNTAIN TRUCK PURSUANT TO THE CONSEQUENTIAL LOSS EXCLUSION OF THE POLICY

24.     Progressive incorporates by reference the allegations of Paragraphs 1-18 as if fully set forth herein.

25.     The Progressive policy provides, in pertinent part, as follows:

2.     "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through l. below as Excluded Perils.

**Excluded Perils:**  Please read the following list of excluded perils carefully.  Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils.  We will not pay for any **losses** to **covered**

**property** or **business equipment** caused by, resulting in or from, or arising our of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

***

f.  **Consequential Loss**

Loss of use, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property** or **business equipment**.

***

26.     The only damage stated in the underlying complaint was Coyote's payment of $53,201.30 to Kraft Heinz for the cargo loss that resulted from Mountain Truck's donation of the cream cheese.

27.     The consequential loss caused by Mountain Truck's donation was not direct physical loss to either covered property or business equipment.

28.     As the loss of cream cheese was a consequential loss, coverage is not provided for the loss pursuant to the conditions of the Policy.

29.     As the type of loss sought in the underlying Complaint is a consequential loss that is not covered pursuant to the conditions of the Policy, Progressive has no duty to defend or indemnify Mountain Truck for any judgment entered against it in the underlying Complaint.

WHEREFORE, Progressive hereby seeks a declaration pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure that Progressive owes no duty to defend or indemnify Mountain Truck for any judgment entered against it in the underlying Complaint as the cargo suffered consequential loss and is therefore excluded from coverage pursuant to the conditions of the Policy , and for other such further relief this Court deems just and appropriate.

<strong>COUNT III</strong><br><strong>PROGRESSIVE HAS NO DUTY TO DEFEND OR INDEMNIFY MOUNTAIN TRUCK PURSUANT TO THE NON-DELIVERY EXCLUSION OF THE POLICY</strong>

30.     Progressive incorporates by reference the allegations of Paragraphs 1-18 as if fully set forth herein.

31.    The Progressive policy provides, in pertinent part, as follows:

2.    "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through l. below as Excluded Perils.

   **Excluded Perils:** Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. We will not pay for any **losses** to **covered property** or **business equipment** caused by, resulting in or from, or arising our of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

   ***

   h.    **Voluntary Parting, Nondelivery, Mysterious Disappearance**

   (i)    Voluntarily parting with title to or possession of, the property fraudulent scheme, trick, or false pretense;

   (ii)    Nondelivery or misdelivery; or

   (iii)    Mysterious or unexplained disappearance; shortage of any property upon taking inventory; or theft of a part of the contents of any shipping package.

   ***

32.    No coverage is afforded for the loss because when Mountain Truck donated the cream cheese:

   A.    Mountain Truck voluntarily parted with possession of the cargo;

   B.    Mountain Truck failed to deliver the cargo;

   C.    Mountain Truck failed to complete the delivery of the cargo; and

   D.    Mountain Truck exercised unauthorized control and dominion over the cargo and thereby participated in the theft of the cream cheese.

33.    For the foregoing reasons, the cause of action from the underlying Complaint is excluded by the Policy.

   WHEREFORE, Progressive hereby seeks a declaration pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure that Progressive owes no duty to defend or indemnify Mountain Truck for any judgment entered against it in the underlying Complaint for the loss it caused is excluded from coverage pursuant to the conditions of Policy, and for other such further relief this Court deems just and appropriate.

Respectfully Submitted,

SUDEKUM, CASSIDY & SHULRUFF, CHTD.

By: /s/ Frederick J. Sudekum, III
      Attorneys for Plaintiff.


Frederick J. Sudekum, III (fjs@scslegal.com)
Abdon Madrigal (am@scslegal.com)
SUDEKUM, CASSIDY & SHULRUFF, CHTD.
20 North Clark Street, Suite 2450
Chicago, Illinois 60602
Phone: (312) 803-6250
Bar No.: 6182381; 6321049

# Exhibit A

# Registration Alert: Mountain Truck Lines - MC879823

rmis@registrymonitoring.com

Wed 6/24/2015 4:25 PM

RMIS

To: ComplianceTeam <ComplianceTeam@Coyote.com>;

| rmis logo | rmis address, 5703 Corsa Avenue, 1st Floor, Westlake Village, CA 91362 |
| --- | --- |

**New Registered Carrier Notice**      6/24/2015

| GENERAL | |
| --- | --- |
| Business Name | **Mountain Truck Lines** |
| MC Number | MC879823 |
| US DOT Number | 2531608 |
| RMIS Carrier ID | 561422 |
| W9 Name: | Mountain Truck Lines |
| Main Address | 109 Jimmy Morris Road |
| | Sylva, NC 287798022 |
| | USA |
| Pay To Name | MOUNTAIN TRUCK LINES |
| Pay To Address | 109 Jimmy Morris Road |
| | Sylva, NC 28779-8022 |
| | USA |
| Pay To Email | |
| The Pay To is a Factoring Company | No |
| Contact | Christopher Broom |
| Title | owner |
| Phone | 828-371-6197 |
| Fax | 828-586-2045 |
| Email | mtl.of.nc@gmail.com |

| CLIENT ATTACHED | | | close |
| --- | --- | --- | --- |
| **Is Attached? Yes** | Attached ID | Attached Date | |
| | | 6/24/2015 1:24:22 PM | |

| DOT INFORMATION | | close |
| --- | --- | --- |
| DBA Name: | MOUNTAIN TRUCK LINES | |
| Legal Name: | CHRISTOPHER DANIEL BROOM | |
| Address: | 109 JIMMY MORRIS ROAD | |
| | SYLVA, NC 28779-8022 | |
| Phone: | 8283716197 | |
| Mailing Address: | | |
| | | |
| Mailing Phone: | | |
| **Operating Status:** | Operating Status | OOS Date |

EXHIBIT 2

AUTHORIZED FOR Property

| Authority: | Common Authority | Contract Authority | Broker Authority |
|---|---|---|---|
| | N | A | N |

Authority Grant Date: 8/29/2014

| Safety Rating: | Rating | Rating Date | Review Type | Review Date |
|---|---|---|---|---|
| | None | | None | None |

DOT Census Total Truck(s): 1

## SMS Safety Data

| Inspection Type | Vehicle | Driver | Total Inspection |
|---|---|---|---|
| Inspection Number | 0 | 1 | 1 |
| Out of Service % | 0 | 0 | |

## BASIC

| BASICs Overview | Percentile | Roadside Alert | Serious Violation | Basic Alert |
|---|---|---|---|---|
| Unsafe Driving | 0% | N | N | N |
| Hours of Service (HOS) | % | N | N | N |
| Driver Fitness | % | N | N | N |
| Controlled Substances and Alcohol | 0% | N | N | N |
| Vehicle Maintenance | % | N | N | N |

## W9 INFORMATION                                                                                                       close

| Name (as shown on your income tax return) | Christopher Broom |
|---|---|
| Business Name | Mountain Truck Lines |
| Company Type | Individual/Sole Proprietor or single-member LLC |
| Is Limited Liab? | No |
| Limited Liability Tax Class | |
| Exempt Payee Code | |
| FATCA code | |
| W9 Address | 109 Jimmy Morris Road |
| W9 City | Sylva |
| W9 State | NC |
| W9 Zip | 28779-8022 |
| Contact Name | Christopher Broom |
| EW9 Create Date | 6/24/2015 1:12:20 PM |
| EIN | 47-1568531 |
| TIN Certified | Yes |
| TIN Validation Reason | TIN and Name combination matches IRS records. |
| TIN Checked By | RMIS Automation |
| TIN Check Date | 6/24/2015 1:21:49 PM |

## AGREEMENT INFORMATION                                                                                           close

AGREEMENT

Print Agreement

Agreement ID                                                                                662041

| | | | |
|---|---|---|---|
| Agreement Date | | | Wednesday, June 24, 2015 |
| Agreed? | | | Yes |
| Agreement | | | |

| | | | |
|---|---|---|---|
| Carrier ID: | 561422 | | |
| Carrier Name: | Mountain Truck Lines | Agreement Date: | 6/24/2015 1:07:57 PM (Pacific Time) |
| Address: | 109 Jimmy Morris Road | MC Number: | MC879823 |
| City, State & Zip: | Sylva, NC 287798022 | US DOT Number: | 2531608 |
| Contact: | Christopher Broom | Phone: | 828-371-6197 |

### BROKER – CARRIER AGREEMENT
#### VERSION 08/01/2015

This Broker-Carrier Agreement (hereinafter "Agreement") is made and entered this 24 day of June, 2015, (the "Effective Date") by and between **COYOTE LOGISTICS, LLC**, a Delaware limited liability company ("BROKER"), and Mountain Truck Lines, a Registered Motor Carrier with its principal office at 109 Jimmy Morris Road Sylva, NC 287798022, ("CARRIER"); collectively referred to as the "Parties".

WHEREAS, BROKER is authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to operate as a Registered Property Broker pursuant to License issued in Number MC-561135-B;

WHEREAS, CARRIER, an independent contractor, is licensed by the FMCSA to operate as a for-hire motor carrier pursuant to authority issued in DOT Number: 2531608; MC Number: MC879823;

WHEREAS the transportation service provided by CARRIER, whether on regulated, unregulated, or intrastate traffic, is intended by the Parties to be contract carriage as defined in 49 U.S.C. § 13102 (4) and § 14101 (b) and the Parties hereto intend that the contractual arrangement be continuous in nature until this Agreement is, by its terms, not renewed or terminated; and

WHEREAS, the parties agree that for all purposes this Agreement is and shall be a contract pursuant to 49 U.S.C. §§ 14101(b). To the extent that any right or remedy provided in this Agreement conflicts, or is otherwise inconsistent with, the rights and remedies provided under the Interstate Commerce Commission Termination Act ("ICCTA") or other laws and regulations, such rights and remedies are hereby waived and the provisions of this Agreement shall prevail to the fullest extent permitted by law. Without limiting the foregoing, the Parties agree that the rights conferred by 49 C.F.R. 371(3)(c) are expressly waived for all purposes.

NOW THEREFORE, for and in consideration of the mutual covenants and undertakings herein, and subject to the terms and conditions hereinafter set forth, the Parties hereto warrant, covenant and agree as follows:

1. **SCOPE OF WORK AND AGREEMENT APPLICABILITY.** BROKER hereby agrees to cause freight to be tendered to CARRIER, and CARRIER agrees to transport such freight, in one or more shipments, and CARRIER hereby agrees to pick up, transport, deliver and provide all such services as BROKER shall request on all freight tendered by BROKER to the extent set forth in a Load Confirmation Sheet (the "Services"). CARRIER specifically warrants and agrees that all freight tendered to it by BROKER pursuant to this Agreement shall only be transported by CARRIER on, in or with equipment owned by CARRIER or leased to CARRIER under a lease having a duration of more than thirty (30) days and operating under CARRIER'S operating authorities. Except to the extent that CARRIER uses the services of "owner/operators" in the course of conducting its regular operations, CARRIER shall not, in any manner, sub-contract, broker or tender to any third party for transportation any freight tendered to CARRIER by BROKER for transportation pursuant to this Agreement. Violation of this article shall be considered a material breach of this Agreement. In addition to other remedies conferred by this Agreement, any violation of this article shall act as a bar to CARRIER'S right to collect any payment for any shipment handled in a manner which violates this article.
2. **APPLICABILITY.** This Agreement shall apply to all shipments in the United States, Canada and/or Mexico, and any shipments within or between any of the foregoing.
3. **AGREEMENT FOR SERVICES; APPENDICES, SCHEDULES, AND EXHIBITS.** CARRIER shall provide all Services as contemplated by and set forth in this Agreement as well as all Services contemplated by and set forth in all appendices, schedules and exhibits ("Incorporated Documents") which are attached and made a part of this Agreement whether such Incorporated Documents were executed at the time that this Agreement was executed or at some later date. All such Incorporated Documents are intended to be supplements to this Agreement and not separate contracts or agreements. In the event of a conflict between the terms of this Agreement and the terms of any Incorporated Document, the terms of the Incorporated Document shall control.
4. **TERM OF AGREEMENT.** The term of this Agreement shall be for a period of one (1) year (the "Initial Term") and shall automatically renew for additional one (1) year periods (each one year period is hereinafter a "Renewal Term") unless written notice of non-renewal is given by either Party at least thirty (30) days prior to the end of the Initial Term or any Renewal Term. This Agreement may be terminated by either Party at any time upon thirty (30) days written notice to the other.
5. **CARRIER WARRANTIES AND REPRESENTATIONS TO BROKER AND ITS CUSTOMERS**
   A. CARRIER warrants and represents that it is in full compliance, and shall continuously maintain full and strict compliance, with all statutes, rules and regulations governing its operations pursuant to this Agreement, including but not limited to adherence to provisions of the Interstate Commerce Act and related laws, rules and regulations of the FMCSA, the Foreign Corrupt Practices Act (as more specifically described in Section 11.V) and all provisions of applicable state and local laws, rules and regulations to the extent they govern CARRIER'S operations. If shipments under this Agreement are tendered in Canada, or for delivery to Canada, CARRIER warrants that it will not accept such shipments unless CARRIER is in full compliance with the laws of Canada.
   B. To the extent that any shipments subject to this Agreement are transported within the State of California, CARRIER warrants that it is in compliance with all California Air Resources Board regulations. Carrier shall be liable to BROKER and SHIPPER for any penalties, or any other liability, imposed on or assumed by BROKER or SHIPPER because of Carrier's use of non-compliant equipment.
   C. CARRIER does not have an "unsatisfactory" or "unfit" safety rating issued by the FMCSA, and will notify BROKER in writing immediately if its

EXHIBIT 2

safety rating is changed to "conditional," "marginal," "unsatisfactory," or "unfit" and shall notify BROKER forthwith of any safety rating changes immediately if CARRIER is assessed an "unsatisfactory" safety rating, or if any equipment is known to be reported as defective or which is not in compliance with applicable laws. In the event CARRIER is issued a "conditional" or "marginal" safety rating, CARRIER shall use commercially reasonable efforts to improve such ratings and shall provide BROKER with a periodic documented action plan of such improvement efforts.

D. CARRIER will provide, operate and maintain in satisfactory and safe working condition all motor vehicles, trailers and allied equipment necessary to perform transportation services pursuant to this Agreement. CARRIER will provide all necessary and fully qualified drivers, ensure that each driver is suitably trained for operation of vehicles and other equipment, procure all licenses, permits, authorizations and other governmental approvals necessary for the ownership and use of such vehicles, furnish at its sole expense all supplies, fuel, oil, tires, parts, service, maintenance and repair in connection with the use and operation of their vehicles and equipment and that may be required to keep the vehicles and equipment in good repair and mechanical condition, and bear all costs of providing the transportation service.

E. All vehicles and equipment used for transportation services shall be clean, odor free, dry, leak proof and free of contamination and infestation. No vehicle that transports goods for BROKER under this Agreement will ever have been knowingly used to transport refuse, garbage, trash or solid or liquid waste of any kind whatsoever, whether hazardous or non-hazardous. CARRIER further warrants that all motor vehicle equipment provided by CARRIER for the transportation of food grade products will comply with the requirements of The Sanitary Food Transportation Act, that no freight transported pursuant to this Agreement shall become, or shall be deemed to be adulterated or misbranded within the meaning of the Federal Food Drug and Cosmetic Act, the Federal Meat Inspection Act, or the Federal Poultry Products Inspection Act, as amended and as may be amended in the future, or any other federal, state or local law or regulation of similar kind or content, by reason of being or having been transported in or with motor vehicle equipment provided by CARRIER to transport freight tendered or arranged by BROKER, or as a consequence of any of CARRIER 's activities in furtherance of such transport and that none of the equipment provided for the transportation of food or food grade products has been or will be used for the transportation of any waste of any kind, garbage, hazardous materials or any other commodity that might adulterate or contaminate food, food products, animal feed or cosmetics. No poison, pesticide, rodenticide or other toxic or hazardous commodity shall be transported in the same vehicle and at the same time as any shipment of food, foodstuffs, food products, commodities intended for human or animal consumption as food or food supplements or ingredients or cosmetics. Should CARRIER violate this Section, it shall be liable for all claims occurring as a consequence thereof, without regard to fault or negligence on CARRIER's part and without regard to whether or not any actual contamination to any such shipment occurred, and no salvage or salvage set off shall be allowed. CARRIER will also ensure that, in connection with goods that are specified by BROKER or its customer ("Customer") as requiring temperature, humidity or other climate control, all vehicles provided for transportation of such goods will be suitable for the purpose intended, and shall be operated in compliance with reefer units properly and regularly maintained.

F. CARRIER shall not perform Services that would require CARRIER or any of its contractors, employees, or others to exceed or violate any applicable laws, rules or regulations. CARRIER, as an independent contractor, has sole and exclusive direction and control over the manner in which CARRIER and its employees, contractors or others perform Services. Such individuals shall be considered employees or representatives of CARRIER only and shall be subject to employment, discharge, discipline and control solely and exclusively by CARRIER, which shall be fully responsible for their acts.

G. CARRIER'S Handling of Freight:

    i. CARRIER will transport all shipments tendered pursuant to this Agreement to the specified consignee at the specified destination at the time specified, or, if there is no time specified, then within a reasonable time. BROKER and CARRIER both agree and recognize that time is of the essence of this Agreement and that due to varying geographical origins and destinations together with the need for expeditious transportation, both Parties will commence performance under this Agreement immediately following the oral tender of a shipment to CARRIER by BROKER. It is understood that all shipment handling requirements are those of BROKER'S Customers and that CARRIER will comply with all such requirements.

    ii. Missed delivery appointments may result in the imposition of fees and penalties by BROKER's Customers, shippers or consignees of shipments for which CARRIER shall be liable.

    iii. CARRIER is responsible at the time of loading for probing any product designated as requiring temperature controls in transit and writing the temperature on the Bill of Lading or shipping receipt. The temperature of the product is a material condition of this Agreement. If the product temperature is more than two (2) degrees different from the required temperature stated on the tender documents, then the CARRIER shall refuse the shipment and immediately contact BROKER.

H. CARRIER hereby assigns to BROKER any and all rights held by CARRIER to bill any party to the Bill of Lading contract, and shall bill only BROKER for the Services herein. CARRIER agrees that BROKER'S Customers are intended to be third party beneficiaries of this Agreement. CARRIER will not communicate, directly or indirectly, in any manner, with BROKER's Customers, consignors, consignees or any party other than BROKER concerning the collection of any charges relating to transportation services accrued or accruing in connection with or as a consequence of this Agreement. CARRIER shall have no lien, and hereby expressly waives its right to any lien of any kind on any cargo, freight or other property of BROKER or any of BROKER'S Customers. It is agreed that BROKER is acting as an independent contractor and not as the agent of any of its Customers.

I. CARRIER is in full compliance, and shall maintain full and strict compliance during the term of this Agreement, with all applicable federal, state and local laws relating to the transportation of Hazardous Materials, (including, but not limited to, insurance, licensing and training of drivers and cargo security), as defined in 49 C.F.R. part §172 et seq. and part §397 et seq. to the extent that any shipments tendered hereunder constitute Hazardous Materials. CARRIER will be responsible for any handling, clean-up or disposal and will indemnify and hold BROKER harmless from all claims, liabilities, losses, fines, legal fees and other expenses arising out of contact with, exposure to, or release of any Hazardous Materials or any remedial action required under applicable federal, state or local environmental laws, except to the extent any such claims, liabilities, losses, or fines result from BROKER's negligence or willful acts or omissions. When CARRIER is required by U.S. D.O.T. to complete a written report "Hazardous Materials Incident Report" (Form DOT 5800.1 per 49CFR171.15 or 49CFR171.16) detailing an incident involving hazardous materials shipped pursuant to this Agreement, CARRIER must also promptly deliver a copy of the report to BROKER within ten (10) business days of filing the report with USDOT.

J. The Parties will notify each other immediately if their Federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if either Party is sold, or if there is a change in control of ownership of either Party, and/or any of their insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

K. CARRIER shall make all arrangements it deems appropriate to provide sufficient, appropriate, personnel and motor vehicle equipment, which shall be dedicated to BROKER'S exclusive use while transporting freight tendered by BROKER, to provide the transportation services contemplated by this agreement. CARRIER shall not comingle any other freight other than that tendered by BROKER on each specific Load

Confirmation Sheet.

L.  CARRIER represents and warrants that it has security procedures in place reasonably designed to protect the cargo from loss or damage, and that it will comply with all such procedures.

    i.  CARRIER agrees to comply with the following minimum requirements with respect to locking systems and security seals: (a) any padlocks used must have a solid steel shackle (locking bar) with a minimum diameter of 11mm and a steel key housing and (b) any security seal used must be a serialized device, of metal or plastic composition, and must be attached to a trailer door in a manner that will provide evidence of any tampering with the trailer or its contents.

    ii.  CARRIER agrees that stored, staged or unattended trailers containing BROKER'S Customer's freight must be secured by means of the following: (a) King Pin lock with padlock meeting the aforementioned padlock standards; (b) Model G Air Lock/Quadralock; (c) TS3 Air Lock; (d) backed with trailer doors secured against a solid wall structure or secure adjacent trailer; and (e) during driver/tractor switching, both drivers must be present.

M.  In the event that CARRIER utilizes a trailer, container, chassis or other equipment owned by or leased to BROKER or its Customer, or otherwise provided to CARRIER by BROKER or its Customer ("Trailer(s)") for the performance of the Services contemplated hereunder, CARRIER shall be liable for any damage to Trailers, destruction of Trailers, theft from Trailers, theft of any contents of Trailers, and for any claims for bodily injury (including death) or property damage arising from or related to any accident involving Trailer(s) regardless of whether such damage, injury, destruction, or theft is caused or occurs while the Trailer is attached or unattached to any power unit operated by CARRIER, except to the extent such damage, destruction, or theft is directly and proximately caused by the negligence, recklessness, or willful misconduct of BROKER or the Customer. In no event will any such Trailer be used for any purpose other than performing Services hereunder, and in no event will CARRIER allow any third party or any power unit not operating under CARRIER's for-hire motor carrier authority to operate any such Trailer, unless expressly authorized to do so in writing which written notice must be specific to the movement at issue. CARRIER ACKNOWLEDGES AND AGREES THAT NEITHER BROKER NOR THE CUSTOMER MAKE ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE TRAILER INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR USE.

N.  CARRIER acknowledges that BROKER'S Customers may, from time to time, require additional warranties and/or terms ("Additional Terms") in connection with CARRIER'S provision of the Services, and CARRIER agrees that the provision of the Services for such Customers is conditioned on CARRIER'S acceptance of such Additional Terms. CARRIER'S provision of the Services after such Additional Terms are made available to CARRIER in writing shall be deemed acceptance of such Additional Terms.

6.  **BILLS OF LADING.** CARRIER will issue and sign a standard, uniform straight Bill of Lading, or other receipt acceptable to BROKER and BROKER'S Customers, upon acceptance of goods for transportation. Bills of Lading may be upon a form prepared and presented by BROKER'S Customers. It is the signing of the Bill of Lading by CARRIER'S driver or other representative that constitutes "execution" of the Bill of Lading, not the preparation of that document. It is agreed that a shipper's and/or consignor's identification of BROKER'S name on a Bill of Lading shall be for the shipper's/consignor's convenience only, and such notation shall not affect or defeat BROKER'S status as a Property Broker or CARRIER'S status as a Motor Carrier. In the event that the terms and conditions of any Bill of Lading executed by CARRIER in connection with a shipment transported pursuant to this Agreement shall conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement shall govern and take precedence; except to the extent the Bill of Lading contains specific instruction directly from the Customer, in which case such instructions shall take precedence.

7.  **INSURANCE.** CARRIER shall at all times during the term of this Agreement have and maintain in full force and effect, Public Liability, Property Damage, Cargo, and Workers' Compensation, Employment Liability and/or Occupational Accident Insurance with reliable insurance companies acceptable to BROKER, and in no event less than the following amounts:

A.  Comprehensive Automobile Liability Insurance. Comprehensive Automobile Liability Insurance shall be with a combined single limit of not less than $1,000,000.00, each accident; provided that $5,000,000.00, each accident, is required if transporting hazardous materials, including a Broadened Coverage for Covered Autos (CA 99 48 03 06) endorsement for environmental damages due to release or discharge of hazardous substances.

B.  Comprehensive General Liability Insurance. Comprehensive General Liability Insurance shall be in amounts of not less than $1,000,000.00 per occurrence; $2,000,000.00 in the aggregate.

C.  Workers' Compensation, Employer's Liability and/or Occupational Accident Insurance.

    i.  Protection under all applicable Workers' Compensation Laws at limits required by law; or

    ii.  Employer's liability insurance or Occupational Accident Insurance if Worker's Compensation is not required by statute.

D.  Cargo Insurance. A non-schedule vehicle Cargo Insurance policy with per shipment minimum of $100,000.00 unless higher limits are specified, together with:

    i.  Employee Infidelity. CARRIER'S cargo insurance policies shall not exclude coverage for infidelity, fraud, dishonesty or criminal acts of CARRIER'S employees, officers or directors.

E.  Additional Insured. BROKER shall be named as an "Additional Insured" on CARRIER'S Comprehensive Automobile Liability insurance and Cargo insurance policies, and said policies shall provide that:

    i.  BROKER shall not be obligated to pay premiums for any such insurance

    ii.  Such insurance shall be applicable separately to each insured and shall cover claims, suits, actions or proceedings by each insured against any other insured.

F.  Certificates of Insurance.

    i.  In lieu of being named as an additional insured, BROKER may agree and CARRIER shall provide certificates of insurance evidencing the insurance coverage required under this Agreement. The certificates of insurance shall contain a clause providing that the insurer will not cancel or change coverage of the insurance without first providing BROKER thirty (30) days' prior written notice.

    ii.  The certificate of coverage for the cargo liability insurance policy must evidence without sub-limits coverage for theft, fire, hijacking, unattended vehicles, hazardous materials, consumer electronics, new garments, footwear, computer and computer components and mechanical breakdown of a refrigeration unit subject to the above stated limits and with a deductible of no greater than ten thousand dollars ($10,000.00) per occurrence. All certificates of coverage must be provided to BROKER prior to CARRIER providing Services.

G.  All insurance must be procured from insurance carriers with a rating of at least A – VII (A MINUS) in the most recent edition of the A.M. Best Key Rating Guide (Property/Casualty) or its equivalent.

H.  Insurance Policy Copies. Upon reasonable request of BROKER, CARRIER shall deliver to BROKER full and complete copies of its insurance policies required under this Agreement.

I.  Self-Insurance. If CARRIER is self-insured, it shall provide evidence of such, including proof of acceptance of self-insurance status by the FMCSA or other governing agency.

J.    <u>No Representation as to Adequacy.</u> It is expressly understood that BROKER does not represent that the types or minimum limits of the insurance set forth herein are adequate to protect the CARRIER'S interests, and do not otherwise constitute limits of liability. Deductible amounts under the foregoing policies shall be paid by CARRIER.

K.    <u>Carrier's Insurance is Primary; No Subrogation.</u> CARRIER'S insurance shall be primary and applicable separately with respect to all insured and CARRIER'S insurer shall be required to respond and to pay prior to other available coverage. CARRIER agrees that CARRIER, CARRIER'S insurer(s), and anyone claiming by, through or under CARRIER shall have no claim, right of action or right of subrogation against BROKER or its Customer(s) based on any loss or liability insured under the insurance required under this Section 7. The failure of CARRIER to secure an appropriate clause in or endorsement to its respective insurance coverage, which waives the right of subrogation as provided for in this Section 7.K, shall not in any manner affect the intended waiver and release and, if CARRIER'S insurance company seeks subrogation against BROKER because of the absence of such a waiver and release, CARRIER shall defend, indemnify and hold BROKER harmless from and against such subrogation claim.

8.   **COMPENSATION AND PAYMENT.**

A.    <u>Rate Agreement.</u> With respect to all shipments tendered to CARRIER pursuant to this Agreement, compensation shall be paid to CARRIER solely and exclusively by BROKER, in the amounts set forth in Appendix A, attached hereto and made a part hereof; provided, however, that the Parties hereto may at any time agree, in writing, or orally, and subsequently confirmed by both Parties in writing, on a form incorporating all of the information of and similar in format to Appendix B ("Load Confirmation Sheet"), attached hereto and made a part hereof, or such other form as the Parties may agree upon, to change such compensation for any specific shipment or shipments. Such confirmation may be accomplished through the exchange of supplements to this Agreement executed by the Parties in counterparts being exchanged by fax, Telecopy, electronic acceptance by CARRIER of the Load Confirmation Sheet transmitted by BROKER or other electronic means agreed to by the Parties and acknowledged in a written supplement to this Agreement. Such Load Confirmation Sheets are supplements to this Agreement, not separate contracts or agreements, and unless CARRIER objects to the terms and rates of an individual Load Confirmation within twenty-four (24) hours after receipt and prior to the pickup of the shipment(s) of freight set forth thereon, CARRIER shall be deemed to have agreed that the terms are fully and correctly stated. All such Confirmations shall become incorporated as addenda to this Agreement, and BROKER and CARRIER agree to retain all such addenda for three (3) years. If BROKER and CARRIER fail to agree to a negotiated rate for a shipment transported by CARRIER as described above, the rate paid by BROKER to CARRIER for the shipment(s) pursuant to this Agreement shall be the amounts set forth in Appendix A, attached hereto and made a part hereof. CARRIER, from time to time, may request that BROKER make early payment of freight charges in exchange for a discount of the agreed rates, which separate agreement ("Coyote Advance Program," "Two Day Pay," or "ACH/Direct Deposit" ) may be attached to and become part of this Agreement as Appendix F. If the CARRIER agrees to or any early payment program contained in Appendix F.1-3, respectively, the discounted payment shall become the negotiated rate.

B.    <u>Mileage and Accessorial Charges.</u> Mileage and accessorial charges applicable to the Services provided or to be provided pursuant to this Agreement shall be as set forth in an appendix to this Agreement (Appendix C, the "Governing Rules"). CARRIER agrees, represents and warrants that, other than the rates and charges set forth in this Agreement and any Appendix hereto; there are no other rates, charges or surcharges, including, without limitation, any taxes, applicable to the Services provided or to be provided pursuant to this Agreement.

C.    <u>Fuel Surcharge.</u> Unless a separate and distinct fuel surcharge is specifically agreed to by BROKER, in writing, the quoted rate of CARRIER includes any and all fuel surcharges or adjustments.

D.    <u>Payment/Procedure.</u>

     i.    CARRIER shall invoice BROKER in BROKER'S name and deliver all such invoices to BROKER promptly following delivery of freight. CARRIER shall submit to BROKER all shipping documents within fifteen (15) days after delivery of each shipment transported pursuant to this Agreement and BROKER shall pay CARRIER for each shipment tendered pursuant to this Agreement the agreed compensation within thirty (30) days after receipt by BROKER of (a) if applicable, a written Load Confirmation Sheet, duly signed by CARRIER, acknowledging a change in compensation for any specific shipment or shipments; and (b) CARRIER'S freight bill with attached original Bill of Lading (or a readable copy thereof), without exception or notation, signed by the consignee at point of delivery as proof of delivery of the shipment, on time, on schedule and in good order and condition. CARRIER compensation to be paid under this Agreement may be withheld by BROKER, in whole or in part, to satisfy claims for loss, damage or delay to shipments transported by CARRIER pursuant to this Agreement. Only if no Bill of Lading was provided at point of origin will a written and signed delivery receipt be acceptable as a substitute. The foregoing is a condition of payment.

     ii.    CARRIER shall provide proof of delivery to BROKER within twenty-four (24) hours of delivery or request.

     iii.    Invoices which are received by BROKER more than one hundred twenty (120) days after Services are performed will not be accepted for payment. Inquiries or claims for non-payment received by BROKER more than one hundred twenty (120) days after such invoices are due and payable will not be investigated, researched or paid.

     iv.    BROKER shall not be required to pay CARRIER any penalties or interest for late payments due hereunder or otherwise, nor shall BROKER be required to forfeit any applicable discounts for any reason whatsoever.

9.   <u>**LIABILITY FOR LOSS, DAMAGE OR DELAY.**</u>

A.    <u>Common Carrier Liability.</u> BROKER and BROKER'S Customers specifically reserve all rights and remedies conferred by 49 U.S.C. § 14706, and this Agreement is subject to and governed by said statute. Except as otherwise specifically provided in this Agreement, CARRIER agrees that in the transportation of all goods hereunder, it assumes the same liability as that of a common CARRIER for full actual loss, subject to the provisions of 49 U.S.C. § 14706, ("Carmack Amendment") and 49 CFR Part 370 (claim regulations). CARRIER agrees to contact (at time of loss, damage or shortage occurrence, and no more than three (3) hours thereafter) BROKER regarding any exceptions (over, short, damaged, or refused) on any loads transported by CARRIER. CARRIER shall be responsible to pay BROKER for any loss or damage claims BROKER may incur or pay to its customers on account of any transportation services performed by CARRIER, for BROKER. If occurrence happens during a weekend or after hours, BROKER should be notified no later than next business morning.

B.    <u>Seal Integrity.</u> CARRIER agrees to maintain a continuous seal record during the time the trailer is in the custody and control of CARRIER. CARRIER agrees to have the seal verified and the seal number and condition of the seal noted on the bills of lading and/or delivery receipt. CARRIER also agrees to notify BROKER immediately (at time of first discovery) if the seal integrity is broken.

In the event a shipment that was sealed at origin arrives at the destination with a tampered seal or without the seal intact then;

     i.    the CARRIER shall be liable for any shortage or damage claims with respect to such shipment and

     ii.    the shipper shall have the right, in its sole discretion, to deem the entire shipment damaged, contaminated and unsalvageable, without the need for any inspection, in order to protect its brands and prevent potentially contaminated goods from entering into the

stream of commerce, regardless of any actual condition of the shipment which an inspection might have revealed, in which case, the shipment shall be considered totally damaged and worthless for all purposes and the CARRIER shall be liable for the full value of the shipment. To the extent that this paragraph might conflict with 49 U.S.C. § 14706, this paragraph shall take precedence and said statute is considered waived.

C. <u>Concealed Damage Claims.</u> Claims based on a concealed loss or damage reported to CARRIER within two (2) business days of the date of delivery shall be treated by CARRIER as though an exception notation had been made on the delivery receipt at the time of delivery.

D. <u>Damaged or Rejected Shipments.</u> CARRIER shall not dispose of damaged or rejected product without the prior written consent of BROKER or its Customer. BROKER or its Customer may determine within their sole discretion whether the goods may be salvaged, and if salvageable, the value of such salvage.

E. <u>Shipper Load and Count.</u> CARRIER shall not be liable for loss or damage on truckload shipments if trailer is loaded and sealed by Shipper/Customer and CARRIER has no opportunity to inspect or count contents of trailer, the trailer is delivered with original seal(s) intact, and there is no evidence indicating that the contents of the trailer were compromised while the trailer is in the CARRIER'S possession. However, in such event, prior to signing the Bill of Lading accepting the shipment, CARRIER'S personnel shall note on the Bill of Lading that they were not allowed or afforded an opportunity to view and/or examine the goods shipped. Failure of CARRIER to make such a notation shall create a rebuttable presumption that the goods were received by CARRIER in the correct quantity and in good condition.

F. <u>Replacement Shipments.</u> CARRIER acknowledges that BROKER may utilize other carriers to facilitate the movement of delayed shipments, or to ship replacement goods. If CARRIER fails to arrange to make timely delivery of any shipment, CARRIER shall be liable to BROKER and its Customers for all reasonable and necessary costs, charges, fees and expenses reasonably resulting from such delay.

G. <u>Return of Damaged or Rejected Shipments.</u> To the extent caused by CARRIER, CARRIER shall return all damaged or rejected product at its expense to the point of origin or, with BROKER'S direction, to other points as instructed by BROKER.

H. <u>Time Limits; Claims for Loss or Damage.</u> Notwithstanding the terms of 49 CFR 370.9, CARRIER shall pay, decline or make settlement offer in writing on all cargo loss or damage claims within ninety (90) days of receipt of the claim. Failure of CARRIER to pay, decline or offer settlement within this ninety (90) days day period shall be deemed an admission by CARRIER of full liability for the amount. The time limit within which BROKER must file a claim against CARRIER shall be nine (9) months from the date of delivery or within nine (9) months of a reasonable time for delivery if a complete loss. Disallowances shall state a lawful reason for declining to accept responsibility for the claim, and shall be stated by the CARRIER, not its insurer.

I. <u>Offset:</u> BROKER may withhold as setoff any payment due to CARRIER pursuant to this Agreement, in whole or in part, to: satisfy advances made to or on behalf of CARRIER, to satisfy any debt owed to BROKER by CARRIER, or to satisfy any cargo damage claim which CARRIER has not paid or denied for a legally valid cause or reason within ninety (90) days of presentation of the claim. Such setoff is to be made in the sole discretion of BROKER.

J. <u>Time Limits; Suits for Loss or Damage.</u> The time limit within which BROKER must institute suit against CARRIER to recover on a claim shall be two (2) years and a day from the date BROKER receives a written disallowance from CARRIER.

K. <u>Suits: Expenses and Attorneys' Fees .</u> If BROKER is successful in recovering a claim against CARRIER in a court of law or arbitration proceeding, BROKER shall be entitled to recover all of its expenses incurred in collecting its claim, including reasonable attorneys' fees, costs and interest at the legal rate from the date of delivery or scheduled delivery of the shipment.

L. <u>Limitation of Liability.</u> EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR LOSS OF PROFITS OR PROSPECTIVE PROFITS (COLLECTIVELY, "DISCLAIMED DAMAGES"), WHETHER ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF BREACH OF THIS AGREEMENT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE) OR OTHERWISE.

M. <u>Survival of Provisions.</u> The provisions of this Section shall survive cancellation, termination, or expiration of this Agreement.

10. **INDEMNITY.** CARRIER agrees to be responsible for, and to defend, indemnify and hold BROKER together with its customers, agents, servants, insurers and reinsurers, successors and assigns, and each of them, jointly and severally, harmless of and from any and all claims, liabilities, demands, actions and causes of action, suits at law and proceedings in equity, without limitation, of any nature, howsoever arising, including, but not limited to, all losses, damages (including, but not limited to: consequential, speculative, direct, indirect and punitive damages), personal injury, death, and/or loss or damage to cargo or other property, and/or claim for any such loss or occurrence, which may arise from or in connection with the operations performed or to be performed pursuant to this Agreement, without regard to fault or negligence on the part of CARRIER, including, but not limited to the following:

A. Any and all liability, claims, demands or expenses, including attorney's fees or other professional fees, directly or indirectly arising out of or related to the Services provided pursuant to this Agreement, or otherwise arising or growing out of the operations and activities of CARRIER hereunder, as a CARRIER or otherwise, initiated or advanced by any person;

B. Any liability, claims, demands or expenses (including attorney's and other professional fees) for damage to property of BROKER, its Customers or third parties, or personal injuries (including death) to BROKER or BROKER'S Customers' officers, directors, agents or employees or any other person, arising from or in conjunction with the CARRIER'S performance of Services pursuant to this Agreement;

C. Any and all claims made against BROKER, its agents, officers, directors or employees or BROKER'S Customers, agents or employees by or on behalf of CARRIER'S employees, for salary or other compensation or payments resulting or claimed to have resulted, in whole or in part, from CARRIER'S Services;

D. Any and all penalties or fines of any character which may be sought to be enforced against BROKER or its Customers by reason of an alleged violation by CARRIER, of any federal, state, provincial, or local law, rule or regulation; and

E. Any and all claims, demands, and suits by other carriers or intermediaries against BROKER or its Customers seeking payment for transportation charges on shipments tendered to CARRIER.

F. The indemnifications contained in this Section 10 shall NOT have application in instances when the claim, demand, liability or expense results directly from the sole negligence of BROKER.

G. The provisions of this Section shall survive cancellation, termination, or expiration of this Agreement.

11. **MISCELLANEOUS.**

A. <u>Independent Contractor.</u> It is understood and agreed that the relationship between BROKER and CARRIER is solely that of independent contractor and not as an agent, joint venturer, owner-operator or employee and that no employer/employee relationship exists, or is intended. CARRIER shall provide services to BROKER as an independent contractor, not as an agent, joint venturer or employee. BROKER has no control of any kind over CARRIER, including but not limited to routing of freight, instruction to drivers, expenses, advances, equipment, confirmation, load securement, and driver location and nothing contained herein or on the website of BROKER shall be construed to be inconsistent with this provision. BROKER is not and will not be responsible for any debts, liabilities or obligations incurred by CARRIER in the

performance of its business. CARRIER assumes full responsibility for all commissions, salaries, insurance, taxes, pensions and benefits of CARRIER'S agents, contractors, sub-contractors and/or employees in connection with CARRIER'S performance pursuant to this Agreement.

B. <u>Non-Exclusive Agreement.</u> CARRIER and BROKER acknowledge and agree that this Agreement does not bind the respective Parties to exclusive Services to each other. Either Party may enter into similar agreements with other carriers, brokers, or freight forwarders.

C. <u>Waiver of Provisions.</u> Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.

D. <u>Carrier's Option to Assign its Accounts Receivables.</u> CARRIER may assign its accounts receivables under this Agreement to a third party. In order to so do however, CARRIER must:

    i. Notify BROKER in writing a minimum of thirty (30) days in advance of any change in the CARRIER'S direction for payment, including without limitation any assignment of CARRIER'S right to payments earned or to be earned under this Agreement. Notice of any such assignment by CARRIER must include a self-addressed, stamped, return acknowledgement for BROKER to execute and return. Notices to BROKER shall be sent to:

Coyote Logistics, LLC
960 North Point Parkway, Suite 150
Alpharetta, GA 30005

    ii. Inform any assignee of the terms of this Agreement, including these terms regarding notice requirements.

    iii. CARRIER acknowledges and agrees that any change in CARRIER'S directions for payment or notice of assignment sent to any BROKER employee or location other than as set forth in Section 11.D.(i) is inadequate and defective. During the transition period from one set of CARRIER'S payment directions to another, CARRIER agrees that payments inadvertently made by BROKER in accordance with earlier payment directions shall constitute full satisfaction of BROKER'S payment obligations under this Agreement. CARRIER further agrees that in such event it is the responsibility of the CARRIER to forward, or cause to be forwarded, the payment to the correct party. CARRIER shall indemnify, defend and hold harmless BROKER from and against all liability, loss, damages, claims, suits or expenses, including without limitation reasonable attorney fees, caused by or arising from any failure on the part of the CARRIER or any assignee to comply with the terms of this Section. In no event shall BROKER'S right or ability to offset any claims which it may have against CARRIER pursuant to this Agreement against any monies otherwise owing to the CARRIER be limited or negatively affected, in any manner by the assignment, factoring, or other transfer of CARRIER'S right to receive payments referred hereinabove. All such factoring or assignment shall be subject to and not impair BROKER'S right of set off. Deduction of trip advances from payment for freight charges for a specific shipment shall not be modified or affected by any factoring or assignment of receivables by CARRIER.

E. <u>No Back Solicitation/Transportation.</u>

    i. CARRIER shall not knowingly solicit any shipper or payor of freight and transport or arrange for the transportation of such freight directly for such shipper or payor of freight who first was introduced by BROKER to CARRIER. This restrictive covenant relates only to the type traffic and in traffic lanes or territories served by CARRIER on behalf of BROKER and relates only to Customers of BROKER with whom CARRIER had substantial business contact during the 12 months immediately preceding termination of this Agreement. The term of the prohibited solicitation and transportation shall be during the term of this Agreement and for one (1) year thereafter.

    ii. In the event of breach of this provision, BROKER shall be entitled, for a period of 6 months following delivery of the last shipment transported by CARRIER under this Agreement, to liquidated damages equal to fifteen percent (15%) of the gross transportation revenue (as evidenced by freight bills) received by CARRIER for the transportation of said freight. Additionally, BROKER may seek injunctive relief and in the event it is successful, CARRIER shall be liable for all costs and expenses incurred by BROKER, including, but not limited to, reasonable attorney's fees.

F. <u>Confidentiality.</u>

    i. In addition to Confidential Information protected by law, statutory or otherwise, CARRIER agrees that all business, technical and financial information of BROKER and that of its Customers obtained by CARRIER, including but not limited to, freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent of BROKER.

    ii. In the event of violation of this Confidentiality Section, CARRIER agrees that the remedy at law, including monetary damages, may be inadequate and that BROKER shall be entitled, in addition to any other remedy it may have, to an injunction restraining CARRIER from further violation of this Agreement, in which case the prevailing Party shall be liable for all costs and expenses incurred, including, but not limited to, reasonable attorney's fees.

G. <u>Country of Origin.</u> The limitations of liability for cargo loss and damage as well as other liabilities, arising out of the transportation of shipments, which originate outside the United States of America, may be subject to the laws of the country of origin.

H. <u>Modification of Agreement.</u> This Agreement and any attachments hereto shall not be modified, except by mutual written agreement.

I. <u>Notices.</u>

    i. All notices provided or required by this Agreement, shall be made in writing and delivered, return receipt requested, to the person or persons and at the addresses shown herein with postage prepaid; or by confirmed (electronically acknowledged on paper) fax.

    ii. The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of the Parties performance of this Agreement.

    iii. Notices sent as required hereunder, to the addresses shown in this Agreement shall be deemed sent to the correct address, unless the Parties are notified in writing of any changes in address.

J. <u>Severance/Survival.</u> In the event any of the terms of this Agreement are determined to be invalid or unenforceable, no other terms shall be affected and the unaffected terms shall remain valid and enforceable as written. The representations, rights and obligations of the Parties hereunder shall survive termination of this Agreement for any reason.

K. <u>Counterparts and Electronic Signature.</u> This Agreement may be executed in any number of counterparts, each of which shall be deemed a duplicate original, but all of which together shall constitute one and the same Agreement. The counterparts of this Agreement and all ancillary documents (appendix, schedule or exhibit) may be executed and delivered by facsimile or other electronic signature by any of the parties to any other party and the receiving party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

L. <u>Entire Agreement.</u> This Agreement, together with any Incorporated Documents which are a part hereof, contains the entire understanding of

the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence such as a Bill of Lading, CARRIER'S tariff, web site, or otherwise may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement. BROKER may, from time to time modify or amend the terms or conditions of this Agreement by means of a written amendment which it shall promptly mail or otherwise transmit to CARRIER. Said modification or amendment shall become effective three (3) days after transmission by BROKER. CARRIER'S continued acceptance of freight tendered by BROKER or BROKER's Customers thereafter shall constitute acceptance by CARRIER of such modification or amendment to this Agreement. Amendments or modification to this Agreement shall be in writing and, except as otherwise provided for in this Section, must be signed by a duly authorized representative of each Party hereto.

M. <u>Right to Review with Counsel.</u> CARRIER warrants and represents that it fully understands its right to review all aspects of this Agreement with an attorney of its choice, that CARRIER has had the opportunity to consult with an attorney of its choice, that CARRIER has carefully read and fully understands all the provisions of this Agreement and that CARRIER is freely, knowingly, and voluntarily entering in this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived. Further, the Parties warrant that the individuals executing this Agreement on their behalf are authorized to do so.

N. <u>Governing Law-Venue.</u> Any legal action arising under or pursuant to this Agreement shall be brought and maintained only in the courts of Cook County, Illinois or Fulton County, Georgia at the discretion of either party and shall be governed by and construed in accordance with the laws of the State of Illinois without regard to choice of law provisions.

O. <u>Force Majeure.</u> The performance of either or both Parties hereto shall be excused and abated if such is prevented or substantially impeded by any Act of God, the public enemy, the authority of law, natural disaster or other like event, for the duration of such event. The Party who is unable to perform because of such event shall give the other notice of same within twenty-four 24 hours of the occurrence of such event or its performance hereunder will not be excused.

P. <u>Enforcement/Attorney's Fees.</u> In the event either Party incurs attorney's fees, costs or expenses in enforcing any of the provisions of this Agreement, or in exercising any right or remedy arising out of any breach of this Agreement by the other Party, the prevailing Party shall be entitled to an award of attorney's fees, costs and expenses against the defaulting Party.

Q. <u>Assignment.</u> Neither party shall assign this Agreement or its rights or obligations hereunder without the other party's prior written consent. Subject to the foregoing limitations, this Agreement shall be binding on the Parties' respective successors and assigns.

R. <u>Currency.</u> All amounts shall be in United States Dollars.

S. <u>Equal Opportunity.</u> In the performance of Service pursuant to this Agreement, the Parties hereto shall comply with the equal opportunity provisions as set forth in Federal Acquisition Regulation (FAR) § 52.222-26.

T. <u>Compliance with Executive Order 13496 of January 30, 2009.</u> CARRIER agrees to comply with all provisions and related rules, regulations, and orders of the Secretary of Labor as set forth by Executive Order 13496 of January 30, 2009 during the term of this Agreement.

U. <u>Service Contract Act (SCA) Requirements.</u> CARRIER shall comply with the wage, fringe benefit, record-keeping and all other requirements of the SCA (as amended, 41 U.S.C. 6701 et. seq.) for personnel who qualify as "service employees" under the SCA and provide services under this Agreement involving transportation services relating to cargo shipped under U.S. government service contracts.

V. <u>General Provisions and Interpretation.</u>
    i.   Where applicable, all references to local laws, statutes and regulations and standards in the Agreement and the Appendices include the applicable Federal, Provincial, Territorial, Municipal and local laws, statutes, regulations and standards in force in Canada and/or Mexico, as applicable, from time to time.
    ii.   Where reference is made to government officials or regulators in the Agreement, such references shall include the equivalent Canadian and/or Mexican counterpart, as applicable.
    iii.   References to laws, statutes, regulations and standards mean such laws, statutes, regulation and standards as they may be amended, supplemented and replaced from time to time.
    iv.   The term <u>*"including"*</u> shall mean including without limitation, regardless of whether such words are used in some contexts but not others.

W. Foreign Corrupt Practices Act. CARRIER agrees to comply with the U.S. Foreign Corrupt Practices Act ("FCPA") and all other applicable anti-corruption/bribery laws in effect in connection with the performance of this Agreement. CARRIER agrees that during its performance of this Agreement, it will not, directly or by means of an intermediary, offer, promise to pay, or pay, any money or anything else of value to any government officer (or candidate to a public position), officers of international organizations, or a political party or official entity, with the purpose of influencing an official decision, inducing the officer to act or omit any act or guarantee an unlawful advantage. CARRIER represents and warrants that neither it, none of its employees or officers is a government official, officer of a political party or a candidate of a political party; and no government official or officer of a government agency or entity is or will be associated with or has or will have an interest in the Agreement or the payments made by BROKER pursuant with this Agreements as a result of any act or omission by CARRIER. CARRIER agrees to promptly provide documentation as reasonably requested by BROKER to verify the foregoing. CARRIER represents and warrants that that it is familiar with all applicable anticorruption laws, including the FCPA, and all anticorruption laws in effect in the countries in which CARRIER performs or will perform its business. CARRIER shall require that any other carriers utilized by CARRIER to perform its obligations (to the extent permitted herein), including, without limitation, carriers contracted by CARRIER to transport shipments within Mexico, agree in writing to requirements no less restrictive than those set forth above, and shall be responsible for any noncompliance of such requirements. Any breach to the above mentioned obligations will constitute a material breach of the Agreement and will entitle BROKER to exercise all legal rights that may be available. Such breach will also entitle BROKER to a refund of the amounts paid to CARRIER for such shipment.

IN WITNESS WHEREOF, we have signed this Agreement the date and year first shown above.


Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:07:57 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

---

AGREEMENT                                                                    [ Print Agreement ]

Agreement ID                                                     662042

Agreement Date                                                  Wednesday, June 24, 2015

Agreed?                                                              Yes

Agreement

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:08:29 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

APPENDIX A
BROKER - CARRIER AGREEMENT

The rates and charges to be assessed for transportation performed pursuant to this BROKER - CARRIER Agreement, unless OTHERWISE specified in a Load Confirmation Agreement or other specific writing as provided in Section 8 and Appendix C "Governing Rules" of this BROKER - CARRIER Agreement shall be as follows:

The rates and charges listed below shall be applicable on interstate and foreign shipments on freight of all kinds except household goods between points in the United States (except Alaska & Hawaii).

1) The rate shall be computed on the basis of $1.00 per loaded mile, including fuel surcharge.
2) The rate shall include a single pickup and single delivery.
3) Additional pickups and/or deliveries shall be charged at $50.00 per each additional stop.
4) The mileage shall be determined and governed by the Mileage Guide then in use by BROKER, supplements thereto and reissues thereof. The applicable Guide shall be identified upon request of CARRIER.

**NOTE: The above charges shall only apply in the event that a Load Confirmation Sheet or other written confirmation has not been executed by the Parties with respect to a specific shipment.**

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:08:29 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

---

AGREEMENT                                                                    [ Print Agreement ]

Agreement ID                                                     662043

Agreement Date                                                  Wednesday, June 24, 2015

Agreed?                                                              Yes

Agreement

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:08:54 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

**APPENDIX B**
**LOAD CONFIRMATION SHEET**
**(SAMPLE)**

Appendix B

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:08:54 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

## AGREEMENT

Print Agreement

| | |
|---|---|
| Agreement ID | 662045 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | Yes |
| Agreement | |

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:09:15 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

### APPENDIX C
### MILEAGE, ACCESSORIAL, GOVERNING RULES

This Appendix C (the "Appendix") is a supplement to the Broker-Carrier Agreement ("Agreement") by and between Coyote Logistics, LLC ("BROKER") and Mountain Truck Lines("CARRIER"), MC879823 and is made a part thereof.

**1. MILEAGE.** For each freight movement or shipment, the Parties may specify the mileage to apply for the purposes of computing transportation charges if a mileage rate schedule applies. Otherwise, the mileage according to the then current version of PC Miler will apply.

**2. ACCESSORIAL CHARGES.** There shall be no charge for waiting time or demurrage other than as provided in this Section.
A. CARRIER shall allow two (2) hours of free time for loading and after that free time has expired, BROKER shall pay for waiting at the rate of $25.00 per hour, not to exceed a total of $150.00 in a 24 hour period. CARRIER shall allow two (2) hours of free time for unloading and after that free time has expired, BROKER shall pay for waiting at the rate of $25.00 per hour, not to exceed a total of $150.00 in a 24 hour period. In order to be eligible to receive payment for waiting time, CARRIER must first furnish to BROKER written proof of the time of arrival of the subject vehicle for loading/unloading and the time of completion of the loading/unloading on the Bill of Lading for the subject shipment, or other appropriate and acceptable (to BROKER) shipping document. Time spent waiting prior to the time of opening for business of the consignor or consignee, as the case may be, shall not be included in the computation of either free time or waiting time.
B. In order to receive payment for waiting time, CARRIER must also adhere to the Accessorial Governing Rules outlined, herein as Section 3.
C. CARRIER shall not be entitled to any payment for waiting time which was caused due to an Act of God, the public enemy, the authority of law, strikes or act of the CARRIER, or because CARRIER'S driver has run out of hours.
D. Appointments for loading and unloading are to be made at no additional charge.
E. Waiting time incurred on account of CARRIER'S failure to keep its scheduled appointment for pick up or delivery shall not be charged to BROKER or BROKER'S Customers. Loads shall be held for delivery and/or re-delivery at no additional charge.
F. Upon the request of the consignor and/or consignee of any shipment transported by CARRIER pursuant to this Agreement for CARRIER to load and/or unload any such shipment from CARRIER'S vehicle, CARRIER shall provide such loading and/or unloading service, at its own, sole, expense, unless otherwise provided for in a Load Confirmation sheet from BROKER for a specific shipment.

**3. ACCESSORIAL GOVERNING RULES.**
A. Detention.
(i) BROKER will receive two (2) hours of free time at both shipper and consignee. Some of BROKER's Customers require more free time but these situations will be negotiated at the time of booking. Detention must be communicated thirty (30) minutes prior to the expiration of free time to allow BROKER the opportunity to prevent or minimize detention. Failure to adhere to this policy may result in a delay or loss of detention pay. Please email your Account Manager and Accessorial@coyote.com as notification. Include the BROKER load number in the subject field. **(See, EXAMPLE A).**

(ii) Send a follow up email to your Account Rep and the Coyote accessorial email with the departure time and total detention hours (if detention actually occurred). A confirmation email will be sent back with the details of the detention reimbursement. Arrival and departure times MUST be documented on the BOL's. CARRIER is responsible for contacting BROKER, prior to departing a facility, if there are no times, or inaccurate times, notated on the BOL. BROKER is not responsible for paying detention without written notice or documentation. BROKER pays $25/hr after two (2) free hours (Layover Fees may apply after eight (8) hours). Any additional money for a lumper will be added to the notes section of the rate con and a new rate con will be sent. **(See, EXAMPLE B).**

EXAMPLE A    EXAMPLE B

B. Lumper. All lumper charges must be approved at the time of occurrence. Lumper charges without approval will NOT be paid.

(i) Receipts must be submitted to BROKER within 48 hours of occurrence. The lumper receipt must also be attached to invoice.

(ii) If BROKER issues a T-Chek, ComChek, EFS, or a similar advance payment programs for a lumper on the CARRIER'S behalf, and CARRIER cannot provide a lumper receipt, the lumper charges will be removed from CARRIER'S rate.

C. Once email is submitted, you will receive an email confirmation and a new rate confirmation. Additional money for any accessorial will be added to the notes section of the rate-con until BROKER has the lumper receipt or signed BOL with in and out times. Detention and/or lumper fees WILL NOT be reimbursed without lumper receipt or signed BOL with in and out times.

D. BROKER offers free truck stop faxing services for accessorials to all of our carriers via TRANSFLOExpress®. TRANSFLO is available at over 500 truck stops nationwide. For a full listing of all TRANSFLO locations visit http://transfloexpress.com/truckstops.asap. (**See the TRANSFLOExpress® flier in the "Thank You" packet provide upon completion of the contracting process**).

E. All Other Accessorials. Any monetary variations from the original Load Confirmation Sheet must be agreed upon in writing in order to receive compensation. Verbal agreements that differ from the original Load Confirmation Sheet will not be accepted.

**4. ORDER OF PRECEDENCE**. In the event of any conflict between the terms and conditions set forth in this Appendix C and any attachments, if applicable, on the one hand, and, on the other, the terms and conditions of the Agreement, the terms and conditions of this Appendix and any attachments, as the case may be, shall control. Any terms and conditions printed on transportation documents such as bills of lading or delivery receipts shall be no force or effect, and will not change or supersede the terms of this Appendix, the Agreement, and their attachments, and such documents will operate solely as receipts.

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:09:15 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

---

AGREEMENT

Print Agreement

| Agreement ID | 662048 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | Yes |

Agreement

| Carrier ID: | 561422 | | |
| Carrier Name: | Mountain Truck Lines | Agreement Date: | 6/24/2015 1:09:29 PM (Pacific Time) |
| Address: | 109 Jimmy Morris Road | MC Number: | MC879823 |
| City, State & Zip: | Sylva, NC 287798022 | US DOT Number: | 2531608 |
| Contact: | Christopher Broom | Phone: | 828-371-6197 |

APPENDIX F.1
Coyote Advance Program

**Terms of Agreement**

**Fuel Advances:** Coyote Logistics will issue fuel advances up to 50% on load confirmation after receipt of legible signed Bill of Lading in exchange for a 4% fee. Faxed BOL'S are required to receive after hours (**2400 EST – 0600 EST**) Fuel Advances.

**Lumpers:** Coyote Logistics offers direct payments to lumper services on our loads 24/7/365 and does not require that carriers or their drivers pay for these services unless this cost is figured into your line haul rate on the load and noted on your load confirmation. Please contact your carrier representative at Coyote to have these fees paid during regular business hours or after hours at 1-877-6COYOTE option 1.

**Same Day Pay on Invoice:** Coyote Logistics, LLC will issue final payouts to carriers upon receipt of an invoice from booked carrier, all legible signed POD/s, and any accompanying receipts for pallet charges, or lumpers paid by carrier or direct to lumpers by Coyote Logistics in exchange for a 4% fee. **Final Payout by Coyote Advance Program is offered M-F 0600 EST - 2100 EST and not available over the weekend or on observed holidays.**

**Standard Policy**

Coyote Logistics' payment policy stipulates that all carrier invoices be paid within 30 days of receipt of an invoice, all legible signed POD/s and any

accompanying receipts for pallet charges, or lumpers paid by carrier or direct to lumpers by Coyote Logistics. Nonparticipation in the Coyote Advance Program will not affect this policy.

**Factoring Companies**

Coyote Logistics, LLC reserves the right to suspend Coyote Advance Program privileges without notification to any participating carriers upon receipt of a Notice of Assignment from a Factoring Company identifying a UCC filing. This suspension will not be lifted until authorization is received from the Factoring Company allowing Coyote Logistics, LLC the ability to make direct payments to the carrier.

Written authorization to advance payment to carriers with Factoring Companies must be received from Factoring Company on letterhead prior to any Coyote Advance codes being issued.

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ I have reviewed and agree to the above document and I authorize Coyote Logistics, LLC. to issue Coyote Advances and deduct the fees from my Company's invoice. I understand the amount deducted is NOT refundable under any circumstances. I also understand should my Company wish to alter or discontinue eligibility in the Coyote Advance Program, it will be necessary to make any request in writing and fax directly to Coyote Logistics, LLC. at 847-810-4871. Also, by checking this box, I authorize Coyote Logistics, LLC to issue Coyote Advances to any driver for or on behalf of the company set forth above (the "Company").

---

AGREEMENT

|  |  | Print Agreement |
|---|---|---|

| Agreement ID | | 662050 |
|---|---|---|
| Agreement Date | | Wednesday, June 24, 2015 |
| Agreed? | | No |
| Agreement | | |

| **Carrier ID:** | 561422 | | |
|---|---|---|---|
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:10:10 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

<u>APPENDIX F.2</u>
**TWO DAY PAY PROGRAM**

Instructions: If you wish to participate in this optional program, click the link below and download and complete the document. Please send the document to Coyote Logistics, Compliance Department, 960 North Point Parkway, Suite 150, Alpharetta, GA, 30005. Then select the "We wish to participate" check box below.

If you do not wish to participate, leave the check box empty and click "Go To Next Step".

<u>Two Day Pay Form</u>

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☐ We wish to participate in this program, and will download and complete the linked document, and will send the completed document to Coyote directly.

---

AGREEMENT

|  |  | Print Agreement |
|---|---|---|

| Agreement ID | | 662051 |
|---|---|---|
| Agreement Date | | Wednesday, June 24, 2015 |
| Agreed? | | No |
| Agreement | | |

| Carrier ID: | 561422 | | |
|---|---|---|---|
| Carrier Name: | Mountain Truck Lines | Agreement Date: | 6/24/2015 1:10:43 PM (Pacific Time) |
| Address: | 109 Jimmy Morris Road | MC Number: | MC879823 |
| City, State & Zip: | Sylva, NC 287798022 | US DOT Number: | 2531608 |
| Contact: | Christopher Broom | Phone: | 828-371-6197 |

**APPENDIX F.3**
**ACH/DIRECT DEPOSIT PAYMENTS**

Instructions: If you wish to participate in this optional program, click the link below and download and complete the document. Please send the document to Coyote Logistics, Compliance Department, 960 North Point Parkway, Suite 150, Alpharetta, GA, 30005. Then select the "We wish to participate" check box below.

If you do not wish to participate, leave the check box empty and click "Go To Next Step".

ACH/Direct Deposit Payments

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☐ We wish to participate in this program, and will download and complete the linked document, and will send the completed document to Coyote directly.

| OPERATING AREAS | | | | close |
|---|---|---|---|---|
| Description | Code | Group | Group | Group |
| Arkansas | TCSARK | Central South | United States | Truck |
| Kansas | TCSKAN | Central South | United States | Truck |
| Louisiana | TCSLOU | Central South | United States | Truck |
| Oklahoma | TCSOKL | Central South | United States | Truck |
| Texas | TCSTEX | Central South | United States | Truck |
| Alabama | TSEALA | Southeast | United States | Truck |
| Florida | TSEFLO | Southeast | United States | Truck |
| Georgia | TSEGEO | Southeast | United States | Truck |
| Kentucky | TSEKEN | Southeast | United States | Truck |
| Mississippi | TSEMIS | Southeast | United States | Truck |
| North Carolina | TSENCA | Southeast | United States | Truck |
| South Carolina | TSESCA | Southeast | United States | Truck |
| Tennessee | TSETEN | Southeast | United States | Truck |

| PRODUCER INFORMATION | | close |
|---|---|---|
| **Producer Type** | **Auto** | |
| Producer Name | Commercial Insurance Agency | |
| Phone | 828-670-6342 | |
| Fax | 828-670-6343 | |
| Email | emeadowscianc@bellsouth.net | |
| Policy Number | insurance agent has | |
| **Producer Type** | **Cargo** | |
| Producer Name | Commercial Insurance Agency | |
| Phone | 828-670-6342 | |
| Fax | 828-670-6343 | |
| Email | emeadowscianc@bellsouth.net | |
| Policy Number | insurance agent has | |
| **Producer Type** | **General Liability** | |
| Producer Name | Commercial Insurance Agency | |
| Phone | 828-670-6342 | |

| | |
|---|---|
| Fax | 828-670-6343 |
| Email | emeadowscianc@bellsouth.net |
| Policy Number | insurance agent has |

CARRIER PROFILE INFORMATION                                                                                                                                          close

Modes

TL Reefer

Commodities

Agriculture, Food, Household Goods, Manufactured Products

Tractor / Trailer Information

| | |
|---|---|
| Tractors | 1 |
| SCAC Code | |
| Dry Van | 1 |
| Flatbed | 0 |
| Refrigerated | 1 |
| IMDL | 0 |
| Tanker | 0 |
| Bulk | 0 |
| Other | 0 |
| Pad Wraps | 0 |
| Straps | 0 |
| Tri Axle Vans | 0 |
| Heated Vans | 0 |
| Garment Trailers | 0 |
| Super Vans | 0 |
| Walking Floor | 0 |
| Open Top | 0 |
| Straight Trucks | 0 |
| Cargo Van | 0 |
| Hopper | 0 |
| Dump | 0 |
| RGN | 0 |
| Step Decks | 0 |
| Double Drop | 0 |
| 48 Foot Vans | 0 |
| 48 Foot Reefer | 0 |
| 48 Foot Flat Beds | 0 |
| 53 Foot Vans | 0 |
| 53 Foot Reefer | 1 |
| 53 Foot Flat Beds | 0 |

Extended Profile Fields

| | |
|---|---|
| Company Drivers | 2 |
| Teams | 0 |
| Owner Operators | 1 |
| Has Mexico Interchange | No |
| Has Canadian Authority | No |
| Email Carrier | Yes |

Certifications

| | |
|---|---|
| SmartWay | No |

| | |
|---|---|
| C-TPAT | No |
| FAST | No |
| TWIC | No |
| CARB | No |
| HazMat Certification? | No |
| HazMat Cert Expiration Date (carrier reported) | |
| HazMat Verified by RMIS? | No |
| Safety Permit (HM 232) | No |
| Safety Permit Text Agreed? | |

### Other Information

| | |
|---|---|
| Intrastate State | |
| Intrastate Authority ID | |

### Diversity Information

| | |
|---|---|
| M/WBE | N/A |
| SBE/DSBE | N/A |
| Certifying Entity | N/A |

### Pay To Information

| | |
|---|---|
| The Pay To is a Factoring Company | No |

## CONTACTS      close

### ACCOUNTSPAYABLE

Rebekah Broom
Dispatch/Office Manager
mtl.of.nc@gmail.com

Phone:828-507-1604
Fax:
Cell:

### AFTERHOURS

Rebekah Broom
Dispatch/Office Manager
mtl.of.nc@gmail.com

Phone:828-507-1604
Fax:
Cell:

### CLAIMS

Rebekah Broom
Dispatch/Office Manager
mtl.of.nc@gmail.com

Phone:828-507-1604
Fax:
Cell:

### CORPORATE

Christopher Broom
owner
mtl.of.nc@gmail.com

Phone:828-371-6197
Fax: 828-586-2045
Cell: 828-371-6197

### DISPATCH

Rebekah Broom
Dispatch/Office Manager
mtl.of.nc@gmail.com

Phone:828-507-1604
Fax:
Cell:

### SALES

Chris Broom
owner
mtl.of.nc@gmail.com

Phone:828-371-6197
Fax: 828-586-2045
Cell: 828-371-6197

## CARRIER NOTES      close

No notes are on file.

## CERTIFICATE      close

No certificates were found.

## CORRECTIVE ACTION PLAN      close

No corrective action plan on file.

## ADDITIONAL FIELDS      close

| | |
|---|---|
| ACH | Yes |

| ClientContact | Heather Elston. |
| ComData | Yes |
| DrayageService | No |
| GovtApproved | No |
| LiquorLicensed | No |
| ProvidesCanadianService | No |
| TwoDayProgram | Yes |
| UIIA | No |
| WCWaiver | YES |

| REFERENCES | | | close |
|---|---|---|---|
| Company Name | Contact | Phone | Email |
| JTL Brokerage | Don Justus | 828-685-7179 | |

| AFFILIATIONS | close |
|---|---|
| No affiliations on file. | |

5703 Corsa Avenue, 1st floor, Westlake Village, CA, 91362
Copyright © 2015 Registry Monitoring Insurance Services, Inc.
800-400-4924

If you no longer wish to receive these emails, click here for further instructions.

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| COYOTE LOGISTICS, LLC, | |
| Plaintiff, | Court No.: |
| v. | Judge: |
| MOUNTAIN TRUCK LINES INC., | **Jury Trial Demanded** |
| Defendant. | |

## COMPLAINT

NOW COMES the Plaintiff, COYOTE LOGISTICS, LLC ("Plaintiff") by and through its attorneys, ORLEANS CANTY NOVY, LLC, and as and for its Complaint against Defendant, MOUNTAIN TRUCK LINES INC. ("Mountain Truck") states as follows:

## THE PARTIES

1.      At all times relevant, Plaintiff was a Limited Liability Company authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to arrange for the transportation of freight by motor carrier in interstate and foreign commerce with its principal place of business in Chicago, Illinois.

2.      At all times relevant, Mountain Truck, was a North Carolina corporation and federally authorized motor carrier providing transportation services in interstate commerce throughout the United States with its principal place of business in Sylva, North Carolina.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 49 U.S.C. § 14706 as the claim for relief is premised in the liability of a motor carrier transporting freight in interstate commerce and conducts business in this District.

4. Venue is also appropriate in this District because Plaintiff and Mountain Truck entered into a Broker-Carrier Agreement in effect at the time of the incident that requires all legal actions between Plaintiff and Mountain Truck to be brought and maintained in Cook County, Illinois. A true and correct copy of the Broker-Carrier Agreement is attached hereto as Exhibit 1.

## THE INCIDENT AND CARGO CLAIM

5. On or about May 17, 2021, Plaintiff, in its capacity as a freight broker and on behalf of its customer, The Kraft Heinz Company ("Kraft Heinz"), tendered a load of cream cheese to Mountain Truck for transportation in intrastate commerce from Union City, Georgia to Robert, Louisiana with Bill of Lading Number 2068871220.

6. At the time the cargo was tendered to, and received by, Mountain Truck, it was in good order and condition as acknowledged on the Bill of Lading issued for the shipment.

7. Mountain Truck failed to deliver the cargo in good order and condition because the cargo was donated without the authorization of Kraft Heinz.

8. The value of the cargo, as shown on the damage claim issued by Kraft Heinz was $53,201.30.

9. Plaintiff paid $53,201.30 to Kraft Heinz in exchange for an assignment of rights to pursue this claim. *See* Exhibit 1.

## COUNT I- CARMACK AMENDMENT LIABILITY

10. Plaintiff Restates and re-alleges Paragraphs 1-9 as Paragraph 10 as if fully set forth herein.

11. The shipment of the subject cargo involves the transportation of goods by motor carrier in interstate commerce.

2

12.     On or about November 1, 2021, Mountain Truck received and accepted the subject cargo in good order and condition and suitable in every respect for the subject transportation.

13.     Mountain Truck failed to deliver the cargo in good order and condition.

14.     Pursuant to 49 U.S.C. § 14706 (the "Carmack Amendment"), Mountain Truck, the motor carrier, is liable for damages for the loss to the cargo and consequential damages.

15.     Plaintiff demanded, and continues to demand, payment for the cargo loss and consequential damages from Mountain Truck.

16.     To date, Mountain Truck has failed to remit payment to Plaintiff for $53,201.30.

WHEREFORE, Plaintiff, COYOTE LOGISTICS, LLC respectfully requests this Honorable Court enter Judgment in its favor in the amount of $53,201.30 against Defendant, MOUNTAIN TRUCK LINES INC., plus costs, attorneys' fees, and interest, and for any other relief deemed just under the circumstances.

### COUNT II - BREACH OF INDEMNIFICATION AGREEMENT – IN THE ALTERNATIVE

17.     Plaintiff restates and re-alleges Paragraphs 1-9 as Paragraph 17 as if fully set forth herein.

18.     At all times relevant, there was a Broker-Carrier Agreement ("Agreement") entered into between Plaintiff and Mountain Truck. *See* Ex. 2.

19.     At all times relevant, Plaintiff performed all conditions precedent to the Agreement.

20.     The Agreement requires Mountain Truck to defend and indemnify Plaintiff against all claims, including losses or damages to cargo shipped under the Agreement.  *See* Ex. 2 at Paragraph 13.

21.     Plaintiff demanded, and continues to demand, that Mountain Truck indemnify Plaintiff in the amount of $53,201.30.

3

22.     Mountain Truck is in breach of its Agreement with Plaintiff, by failing to indemnify Plaintiff.

WHEREFORE, Plaintiff, COYOTE LOGISTICS, LLC respectfully requests this Honorable Court enter Judgment in its favor in the amount of $53,201.30 against Defendant, MOUNTAIN TRUCKLINES INC., plus costs, attorneys' fees, and interest, and for any other relief deemed just under the circumstances.


Dated this 1st day of February, 2023

Respectfully Submitted,

Plaintiff, COYOTE LOGISTICS, LLC

/s/ *Jason Orleans*_____
One Of Its Attorneys
ORLEANS CANTY NOVY, LLC

Jason Orleans (ARDC #6258048)
Nicky M. Priovolos (ARDC #6321326)
Orleans Canty Novy LLC
65 E. Wacker Place #1220
Chicago, IL 60601
P: (847) 625-8200
F: (847) 625-8262
Service@ocnlaw.com

**COYOTE** ➤

960 North Point Parkway
Suite 150
Alpharetta, GA 30005
www.coyote.com

T  877 626 9683

### *ASSIGNMENT OF CLAIM*

For and in consideration of the payment of $53,201.30 by or on behalf of Coyote Logistics, LLC,
the sufficiency of which is hereby acknowledged, The Kraft Heinz Company upon receipt of said
payment does hereby assign to Coyote Logistics, LLC all rights, title and interest in and claim to
any payment from Mountain Truck Lines Inc. for a shipment of food products shipped from
Atlanta Marketplace at 6710 OAKLEY INDUSTRIAL BLVD Union City, GA 30291 UNITED STATES
on or about 11/1/2021 on Bill of Lading No. 2068871220 and Coyote Claim No. CL24999810
Referred to as the "Claim".

The Kraft Heinz Company warrants that it holds free and good title to said Claim, that it has not
sold, assigned or otherwise alienated said Claim and has not received any payment thereon.
The Kraft Heinz Company agrees to cooperate fully with Coyote Logistics, LLC in the assertion
and collection of said Claim, including but not limited to furnishing whatever documents and
witnesses may reasonably be necessary to prosecute said Claim.  It is specifically understood
that the execution of this Assignment acts as complete release of Coyote Logistics, LLC with
respect to this Claim.

Dated:  10/12/2022          At: 25343 Network Place Chicago, IL 60673 UNITED STATES

The Kraft Heinz Company  (Claimant/Customer/Shipper)

By: _____

Title: _Cargo Claims_____

Signed and Sworn to before me

_____ 20 ____
December 12, 2022
Notary Public

*Alexandra Omiotek*

> ALEXANDRA OMIOTEK
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Jun 1, 2025

Coyote Form AOC-122118

EXHIBIT 1

# Registration Alert: Mountain Truck Lines - MC879823

**rmis@registrymonitoring.com**

Wed 6/24/2015 4:25 PM

RMIS

To: ComplianceTeam <ComplianceTeam@Coyote.com>;

| rmis logo | rmis address, 5703 Corsa Avenue, 1st Floor, Westlake Village, CA 91362 |
|---|---|

**New Registered Carrier Notice**                                                        6/24/2015

| GENERAL | |
|---|---|
| Business Name | **Mountain Truck Lines** |
| MC Number | MC879823 |
| US DOT Number | 2531608 |
| RMIS Carrier ID | 561422 |
| W9 Name: | Mountain Truck Lines |
| Main Address | 109 Jimmy Morris Road |
| | Sylva, NC 287798022 |
| | USA |
| Pay To Name | MOUNTAIN TRUCK LINES |
| Pay To Address | 109 Jimmy Morris Road |
| | Sylva, NC 28779-8022 |
| | USA |
| Pay To Email | |
| The Pay To is a Factoring Company | No |
| Contact | Christopher Broom |
| Title | owner |
| Phone | 828-371-6197 |
| Fax | 828-586-2045 |
| Email | mtl.of.nc@gmail.com |

| CLIENT ATTACHED | | | close |
|---|---|---|---|
| **Is Attached? Yes** | Attached ID | Attached Date | |
| | | 6/24/2015 1:24:22 PM | |

| DOT INFORMATION | | | close |
|---|---|---|---|
| DBA Name: | MOUNTAIN TRUCK LINES | | |
| Legal Name: | CHRISTOPHER DANIEL BROOM | | |
| Address: | 109 JIMMY MORRIS ROAD | | |
| | SYLVA, NC 28779-8022 | | |
| Phone: | 8283716197 | | |
| Mailing Address: | | | |
| | | | |
| Mailing Phone: | | | |
| **Operating Status:** | Operating Status | OOS Date | EXHIBIT 2 |

AUTHORIZED FOR Property

| Authority: | Common Authority | Contract Authority | Broker Authority |
|---|---|---|---|
| | N | A | N |

| Authority Grant Date: | 8/29/2014 | | |
|---|---|---|---|

| Safety Rating: | Rating | Rating Date | Review Type | Review Date |
|---|---|---|---|---|
| | None | | None | None |

**DOT Census Total Truck(s):**  1

**SMS Safety Data**

| Inspection Type | Vehicle | Driver | Total Inspection |
|---|---|---|---|
| Inspection Number | 0 | 1 | 1 |
| Out of Service % | 0 | 0 | |

**BASIC**

| BASICs Overview | Percentile | Roadside Alert | Serious Violation | Basic Alert |
|---|---|---|---|---|
| Unsafe Driving | 0% | N | N | N |
| Hours of Service (HOS) | % | N | N | N |
| Driver Fitness | % | N | N | N |
| Controlled Substances and Alcohol | 0% | N | N | N |
| Vehicle Maintenance | % | N | N | N |

**W9 INFORMATION**      close

| Name (as shown on your income tax return) | Christopher Broom |
|---|---|
| Business Name | Mountain Truck Lines |
| Company Type | Individual/Sole Proprietor or single-member LLC |
| Is Limited Liab? | No |
| Limited Liability Tax Class | |
| Exempt Payee Code | |
| FATCA code | |
| W9 Address | 109 Jimmy Morris Road |
| W9 City | Sylva |
| W9 State | NC |
| W9 Zip | 28779-8022 |
| Contact Name | Christopher Broom |
| EW9 Create Date | 6/24/2015 1:12:20 PM |
| EIN | 47-1568531 |
| TIN Certified | Yes |
| TIN Validation Reason | TIN and Name combination matches IRS records. |
| TIN Checked By | RMIS Automation |
| TIN Check Date | 6/24/2015 1:21:49 PM |

**AGREEMENT INFORMATION**      close

**AGREEMENT**

[ Print Agreement ]

| Agreement ID | | 662041 |
|---|---|---|

| | |
|---|---|
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | Yes |
| Agreement | |

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:07:57 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

## BROKER – CARRIER AGREEMENT
### VERSION 08/01/2015

This Broker-Carrier Agreement (hereinafter "Agreement") is made and entered this 24 day of June, 2015, (the "Effective Date") by and between **COYOTE LOGISTICS, LLC**, a Delaware limited liability company ("BROKER"), and Mountain Truck Lines, a Registered Motor Carrier with its principal office at 109 Jimmy Morris Road Sylva, NC 287798022, ("CARRIER"); collectively referred to as the "Parties".

WHEREAS, BROKER is authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to operate as a Registered Property Broker pursuant to License issued in Number MC-561135-B;

WHEREAS, CARRIER, an independent contractor, is licensed by the FMCSA to operate as a for-hire motor carrier pursuant to authority issued in DOT Number: 2531608; MC Number: MC879823;

WHEREAS the transportation service provided by CARRIER, whether on regulated, unregulated, or intrastate traffic, is intended by the Parties to be contract carriage as defined in 49 U.S.C. § 13102 (4) and § 14101 (b) and the Parties hereto intend that the contractual arrangement be continuous in nature until this Agreement is, by its terms, not renewed or terminated; and

WHEREAS, the parties agree that for all purposes this Agreement is and shall be a contract pursuant to 49 U.S.C. §§ 14101(b). To the extent that any right or remedy provided in this Agreement conflicts, or is otherwise inconsistent with, the rights and remedies provided under the Interstate Commerce Commission Termination Act ("ICCTA") or other laws and regulations, such rights and remedies are hereby waived and the provisions of this Agreement shall prevail to the fullest extent permitted by law. Without limiting the foregoing, the Parties agree that the rights conferred by 49 C.F.R. 371(3)(c) are expressly waived for all purposes.

NOW THEREFORE, for and in consideration of the mutual covenants and undertakings herein, and subject to the terms and conditions hereinafter set forth, the Parties hereto warrant, covenant and agree as follows:

1. **SCOPE OF WORK AND AGREEMENT APPLICABILITY.** BROKER hereby agrees to cause freight to be tendered to CARRIER, and CARRIER agrees to transport such freight, in one or more shipments, and CARRIER hereby agrees to pick up, transport, deliver and provide all such services as BROKER shall request on all freight tendered by BROKER to the extent set forth in a Load Confirmation Sheet (the "Services"). CARRIER specifically warrants and agrees that all freight tendered to it by BROKER pursuant to this Agreement shall only be transported by CARRIER on, in or with equipment owned by CARRIER or leased to CARRIER under a lease having a duration of more than thirty (30) days and operating under CARRIER'S operating authorities. Except to the extent that CARRIER uses the services of "owner/operators" in the course of conducting its regular operations, CARRIER shall not, in any manner, sub-contract, broker or tender to any third party for transportation any freight tendered to CARRIER by BROKER for transportation pursuant to this Agreement. Violation of this article shall be considered a material breach of this Agreement. In addition to other remedies conferred by this Agreement, any violation of this article shall act as a bar to CARRIER'S right to collect any payment for any shipment handled in a manner which violates this article.
2. **APPLICABILITY.** This Agreement shall apply to all shipments in the United States, Canada and/or Mexico, and any shipments within or between any of the foregoing.
3. **AGREEMENT FOR SERVICES; APPENDICES, SCHEDULES, AND EXHIBITS.** CARRIER shall provide all Services as contemplated by and set forth in this Agreement as well as all Services contemplated by and set forth in all appendices, schedules and exhibits ("Incorporated Documents") which are attached and made a part of this Agreement whether such Incorporated Documents were executed at the time that this Agreement was executed or at some later date. All such Incorporated Documents are intended to be supplements to this Agreement and not separate contracts or agreements. In the event of a conflict between the terms of this Agreement and the terms of any Incorporated Document, the terms of the Incorporated Document shall control.
4. **TERM OF AGREEMENT.** The term of this Agreement shall be for a period of one (1) year (the "Initial Term") and shall automatically renew for additional one (1) year periods (each one year period is hereinafter a "Renewal Term") unless written notice of non-renewal is given by either Party at least thirty (30) days prior to the end of the Initial Term or any Renewal Term. This Agreement may be terminated by either Party at any time upon thirty (30) days written notice to the other.
5. **CARRIER WARRANTIES AND REPRESENTATIONS TO BROKER AND ITS CUSTOMERS**
   A. CARRIER warrants and represents that it is in full compliance, and shall continuously maintain full and strict compliance, with all statutes, rules and regulations governing its operations pursuant to this Agreement, including but not limited to adherence to provisions of the Interstate Commerce Act and related laws, rules and regulations of the FMCSA, the Foreign Corrupt Practices Act (as more specifically described in Section 11.V) and all provisions of applicable state and local laws, rules and regulations to the extent they govern CARRIER'S operations. If shipments under this Agreement are tendered in Canada, or for delivery to Canada, CARRIER warrants that it will not accept such shipments unless CARRIER is in full compliance with the laws of Canada.
   B. To the extent that any shipments subject to this Agreement are transported within the State of California, CARRIER warrants that it is in compliance with all California Air Resources Board regulations. Carrier shall be liable to BROKER and SHIPPER for any penalties, or any other liability, imposed on or assumed by BROKER or SHIPPER because of Carrier's use of non-compliant equipment.
   C. CARRIER does not have an "unsatisfactory" or "unfit" safety rating issued by the FMCSA, and will notify BROKER in writing immediately if its

EXHIBIT 2

safety rating is changed to "conditional," "marginal," "unsatisfactory," or "unfit" and shall notify BROKER forthwith of any safety rating changes immediately if CARRIER is assessed an "unsatisfactory" safety rating, or if any equipment is known to be reported as defective or which is not in compliance with applicable laws. In the event CARRIER is issued a "conditional" or "marginal" safety rating, CARRIER shall use commercially reasonable efforts to improve such ratings and shall provide BROKER with a periodic documented action plan of such improvement efforts.

D.  CARRIER will provide, operate and maintain in satisfactory and safe working condition all motor vehicles, trailers and allied equipment necessary to perform transportation services pursuant to this Agreement. CARRIER will provide all necessary and fully qualified drivers, ensure that each driver is suitably trained for operation of vehicles and other equipment, procure all licenses, permits, authorizations and other governmental approvals necessary for the ownership and use of such vehicles, furnish at its sole expense all supplies, fuel, oil, tires, parts, service, maintenance and repair in connection with the use and operation of their vehicles and equipment and that may be required to keep the vehicles and equipment in good repair and mechanical condition, and bear all costs of providing the transportation service.

E.  All vehicles and equipment used for transportation services shall be clean, odor free, dry, leak proof and free of contamination and infestation. No vehicle that transports goods for BROKER under this Agreement will ever have been knowingly used to transport refuse, garbage, trash or solid or liquid waste of any kind whatsoever, whether hazardous or non-hazardous. CARRIER further warrants that all motor vehicle equipment provided by CARRIER for the transportation of food grade products will comply with the requirements of The Sanitary Food Transportation Act, that no freight transported pursuant to this Agreement shall become, or shall be deemed to be adulterated or misbranded within the meaning of the Federal Food Drug and Cosmetic Act, the Federal Meat Inspection Act, or the Federal Poultry Products Inspection Act, as amended and as may be amended in the future, or any other federal, state or local law or regulation of similar kind or content, by reason of being or having been transported in or with motor vehicle equipment provided by CARRIER to transport freight tendered or arranged by BROKER, or as a consequence of any of CARRIER 's activities in furtherance of such transport and that none of the equipment provided for the transportation of food or food grade products has been or will be used for the transportation of any waste of any kind, garbage, hazardous materials or any other commodity that might adulterate or contaminate food, food products, animal feed or cosmetics. No poison, pesticide, rodenticide or other toxic or hazardous commodity shall be transported in the same vehicle and at the same time as any shipment of food, foodstuffs, food products, commodities intended for human or animal consumption as food or food supplements or ingredients or cosmetics. Should CARRIER violate this Section, it shall be liable for all claims occurring as a consequence thereof, without regard to fault or negligence on CARRIER's part and without regard to whether or not any actual contamination to any such shipment occurred, and no salvage or salvage set off shall be allowed. CARRIER will also ensure that, in connection with goods that are specified by BROKER or its customer ("Customer") as requiring temperature, humidity or other climate control, all vehicles provided for transportation of such goods will be suitable for the purpose intended, and shall be operated in compliance with reefer units properly and regularly maintained.

F.  CARRIER shall not perform Services that would require CARRIER or any of its contractors, employees, or others to exceed or violate any applicable laws, rules or regulations. CARRIER, as an independent contractor, has sole and exclusive direction and control over the manner in which CARRIER and its employees, contractors or others perform Services. Such individuals shall be considered employees or representatives of CARRIER only and shall be subject to employment, discharge, discipline and control solely and exclusively by CARRIER, which shall be fully responsible for their acts.

G.  CARRIER'S Handling of Freight:

   i.  CARRIER will transport all shipments tendered pursuant to this Agreement to the specified consignee at the specified destination at the time specified, or, if there is no time specified, then within a reasonable time. BROKER and CARRIER both agree and recognize that time is of the essence of this Agreement and that due to varying geographical origins and destinations together with the need for expeditious transportation, both Parties will commence performance under this Agreement immediately following the oral tender of a shipment to CARRIER by BROKER. It is understood that all shipment handling requirements are those of BROKER'S Customers and that CARRIER will comply with all such requirements.

   ii.  Missed delivery appointments may result in the imposition of fees and penalties by BROKER's Customers, shippers or consignees of shipments for which CARRIER shall be liable.

   iii.  CARRIER is responsible at the time of loading for probing any product designated as requiring temperature controls in transit and writing the temperature on the Bill of Lading or shipping receipt. The temperature of the product is a material condition of this Agreement. If the product temperature is more than two (2) degrees different from the required temperature stated on the tender documents, then the CARRIER shall refuse the shipment and immediately contact BROKER.

H.  CARRIER hereby assigns to BROKER any and all rights held by CARRIER to bill any party to the Bill of Lading contract, and shall bill only BROKER for the Services herein. CARRIER agrees that BROKER'S Customers are intended to be third party beneficiaries of this Agreement. CARRIER will not communicate, directly or indirectly, in any manner, with BROKER'S Customers, consignors, consignees or any party other than BROKER concerning the collection of any charges relating to transportation services accrued or accruing in connection with or as a consequence of this Agreement. CARRIER shall have no lien, and hereby expressly waives its right to any lien of any kind on any cargo, freight or other property of BROKER or any of BROKER'S Customers. It is agreed that BROKER is acting as an independent contractor and not as the agent of any of its Customers.

I.  CARRIER is in full compliance, and shall maintain full and strict compliance during the term of this Agreement, with all applicable federal, state and local laws relating to the transportation of Hazardous Materials, (including, but not limited to, insurance, licensing and training of drivers and cargo security), as defined in 49 C.F.R. part §172 et seq. and part §397 et seq. to the extent that any shipments tendered hereunder constitute Hazardous Materials. CARRIER will be responsible for any handling, clean-up or disposal and will indemnify and hold BROKER harmless from all claims, liabilities, losses, fines, legal fees and other expenses arising out of contact with, exposure to, or release of any Hazardous Materials or any remedial action required under applicable federal, state or local environmental laws, except to the extent any such claims, liabilities, losses, or fines result from BROKER's negligence or willful acts or omissions. When CARRIER is required by U.S. D.O.T. to complete a written report "Hazardous Materials Incident Report" (Form DOT 5800.1 per 49CFR171.15 or 49CFR171.16) detailing an incident involving hazardous materials shipped pursuant to this Agreement, CARRIER must also promptly deliver a copy of the report to BROKER within ten (10) business days of filing the report with USDOT.

J.  The Parties will notify each other immediately if their Federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if either Party is sold, or if there is a change in control of ownership of either Party, and/or any of their insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

K.  CARRIER shall make all arrangements it deems appropriate to provide sufficient, appropriate, personnel and motor vehicle equipment, which shall be dedicated to BROKER'S exclusive use while transporting freight tendered by BROKER, to provide the transportation services contemplated by this agreement. CARRIER shall not comingle any other freight other than that tendered by BROKER on each specific Load

Confirmation Sheet.

L. CARRIER represents and warrants that it has security procedures in place reasonably designed to protect the cargo from loss or damage, and that it will comply with all such procedures.

    i. CARRIER agrees to comply with the following minimum requirements with respect to locking systems and security seals: (a) any padlocks used must have a solid steel shackle (locking bar) with a minimum diameter of 11mm and a steel key housing and (b) any security seal used must be a serialized device, of metal or plastic composition, and must be attached to a trailer door in a manner that will provide evidence of any tampering with the trailer or its contents.

    ii. CARRIER agrees that stored, staged or unattended trailers containing BROKER'S Customer's freight must be secured by means of the following: (a) King Pin lock with padlock meeting the aforementioned padlock standards; (b) Model G Air Lock/Quadralock; (c) TS3 Air Lock; (d) backed with trailer doors secured against a solid wall structure or secure adjacent trailer; and (e) during driver/tractor switching, both drivers must be present.

M. In the event that CARRIER utilizes a trailer, container, chassis or other equipment owned by or leased to BROKER or its Customer, or otherwise provided to CARRIER by BROKER or its Customer ("Trailer(s)") for the performance of the Services contemplated hereunder, CARRIER shall be liable for any damage to Trailers, destruction of Trailers, theft from Trailers, theft of any contents of Trailers, and for any claims for bodily injury (including death) or property damage arising from or related to any accident involving Trailer(s) regardless of whether such damage, injury, destruction, or theft is caused or occurs while the Trailer is attached or unattached to any power unit operated by CARRIER, except to the extent such damage, destruction, or theft is directly and proximately caused by the negligence, recklessness, or willful misconduct of BROKER or the Customer. In no event will any such Trailer be used for any purpose other than performing Services hereunder, and in no event will CARRIER allow any third party or any power unit not operating under CARRIER's for-hire motor carrier authority to operate any such Trailer, unless expressly authorized to do so in writing which written notice must be specific to the movement at issue. CARRIER ACKNOWLEDGES AND AGREES THAT NEITHER BROKER NOR THE CUSTOMER MAKE ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE TRAILER INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR USE.

N. CARRIER acknowledges that BROKER'S Customers may, from time to time, require additional warranties and/or terms ("Additional Terms") in connection with CARRIER'S provision of the Services, and CARRIER agrees that the provision of the Services for such Customers is conditioned on CARRIER'S acceptance of such Additional Terms. CARRIER'S provision of the Services after such Additional Terms are made available to CARRIER in writing shall be deemed acceptance of such Additional Terms.

6. **BILLS OF LADING.** CARRIER will issue and sign a standard, uniform straight Bill of Lading, or other receipt acceptable to BROKER and BROKER'S Customers, upon acceptance of goods for transportation. Bills of Lading may be upon a form prepared and presented by BROKER'S Customers. It is the signing of the Bill of Lading by CARRIER'S driver or other representative that constitutes "execution" of the Bill of Lading, not the preparation of that document. It is agreed that a shipper's and/or consignor's identification of BROKER'S name on a Bill of Lading shall be for the shipper's/consignor's convenience only, and such notation shall not affect or defeat BROKER'S status as a Property Broker or CARRIER'S status as a Motor Carrier. In the event that the terms and conditions of any Bill of Lading executed by CARRIER in connection with a shipment transported pursuant to this Agreement shall conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement shall govern and take precedence; except to the extent the Bill of Lading contains specific instruction directly from the Customer, in which case such instructions shall take precedence.

7. **INSURANCE.** CARRIER shall at all times during the term of this Agreement have and maintain in full force and effect, Public Liability, Property Damage, Cargo, and Workers' Compensation, Employment Liability and/or Occupational Accident Insurance with reliable insurance companies acceptable to BROKER, and in no event less than the following amounts:

A. Comprehensive Automobile Liability Insurance. Comprehensive Automobile Liability Insurance shall be with a combined single limit of not less than $1,000,000.00, each accident; provided that $5,000,000.00, each accident, is required if transporting hazardous materials, including a Broadened Coverage for Covered Autos (CA 99 48 03 06) endorsement for environmental damages due to release or discharge of hazardous substances.

B. Comprehensive General Liability Insurance. Comprehensive General Liability Insurance shall be in amounts of not less than $1,000,000.00 per occurrence; $2,000,000.00 in the aggregate.

C. Workers' Compensation, Employer's Liability and/or Occupational Accident Insurance.

    i. Protection under all applicable Workers' Compensation Laws at limits required by law; or

    ii. Employer's liability insurance or Occupational Accident Insurance if Worker's Compensation is not required by statute.

D. Cargo Insurance. A non-schedule vehicle Cargo Insurance policy with per shipment minimum of $100,000.00 unless higher limits are specified, together with:

    i. Employee Infidelity. CARRIER'S cargo insurance policies shall not exclude coverage for infidelity, fraud, dishonesty or criminal acts of CARRIER'S employees, officers or directors.

E. Additional Insured. BROKER shall be named as an "Additional Insured" on CARRIER'S Comprehensive Automobile Liability insurance and Cargo insurance policies, and said policies shall provide that:

    i. BROKER shall not be obligated to pay premiums for any such insurance

    ii. Such insurance shall be applicable separately to each insured and shall cover claims, suits, actions or proceedings by each insured against any other insured.

F. Certificates of Insurance.

    i. In lieu of being named as an additional insured, BROKER may agree and CARRIER shall provide certificates of insurance evidencing the insurance coverage required under this Agreement. The certificates of insurance shall contain a clause providing that the insurer will not cancel or change coverage of the insurance without first providing BROKER thirty (30) days' prior written notice.

    ii. The certificate of coverage for the cargo liability insurance policy must evidence without sub-limits coverage for theft, fire, hijacking, unattended vehicles, hazardous materials, consumer electronics, new garments, footwear, computer and computer components and mechanical breakdown of a refrigeration unit subject to the above stated limits and with a deductible of no greater than ten thousand dollars ($10,000.00) per occurrence. All certificates of coverage must be provided to BROKER prior to CARRIER providing Services.

G. All insurance must be procured from insurance carriers with a rating of at least A – VII (A MINUS) in the most recent edition of the A.M. Best Key Rating Guide (Property/Casualty) or its equivalent.

H. Insurance Policy Copies. Upon reasonable request of BROKER, CARRIER shall deliver to BROKER full and complete copies of its insurance policies required under this Agreement.

I. Self-Insurance. If CARRIER is self-insured, it shall provide evidence of such, including proof of acceptance of self-insurance status by the FMCSA or other governing agency.

   J.   <u>No Representation as to Adequacy.</u> It is expressly understood that BROKER does not represent that the types or minimum limits of the insurance set forth herein are adequate to protect the CARRIER'S interests, and do not otherwise constitute limits of liability. Deductible amounts under the foregoing policies shall be supplied by CARRIER.

   K.   <u>Carrier's Insurance is Primary; No Subrogation.</u> CARRIER'S insurance shall be primary and applicable separately with respect to all insured and CARRIER'S insurer shall be required to respond and to pay prior to other available coverage. CARRIER agrees that CARRIER, CARRIER'S insurer(s), and anyone claiming by, through or under CARRIER shall have no claim, right of action or right of subrogation against BROKER or its Customer(s) based on any loss or liability insured under the insurance required under this Section 7. The failure of CARRIER to secure an appropriate clause in or endorsement to its respective insurance coverage, which waives the right of subrogation as provided for in this Section 7.K, shall not in any manner affect the intended waiver and release and, if CARRIER'S insurance company seeks subrogation against BROKER because of the absence of such a waiver and release, CARRIER shall defend, indemnify and hold BROKER harmless from and against such subrogation claim.

8.   **COMPENSATION AND PAYMENT.**

   A.   <u>Rate Agreement.</u> With respect to all shipments tendered to CARRIER pursuant to this Agreement, compensation shall be paid to CARRIER solely and exclusively by BROKER, in the amounts set forth in Appendix A, attached hereto and made a part hereof; provided, however, that the Parties hereto may at any time agree, in writing, or orally, and subsequently confirmed by both Parties in writing, on a form incorporating all of the information of and similar in format to Appendix B ("Load Confirmation Sheet"), attached hereto and made a part hereof, or such other form as the Parties may agree upon, to change such compensation for any specific shipment or shipments. Such confirmation may be accomplished through the exchange of supplements to this Agreement executed by the Parties in counterparts being exchanged by fax, Telecopy, electronic acceptance by CARRIER of the Load Confirmation Sheet transmitted by BROKER or other electronic means agreed to by the Parties and acknowledged in a written supplement to this Agreement. Such Load Confirmation Sheets are supplements to this Agreement, not separate contracts or agreements, and unless CARRIER objects to the terms and rates of an individual Load Confirmation within twenty-four (24) hours after receipt and prior to the pickup of the shipment(s) of freight set forth thereon, CARRIER shall be deemed to have agreed that the terms are fully and correctly stated. All such Confirmations shall become incorporated as addenda to this Agreement, and BROKER and CARRIER agree to retain all such addenda for three (3) years. If BROKER and CARRIER fail to agree to a negotiated rate for a shipment transported by CARRIER as described above, the rate paid by BROKER to CARRIER for the shipment(s) pursuant to this Agreement shall be the amounts set forth in Appendix A, attached hereto and made a part hereof. CARRIER, from time to time, may request that BROKER make early payment of freight charges in exchange for a discount of the agreed rates, which separate agreement ("Coyote Advance Program," "Two Day Pay," or "ACH/Direct Deposit" ) may be attached to and become part of this Agreement as Appendix F. If the CARRIER agrees to any early payment program contained in Appendix F.1-3, respectively, the discounted payment shall become the negotiated rate.

   B.   <u>Mileage and Accessorial Charges.</u> Mileage and accessorial charges applicable to the Services provided or to be provided pursuant to this Agreement shall be as set forth in an appendix to this Agreement (Appendix C, the "Governing Rules"). CARRIER agrees, represents and warrants that, other than the rates and charges set forth in this Agreement and any Appendix hereto; there are no other rates, charges or surcharges, including, without limitation, any taxes, applicable to the Services provided or to be provided pursuant to this Agreement.

   C.   <u>Fuel Surcharge.</u> Unless a separate and distinct fuel surcharge is specifically agreed to by BROKER, in writing, the quoted rate of CARRIER includes any and all fuel surcharges or adjustments.

   D.   <u>Payment/Procedure.</u>

      i.   CARRIER shall invoice BROKER in BROKER'S name and deliver all such invoices to BROKER promptly following delivery of freight. CARRIER shall submit to BROKER all shipping documents within fifteen (15) days after delivery of each shipment transported pursuant to this Agreement and BROKER shall pay CARRIER for each shipment tendered pursuant to this Agreement the agreed compensation within thirty (30) days after receipt by BROKER of (a) if applicable, a written Load Confirmation Sheet, duly signed by CARRIER, acknowledging a change in compensation for any specific shipment or shipments; and (b) CARRIER'S freight bill with attached original Bill of Lading (or a readable copy thereof), without exception or notation, signed by the consignee at point of delivery as proof of delivery of the shipment, on time, on schedule and in good order and condition. CARRIER compensation to be paid under this Agreement may be withheld by BROKER, in whole or in part, to satisfy claims for loss, damage or delay to shipments transported by CARRIER pursuant to this Agreement. Only if no Bill of Lading was provided at point of origin will a written and signed delivery receipt be acceptable as a substitute. The foregoing is a condition of payment.

      ii.   CARRIER shall provide proof of delivery to BROKER within twenty-four (24) hours of delivery or request.

      iii.   Invoices which are received by BROKER more than one hundred twenty (120) days after Services are performed will not be accepted for payment. Inquiries or claims for non-payment received by BROKER more than one hundred twenty (120) days after such invoices are due and payable will not be investigated, researched or paid.

      iv.   BROKER shall not be required to pay CARRIER any penalties or interest for late payments due hereunder or otherwise, nor shall BROKER be required to forfeit any applicable discounts for any reason whatsoever.

9.   <u>**LIABILITY FOR LOSS, DAMAGE OR DELAY.**</u>

   A.   <u>Common Carrier Liability.</u> BROKER and BROKER'S Customers specifically reserve all rights and remedies conferred by 49 U.S.C. § 14706, and this Agreement is subject to and governed by said statute. Except as otherwise specifically provided in this Agreement, CARRIER agrees that in the transportation of all goods hereunder, it assumes the same liability as that of a common CARRIER for full actual loss, subject to the provisions of 49 U.S.C. § 14706, ("Carmack Amendment") and 49 CFR Part 370 (claim regulations). CARRIER agrees to contact (at time of loss, damage or shortage occurrence, and no more than three (3) hours thereafter) BROKER regarding any exceptions (over, short, damaged, or refused) on any loads transported by CARRIER. CARRIER shall be responsible to pay BROKER for any loss or damage claims BROKER may incur or pay to its customers on account of any transportation services performed by CARRIER, for BROKER. If occurrence happens during a weekend or after hours, BROKER should be notified no later than next business morning.

   B.   <u>Seal Integrity.</u> CARRIER agrees to maintain a continuous seal record during the time the trailer is in the custody and control of CARRIER. CARRIER agrees to have the seal verified and the seal number and condition of the seal noted on the bills of lading and/or delivery receipt. CARRIER also agrees to notify BROKER immediately (at time of first discovery) if the seal integrity is broken.

In the event a shipment that was sealed at origin arrives at the destination with a tampered seal or without the seal intact then;

      i.   the CARRIER shall be liable for any shortage or damage claims with respect to such shipment and

      ii.   the shipper shall have the right, in its sole discretion, to deem the entire shipment damaged, contaminated and unsalvageable, without the need for any inspection, in order to protect its brands and prevent potentially contaminated goods from entering into the

stream of commerce, regardless of any actual condition of the shipment which an inspection might have revealed, in which case, the shipment shall be considered totally damaged and worthless for all purposes and the CARRIER shall be liable for the full value of the shipment. To the extent that this paragraph might conflict with 49 U.S.C. § 14706, this paragraph shall take precedence and said statute is considered waived.

C. <u>Concealed Damage Claims.</u> Claims based on a concealed loss or damage reported to CARRIER within two (2) business days of the date of delivery shall be treated by CARRIER as though an exception notation had been made on the delivery receipt at the time of delivery.

D. <u>Damaged or Rejected Shipments.</u> CARRIER shall not dispose of damaged or rejected product without the prior written consent of BROKER or its Customer. BROKER or its Customer may determine within their sole discretion whether the goods may be salvaged, and if salvageable, the value of such salvage.

E. <u>Shipper Load and Count.</u> CARRIER shall not be liable for loss or damage on truckload shipments if trailer is loaded and sealed by Shipper/Customer and CARRIER has no opportunity to inspect or count contents of trailer, the trailer is delivered with original seal(s) intact, and there is no evidence indicating that the contents of the trailer were compromised while the trailer was in the CARRIER'S possession. However, in such event, prior to signing the Bill of Lading accepting the shipment, CARRIER'S personnel shall note on the Bill of Lading that they were not allowed or afforded an opportunity to view and/or examine the goods shipped. Failure of CARRIER to make such a notation shall create a rebuttable presumption that the goods were received by CARRIER in the correct quantity and in good condition.

F. <u>Replacement Shipments.</u> CARRIER acknowledges that BROKER may utilize other carriers to facilitate the movement of delayed shipments, or to ship replacement goods. If CARRIER fails to arrange to make timely delivery of any shipment, CARRIER shall be liable to BROKER and its Customers for all reasonable and necessary costs, charges, fees and expenses reasonably resulting from such delay.

G. <u>Return of Damaged or Rejected Shipments.</u> To the extent caused by CARRIER, CARRIER shall return all damaged or rejected product at its expense to the point of origin or, with BROKER'S direction, to other points as instructed by BROKER.

H. <u>Time Limits; Claims for Loss or Damage.</u> Notwithstanding the terms of 49 CFR 370.9, CARRIER shall pay, decline or make settlement offer in writing on all cargo loss or damage claims within ninety (90) days of receipt of the claim. Failure of CARRIER to pay, decline or offer settlement within this ninety (90) days day period shall be deemed an admission by CARRIER of full liability for the amount. The time limit within which BROKER must file a claim against CARRIER shall be nine (9) months from the date of delivery or within nine (9) months of a reasonable time for delivery if a complete loss. Disallowances shall state a lawful reason for declining to accept responsibility for the claim, and shall be stated by the CARRIER, not its insurer.

I. <u>Offset:</u> BROKER may withhold as setoff any payment due to CARRIER pursuant to this Agreement, in whole or in part, to: satisfy advances made to or on behalf of CARRIER, to satisfy any debt owed to BROKER by CARRIER, or to satisfy any cargo damage claim which CARRIER has not paid or denied for a legally valid cause or reason within ninety (90) days of presentation of the claim. Such setoff is to be made in the sole discretion of BROKER.

J. <u>Time Limits; Suits for Loss or Damage.</u> The time limit within which BROKER must institute suit against CARRIER to recover on a claim shall be two (2) years and a day from the date BROKER receives a written disallowance from CARRIER.

K. <u>Suits: Expenses and Attorneys' Fees .</u> If BROKER is successful in recovering a claim against CARRIER in a court of law or arbitration proceeding, BROKER shall be entitled to recover all of its expenses incurred in collecting its claim, including reasonable attorneys' fees, costs and interest at the legal rate from the date of delivery or scheduled delivery of the shipment.

L. <u>Limitation of Liability.</u> EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR LOSS OF PROFITS OR PROSPECTIVE PROFITS (COLLECTIVELY, "DISCLAIMED DAMAGES"), WHETHER ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF BREACH OF THIS AGREEMENT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE) OR OTHERWISE.

M. <u>Survival of Provisions.</u> The provisions of this Section shall survive cancellation, termination, or expiration of this Agreement.

10. <u>INDEMNITY.</u> CARRIER agrees to be responsible for, and to defend, indemnify and hold BROKER together with its customers, agents, servants, insurers and reinsurers, successors and assigns, and each of them, jointly and severally, harmless of and from any and all claims, liabilities, demands, actions and causes of action, suits at law and proceedings in equity, without limitation, of any nature, howsoever arising, including, but not limited to, all losses, damages (including, but not limited to: consequential, speculative, direct, indirect and punitive damages), personal injury, death, and/or loss or damage to cargo or other property, and/or claim for any such loss or occurrence, which may arise from or in connection with the operations performed or to be performed pursuant to this Agreement, without regard to fault or negligence on the part of CARRIER, including, but not limited to the following:

A. Any and all liability, claims, demands or expenses, including attorney's fees or other professional fees, directly or indirectly arising out of or related to the Services provided pursuant to this Agreement, or otherwise arising or growing out of the operations and activities of CARRIER hereunder, as a CARRIER or otherwise, initiated or advanced by any person;

B. Any liability, claims, demands or expenses (including attorney's and other professional fees) for damage to property of BROKER, its Customers or third parties, or personal injuries (including death) to BROKER or BROKER'S Customers' officers, directors, agents or employees or any other person, arising from or in conjunction with the CARRIER'S performance of Services pursuant to this Agreement;

C. Any and all claims made against BROKER, its agents, officers, directors or employees or BROKER'S Customers, agents or employees by or on behalf of CARRIER'S employees, for salary or other compensation or payments resulting or claimed to have resulted, in whole or in part, from CARRIER'S Services;

D. Any and all penalties or fines of any character which may be sought or enforced against BROKER or its Customers by reason of an alleged violation by CARRIER, of any federal, state, provincial, or local law, rule or regulation; and

E. Any and all claims, demands, and suits by other carriers or intermediaries against BROKER or its Customers seeking payment for transportation charges on shipments tendered to CARRIER.

F. The indemnifications contained in this Section 10 shall NOT have application in instances when the claim, demand, liability or expense results directly from the sole negligence of BROKER.

G. The provisions of this Section shall survive cancellation, termination, or expiration of this Agreement.

11. <u>MISCELLANEOUS.</u>

A. <u>Independent Contractor.</u> It is understood and agreed that the relationship between BROKER and CARRIER is solely that of independent contractor and not as an agent, joint venturer, owner-operator or employee and that no employer/employee relationship exists, or is intended. CARRIER shall provide services to BROKER as an independent contractor, not as an agent, joint venturer or employee. BROKER has no control of any kind over CARRIER, including but not limited to routing of freight, instruction to drivers, expenses, advances, equipment, confirmation, load securement, and driver location and nothing contained herein or on the website of BROKER shall be construed to be inconsistent with this provision. BROKER is not and will not be responsible for any debts, liabilities or obligations incurred by CARRIER in the

performance of its business. CARRIER assumes full responsibility for all commissions, salaries, insurance, taxes, pensions and benefits of CARRIER'S agents, contractors, sub-contractors and/or employees in connection with CARRIER'S performance pursuant to this Agreement.

B. <u>Non-Exclusive Agreement.</u> CARRIER and BROKER acknowledge and agree that this Agreement does not bind the respective Parties to exclusive Services to each other. Either Party may enter into similar agreements with other carriers, brokers, or freight forwarders.

C. <u>Waiver of Provisions.</u> Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.

D. <u>Carrier's Option to Assign its Accounts Receivables.</u> CARRIER may assign its accounts receivables under this Agreement to a third party. In order to so do however, CARRIER must:

     i. Notify BROKER in writing a minimum of thirty (30) days in advance of any change in the CARRIER'S direction for payment, including without limitation any assignment of CARRIER'S right to payments earned or to be earned under this Agreement. Notice of any such assignment by CARRIER must include a self-addressed, stamped, return acknowledgement for BROKER to execute and return. Notices to BROKER shall be sent to:

     Coyote Logistics, LLC
     960 North Point Parkway, Suite 150
     Alpharetta, GA 30005

     ii. Inform any assignee of the terms of this Agreement, including these terms regarding notice requirements.

     iii. CARRIER acknowledges and agrees that any change in CARRIER'S directions for payment or notice of assignment sent to any BROKER employee or location other than as set forth in Section 11.D.(i) is inadequate and defective. During the transition period from one set of CARRIER'S payment directions to another, CARRIER agrees that payments inadvertently made by BROKER in accordance with earlier payment directions shall constitute full satisfaction of BROKER'S payment obligations under this Agreement. CARRIER further agrees that in such event it is the responsibility of the CARRIER to forward, or cause to be forwarded, the payment to the correct party. CARRIER shall indemnify, defend and hold harmless BROKER from and against all liability, loss, damages, claims, suits or expenses, including without limitation reasonable attorney fees, caused by or arising from any failure on the part of the CARRIER or any assignee to comply with the terms of this Section. In no event shall BROKER'S right or ability to offset any claims which it may have against CARRIER pursuant to this Agreement against any monies otherwise owing to the CARRIER be limited or negatively affected, in any manner by the assignment, factoring, or other transfer of CARRIER'S right to receive payments referred hereinabove. All such factoring or assignment shall be subject to and not impair BROKER'S right of set off. Deduction of trip advances from payment for freight charges for a specific shipment shall not be modified or affected by any factoring or assignment of receivables by CARRIER.

E. <u>No Back Solicitation/Transportation.</u>

     i. CARRIER shall not knowingly solicit any shipper or payor of freight and transport or arrange for the transportation of such freight directly for such shipper or payor of freight who first was introduced by BROKER to CARRIER. This restrictive covenant relates only to the type traffic and in traffic lanes or territories served by CARRIER on behalf of BROKER and relates only to Customers of BROKER with whom CARRIER had substantial business contact during the 12 months immediately preceding termination of this Agreement. The term of the prohibited solicitation and transportation shall be during the term of this Agreement and for one (1) year thereafter.

     ii. In the event of breach of this provision, BROKER shall be entitled, for a period of 6 months following delivery of the last shipment transported by CARRIER under this Agreement, to liquidated damages equal to fifteen percent (15%) of the gross transportation revenue (as evidenced by freight bills) received by CARRIER for the transportation of said freight. Additionally, BROKER may seek injunctive relief and in the event it is successful, CARRIER shall be liable for all costs and expenses incurred by BROKER, including, but not limited to, reasonable attorney's fees.

F. <u>Confidentiality.</u>

     i. In addition to Confidential Information protected by law, statutory or otherwise, CARRIER agrees that all business, technical and financial information of BROKER and that of its Customers obtained by CARRIER, including but not limited to, freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent of BROKER.

     ii. In the event of violation of this Confidentiality Section, CARRIER agrees that the remedy at law, including monetary damages, may be inadequate and that BROKER shall be entitled, in addition to any other remedy it may have, to an injunction restraining CARRIER from further violation of this Agreement, in which case the prevailing Party shall be liable for all costs and expenses incurred, including, but not limited to, reasonable attorney's fees.

G. <u>Country of Origin.</u> The limitations of liability for cargo loss and damage as well as other liabilities, arising out of the transportation of shipments, which originate outside the United States of America, may be subject to the laws of the country of origination.

H. <u>Modification of Agreement.</u> This Agreement and any attachments hereto shall not be modified, except by mutual written agreement.

I. <u>Notices.</u>

     i. All notices provided or required by this Agreement, shall be made in writing and delivered, return receipt requested, to the person or persons and at the addresses shown herein with postage prepaid; or by confirmed (electronically acknowledged on paper) fax.

     ii. The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of the Parties performance of this Agreement.

     iii. Notices sent as required hereunder, to the addresses shown in this Agreement shall be deemed sent to the correct address, unless the Parties are notified in writing of any changes in address.

J. <u>Severance/Survival.</u> In the event any of the terms of this Agreement are determined to be invalid or unenforceable, no other terms shall be affected and the unaffected terms shall remain valid and enforceable as written. The representations, rights and obligations of the Parties hereunder shall survive termination of this Agreement for any reason.

K. <u>Counterparts and Electronic Signature.</u> This Agreement may be executed in any number of counterparts, each of which shall be deemed a duplicate original, but all of which together shall constitute one and the same Agreement. The counterparts of this Agreement and all ancillary documents (appendix, schedule or exhibit) may be executed and delivered by facsimile or other electronic signature by any of the parties to any other party and the receiving party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

L. <u>Entire Agreement.</u> This Agreement, together with any Incorporated Documents which are a part hereof, contains the entire understanding of

the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence such as a Bill of Lading, CARRIER'S tariff, web site, or otherwise may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement. BROKER may, from time to time modify or amend the terms or conditions of this Agreement by means of a written amendment which it shall promptly mail or otherwise transmit to CARRIER. Said modification or amendment shall become effective three (3) days after transmission by BROKER. CARRIER'S continued acceptance of freight tendered by BROKER or BROKER's Customers thereafter shall constitute acceptance by CARRIER of such modification or amendment to this Agreement. Amendments or modification to this Agreement shall be in writing and, except as otherwise provided for in this Section, must be signed by a duly authorized representative of each Party hereto.

M. Right to Review with Counsel. CARRIER warrants and represents that it fully understands its right to review all aspects of this Agreement with an attorney of its choice, that CARRIER has had the opportunity to consult with an attorney of its choice, that CARRIER has carefully read and fully understands all the provisions of this Agreement and that CARRIER is freely, knowingly, and voluntarily entering in this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived. Further, the Parties warrant that the individuals executing this Agreement on their behalf are authorized to do so.

N. Governing Law-Venue. Any legal action arising under or pursuant to this Agreement shall be brought and maintained only in the courts of Cook County, Illinois or Fulton County, Georgia at the discretion of either party and shall be governed by and construed in accordance with the laws of the State of Illinois without regard to choice of law provisions.

O. Force Majeure. The performance of either or both Parties hereto shall be excused and abated if such is prevented or substantially impeded by any Act of God, the public enemy, the authority of law, natural disaster or other like event, for the duration of such event. The Party who is unable to perform because of such event shall give the other notice of same within twenty-four 24 hours of the occurrence of such event or its performance hereunder will not be excused.

P. Enforcement/Attorney's Fees. In the event either Party incurs attorney's fees, costs or expenses in enforcing any of the provisions of this Agreement, or in exercising any right or remedy arising out of any breach of this Agreement by the other Party, the prevailing Party shall be entitled to an award of attorney's fees, costs and expenses against the defaulting Party.

Q. Assignment. Neither party shall assign this Agreement or its rights or obligations hereunder without the other party's prior written consent. Subject to the foregoing limitations, this Agreement shall be binding on the Parties' respective successors and assigns.

R. Currency. All amounts shall be in United States Dollars.

S. Equal Opportunity. In the performance of Service pursuant to this Agreement, the Parties hereto shall comply with the equal opportunity provisions as set forth in Federal Acquisition Regulation (FAR) § 52.222-26.

T. Compliance with Executive Order 13496 of January 30, 2009. CARRIER agrees to comply with all provisions and related rules, regulations, and orders of the Secretary of Labor as set forth by Executive Order 13496 of January 30, 2009 during the term of this Agreement.

U. Service Contract Act (SCA) Requirements. CARRIER shall comply with the wage, fringe benefit, record-keeping and all other requirements of the SCA (as amended, 41 U.S.C. 6701 et. seq.) for personnel who qualify as "service employees" under the SCA and provide services under this Agreement involving transportation services relating to cargo shipped under U.S. government service contracts.

V. General Provisions and Interpretation.

    i. Where applicable, all references to local laws, statutes and regulations and standards in the Agreement and the Appendices include the applicable Federal, Provincial, Territorial, Municipal and local laws, statutes, regulations and standards in force in Canada and/or Mexico, as applicable, from time to time.

    ii. Where reference is made to government officials or regulators in the Agreement, such references shall include the equivalent Canadian and/or Mexican counterpart, as applicable.

    iii. References to laws, statutes, regulations and standards mean such laws, statutes, regulation and standards as they may be amended, supplemented and replaced from time to time.

    iv. The term "including" shall mean including without limitation, regardless of whether such words are used in some contexts but not others.

W. Foreign Corrupt Practices Act. CARRIER agrees to comply with the U.S. Foreign Corrupt Practices Act ("FCPA") and all other applicable anti-corruption/bribery laws in effect in connection with the performance of this Agreement. CARRIER agrees that during its performance of this Agreement, it will not, directly or by means of an intermediary, offer, promise to pay, or pay, any money or anything else of value to any government officer (or candidate to a public position), officers of international organizations, or a political party or official entity, with the purpose of influencing an official decision, inducing the officer to act or omit any act or guarantee an unlawful advantage. CARRIER represents and warrants that neither it, none of its employees or officers is a government official, officer of a political party or a candidate of a political party; and no government official or officer of a government agency or entity is or will be associated with or has or will have an interest in the Agreement or the payments made by BROKER pursuant with this Agreements as a result of any act or omission by CARRIER. CARRIER agrees to promptly provide documentation as reasonably requested by BROKER to verify the foregoing. CARRIER represents and warrants that that it is familiar with all applicable anticorruption laws, including the FCPA, and all anticorruption laws in effect in the countries in which CARRIER performs or will perform its business. CARRIER shall require that any other carriers utilized by CARRIER to perform its obligations (to the extent permitted herein), including, without limitation, carriers contracted by CARRIER to transport shipments within Mexico, agree in writing to requirements no less restrictive than those set forth above, and shall be responsible for any noncompliance of such requirements. Any breach to the above mentioned obligations will constitute a material breach of the Agreement and will entitle BROKER to exercise all legal rights that may be available. Such breach will also entitle BROKER to a refund of the amounts paid to CARRIER for such shipment.

IN WITNESS WHEREOF, we have signed this Agreement the date and year first shown above.


Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:07:57 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

---

AGREEMENT                  [ Print Agreement ]

| | |
|---|---|
| Agreement ID | 662042 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | Yes |
| Agreement | |

| | | | |
|---|---|---|---|
| Carrier ID: | 561422 | | |
| Carrier Name: | Mountain Truck Lines | Agreement Date: | 6/24/2015 1:08:29 PM (Pacific Time) |
| Address: | 109 Jimmy Morris Road | MC Number: | MC879823 |
| City, State & Zip: | Sylva, NC 287798022 | US DOT Number: | 2531608 |
| Contact: | Christopher Broom | Phone: | 828-371-6197 |

APPENDIX A
BROKER - CARRIER AGREEMENT

The rates and charges to be assessed for transportation performed pursuant to this BROKER - CARRIER Agreement, unless OTHERWISE specified in a Load Confirmation Agreement or other specific writing as provided in Section 8 and Appendix C "Governing Rules" of this BROKER - CARRIER Agreement shall be as follows:

The rates and charges listed below shall be applicable on interstate and foreign shipments on freight of all kinds except household goods between points in the United States (except Alaska & Hawaii).

1) The rate shall be computed on the basis of $1.00 per loaded mile, including fuel surcharge.
2) The rate shall include a single pickup and single delivery.
3) Additional pickups and/or deliveries shall be charged at $50.00 per each additional stop.
4) The mileage shall be determined and governed by the Mileage Guide then in use by BROKER, supplements thereto and reissues thereof. The applicable Guide shall be identified upon request of CARRIER.

NOTE: The above charges shall only apply in the event that a Load Confirmation Sheet or other written confirmation has not been executed by the Parties with respect to a specific shipment.

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:08:29 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

---

AGREEMENT                  [ Print Agreement ]

| | |
|---|---|
| Agreement ID | 662043 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | Yes |

Agreement

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:08:54 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

<u>APPENDIX B</u>
LOAD CONFIRMATION SHEET
(SAMPLE)

Appendix B

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:08:54 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

AGREEMENT

Print Agreement

| | | | |
|---|---|---|---|
| Agreement ID | | 662045 | |
| Agreement Date | | Wednesday, June 24, 2015 | |
| Agreed? | | Yes | |
| Agreement | | | |

| | | | |
|---|---|---|---|
| Carrier ID: | 561422 | | |
| Carrier Name: | Mountain Truck Lines | Agreement Date: | 6/24/2015 1:09:15 PM (Pacific Time) |
| Address: | 109 Jimmy Morris Road | MC Number: | MC879823 |
| City, State & Zip: | Sylva, NC 287798022 | US DOT Number: | 2531608 |
| Contact: | Christopher Broom | Phone: | 828-371-6197 |

### APPENDIX C
### MILEAGE, ACCESSORIAL, GOVERNING RULES

This Appendix C (the "Appendix") is a supplement to the Broker-Carrier Agreement ("Agreement") by and between Coyote Logistics, LLC ("BROKER") and Mountain Truck Lines("CARRIER"), MC879823 and is made a part thereof.

**1. MILEAGE.** For each freight movement or shipment, the Parties may specify the mileage to apply for the purposes of computing transportation charges if a mileage rate schedule applies. Otherwise, the mileage according to the then current version of PC Miler will apply.

**2. ACCESSORIAL CHARGES.** There shall be no charge for waiting time or demurrage other than as provided for in this Section.
A. CARRIER shall allow two (2) hours of free time for loading and after that free time has expired, BROKER shall pay for waiting at the rate of $25.00 per hour, not to exceed a total of $150.00 in a 24 hour period. CARRIER shall allow two (2) hours of free time for unloading and after that free time has expired, BROKER shall pay for waiting at the rate of $25.00 per hour, not to exceed a total of $150.00 in a 24 hour period. In order to be eligible to receive payment for waiting time, CARRIER must first furnish to BROKER written proof of the time of arrival of the subject vehicle for loading/unloading and the time of completion of the loading/unloading on the Bill of Lading for the subject shipment, or other appropriate and acceptable (to BROKER) shipping document. Time spent waiting prior to the time of opening for business of the consignor or consignee, as the case may be, shall not be included in the computation of either free time or waiting time.
B. In order to receive payment for waiting time, CARRIER must also adhere to the Accessorial Governing Rules outlined, herein as Section 3.
C. CARRIER shall not be entitled to any payment for waiting time which was caused due to an Act of God, the public enemy, the authority of law, strikes or act of the CARRIER, or because CARRIER'S driver has run out of hours.
D. Appointments for loading and unloading are to be made at no additional charge.
E. Waiting time incurred on account of CARRIER'S failure to keep its scheduled appointment for pick up or delivery shall not be charged to BROKER or BROKER'S Customers. Loads shall be held for delivery and/or re-delivery at no additional charge.
F. Upon the request of the consignor and/or consignee of any shipment transported by CARRIER pursuant to this Agreement for CARRIER to load and/or unload any such shipment from CARRIER'S vehicle, CARRIER shall provide such loading and/or unloading service, at its own, sole, expense, unless otherwise provided for in a Load Confirmation sheet from BROKER for a specific shipment.

**3. ACCESSORIAL GOVERNING RULES.**
A. Detention.
(i) BROKER will receive two (2) hours of free time at both shipper and consignee. Some of BROKER's Customers require more free time but these situations will be negotiated at the time of booking. Detention must be communicated thirty (30) minutes prior to the expiration of free time to allow BROKER the opportunity to prevent or minimize detention. Failure to adhere to this policy may result in a delay or loss of detention pay. Please email your Account Manager and Accessorial@coyote.com as notification. Include the BROKER load number in the subject field. **(See, EXAMPLE A).**

(ii) Send a follow up email to your Account Rep and the Coyote accessorial email with the departure time and total detention hours (if detention actually occurred). A confirmation email will be sent back with the details of the detention reimbursement. Arrival and departure times MUST be documented on the BOL's. CARRIER is responsible for contacting BROKER, prior to departing a facility, if there are no times, or inaccurate times, notated on the BOL. BROKER is not responsible for paying detention without written notice or documentation. BROKER pays $25/hr after two (2) free hours (Layover Fees may apply after eight (8) hours). Any additional money for a lumper will be added to the notes section of the rate con and a new rate con will be sent. **(See, EXAMPLE B).**

EXAMPLE A  EXAMPLE B

B. Lumper. All lumper charges must be approved at the time of occurrence. Lumper charges without approval will NOT be paid.

(i) Receipts must be submitted to BROKER within 48 hours of occurrence. The lumper receipt must also be attached to invoice.
(ii) If BROKER issues a T-Chek, ComChek, EFS, or a similar advance payment programs for a lumper on the CARRIER'S behalf, and CARRIER cannot provide a lumper receipt, the lumper charges will be removed from CARRIER's rate.

C. Once email is submitted, you will receive an email confirmation and a new rate confirmation. Additional money for any accessorial will be added to the notes section of the rate-con until BROKER has the lumper receipt or signed BOL with in and out times in hand. Detention and/or lumper fees WILL NOT be reimbursed without lumper receipt or signed BOL with in and out times.

D. BROKER offers free truck stop faxing services for accessorials to all of our carriers via TRANSFLOExpress®. TRANSFLO is available at over 500 truck stops nationwide. For a full listing of all TRANSFLO locations visit http://transfloexpress.com/truckstops.asap. (**See the TRANSFLOExpress® flier in the "Thank You" packet provide upon completion of the contracting process**).

E. All Other Accessorials. Any monetary variations from the original Load Confirmation Sheet must be agreed upon in writing in order to receive compensation. Verbal agreements that differ from the original Load Confirmation Sheet will not be accepted.

**4. ORDER OF PRECEDENCE**. In the event of any conflict between the terms and conditions set forth in this Appendix C and any attachments, if applicable, on the one hand, and, on the other, the terms and conditions of the Agreement, the terms and conditions of this Appendix and any attachments, as the case may be, shall control. Any terms and conditions printed on transportation documents such as bills of lading or delivery receipts shall be no force or effect, and will not change or supersede the terms of this Appendix, the Agreement, and their attachments, and such documents will operate solely as receipts.

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ "I, Christopher Broom, am the Authorized Representative for Mountain Truck Lines. I am authorized to execute the contract set out above dated 6/24/2015 1:09:15 PM Pacific Time between Coyote Logistics, LLC. and Mountain Truck Lines and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON MOUNTAIN TRUCK LINES. I UNDERSTAND AND ACKNOWLEDGE THAT MOUNTAIN TRUCK LINES IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

AGREEMENT

Print Agreement

| | |
|---|---|
| Agreement ID | 662048 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | Yes |

Agreement

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:09:29 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

APPENDIX F.1
Coyote Advance Program

Terms of Agreement

**Fuel Advances:** Coyote Logistics will issue fuel advances up to 50% on load confirmation after receipt of legible signed Bill of Lading in exchange for a 4% fee. Faxed BOL'S are required to receive after hours (**2400 EST – 0600 EST**) Fuel Advances.

**Lumpers:** Coyote Logistics offers direct payments to lumper services on our loads 24/7/365 and does not require that carriers or their drivers pay for these services unless this cost is figured into your line haul rate on the load and noted on your load confirmation. Please contact your carrier representative at Coyote to have these fees paid during regular business hours or after hours at 1-877-6COYOTE option 1.

**Same Day Pay on Invoice:** Coyote Logistics, LLC will issue final payouts to carriers upon receipt of an invoice from booked carrier, all legible signed POD/s, and any accompanying receipts for pallet charges, or lumpers paid by carrier or direct to lumpers by Coyote Logistics in exchange for a 4% fee. **Final Payout by Coyote Advance Program is offered M-F 0600 EST - 2100 EST and not available over the weekend or on observed holidays.**

Standard Policy
Coyote Logistics' payment policy stipulates that all carrier invoices be paid within 30 days of receipt of an invoice, all legible signed POD/s and any

accompanying receipts for pallet charges, or lumpers paid by carrier or direct to lumpers by Coyote Logistics. Nonparticipation in the Coyote Advance Program will not affect this policy.

**Factoring Companies**
Coyote Logistics, LLC reserves the right to suspend Coyote Advance Program privileges without notification to any participating carriers upon receipt of a Notice of Assignment from a Factoring Company identifying a UCC filing. This suspension will not be lifted until authorization is received from the Factoring Company allowing Coyote Logistics, LLC the ability to make direct payments to the carrier.

Written authorization to advance payment to carriers with Factoring Companies must be received from Factoring Company on letterhead prior to any Coyote Advance codes being issued.

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☑ I have reviewed and agree to the above document and I authorize Coyote Logistics, LLC. to issue Coyote Advances and deduct the fees from my Company's invoice. I understand the amount deducted is NOT refundable under any circumstances. I also understand should my Company wish to alter or discontinue eligibility in the Coyote Advance Program, it will be necessary to make any request in writing and fax directly to Coyote Logistics, LLC. at 847-810-4871. Also, by checking this box, I authorize Coyote Logistics, LLC to issue Coyote Advances to any driver for or on behalf of the company set forth above (the "Company").

---

**AGREEMENT**

[Print Agreement]

| | |
|---|---|
| Agreement ID | 662050 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | No |
| Agreement | |

| | | | |
|---|---|---|---|
| **Carrier ID:** | 561422 | | |
| **Carrier Name:** | Mountain Truck Lines | **Agreement Date:** | 6/24/2015 1:10:10 PM (Pacific Time) |
| **Address:** | 109 Jimmy Morris Road | **MC Number:** | MC879823 |
| **City, State & Zip:** | Sylva, NC 287798022 | **US DOT Number:** | 2531608 |
| **Contact:** | Christopher Broom | **Phone:** | 828-371-6197 |

<u>APPENDIX F.2</u>
TWO DAY PAY PROGRAM

Instructions: If you wish to participate in this optional program, click the link below and download and complete the document. Please send the document to Coyote Logistics, Compliance Department, 960 North Point Parkway, Suite 150, Alpharetta, GA, 30005. Then select the "We wish to participate" check box below.

If you do not wish to participate, leave the check box empty and click "Go To Next Step".

<u>Two Day Pay Form</u>

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☐ We wish to participate in this program, and will download and complete the linked document, and will send the completed document to Coyote directly.

---

**AGREEMENT**

[Print Agreement]

| | |
|---|---|
| Agreement ID | 662051 |
| Agreement Date | Wednesday, June 24, 2015 |
| Agreed? | No |
| Agreement | |

| Carrier ID: | 561422 | Agreement Date: | 6/24/2015 1:10:43 PM (Pacific Time) |
|---|---|---|---|
| Carrier Name: | Mountain Truck Lines | MC Number: | MC879823 |
| Address: | 109 Jimmy Morris Road | US DOT Number: | 2531608 |
| City, State & Zip: | Sylva, NC 287798022 | Phone: | 828-371-6197 |
| Contact: | Christopher Broom | | |

## APPENDIX F.3
## ACH/DIRECT DEPOSIT PAYMENTS

Instructions: If you wish to participate in this optional program, click the link below and download and complete the document. Please send the document to Coyote Logistics, Compliance Department, 960 North Point Parkway, Suite 150, Alpharetta, GA, 30005. Then select the "We wish to participate" check box below.

If you do not wish to participate, leave the check box empty and click "Go To Next Step".

ACH/Direct Deposit Payments

Name of Authorized Carrier Representative: Christopher Broom
Title of Authorized Carrier Representative: owner
Phone number of Authorized Carrier Representative: 828-371-6197
Email of Authorized Carrier Representative: mtl.of.nc@gmail.com

Agreement Date: 6/24/2015

☐ We wish to participate in this program, and will download and complete the linked document, and will send the completed document to Coyote directly.

| OPERATING AREAS | | | | close |
|---|---|---|---|---|
| Description | Code | Group | Group | Group |
| Arkansas | TCSARK | Central South | United States | Truck |
| Kansas | TCSKAN | Central South | United States | Truck |
| Louisiana | TCSLOU | Central South | United States | Truck |
| Oklahoma | TCSOKL | Central South | United States | Truck |
| Texas | TCSTEX | Central South | United States | Truck |
| Alabama | TSEALA | Southeast | United States | Truck |
| Florida | TSEFLO | Southeast | United States | Truck |
| Georgia | TSEGEO | Southeast | United States | Truck |
| Kentucky | TSEKEN | Southeast | United States | Truck |
| Mississippi | TSEMIS | Southeast | United States | Truck |
| North Carolina | TSENCA | Southeast | United States | Truck |
| South Carolina | TSESCA | Southeast | United States | Truck |
| Tennessee | TSETEN | Southeast | United States | Truck |

| PRODUCER INFORMATION | | close |
|---|---|---|
| Producer Type | Auto | |
| Producer Name | Commercial Insurance Agency | |
| Phone | 828-670-6342 | |
| Fax | 828-670-6343 | |
| Email | emeadowscianc@bellsouth.net | |
| Policy Number | insurance agent has | |
| Producer Type | Cargo | |
| Producer Name | Commercial Insurance Agency | |
| Phone | 828-670-6342 | |
| Fax | 828-670-6343 | |
| Email | emeadowscianc@bellsouth.net | |
| Policy Number | insurance agent has | |
| Producer Type | General Liability | |
| Producer Name | Commercial Insurance Agency | |
| Phone | 828-670-6342 | |

| Fax | 828-670-6343 |
|---|---|
| Email | emeadowscianc@bellsouth.net |
| Policy Number | insurance agent has |

CARRIER PROFILE INFORMATION                                                                                close

### Modes

TL Reefer

### Commodities

Agriculture, Food, Household Goods, Manufactured Products

### Tractor / Trailer Information

| | |
|---|---|
| Tractors | 1 |
| SCAC Code | |
| Dry Van | 1 |
| Flatbed | 0 |
| Refrigerated | 1 |
| IMDL | 0 |
| Tanker | 0 |
| Bulk | 0 |
| Other | 0 |
| Pad Wraps | 0 |
| Straps | 0 |
| Tri Axle Vans | 0 |
| Heated Vans | 0 |
| Garment Trailers | 0 |
| Super Vans | 0 |
| Walking Floor | 0 |
| Open Top | 0 |
| Straight Trucks | 0 |
| Cargo Van | 0 |
| Hopper | 0 |
| Dump | 0 |
| RGN | 0 |
| Step Decks | 0 |
| Double Drop | 0 |
| 48 Foot Vans | 0 |
| 48 Foot Reefer | 0 |
| 48 Foot Flat Beds | 0 |
| 53 Foot Vans | 0 |
| 53 Foot Reefer | 1 |
| 53 Foot Flat Beds | 0 |

### Extended Profile Fields

| | |
|---|---|
| Company Drivers | 2 |
| Teams | 0 |
| Owner Operators | 1 |
| Has Mexico Interchange | No |
| Has Canadian Authority | No |
| Email Carrier | Yes |

### Certifications

| | |
|---|---|
| SmartWay | No |

| | |
|---|---|
| C-TPAT | No |
| FAST | No |
| TWIC | No |
| CARB | No |
| HazMat Certification? | No |
| HazMat Cert Expiration Date (carrier reported) | |
| HazMat Verified by RMIS? | No |
| Safety Permit (HM 232) | No |
| Safety Permit Text Agreed? | |

### Other Information

| | |
|---|---|
| Intrastate State | |
| Intrastate Authority ID | |

### Diversity Information

| | |
|---|---|
| M/WBE | N/A |
| SBE/DSBE | N/A |
| Certifying Entity | N/A |

### Pay To Information

| | |
|---|---|
| The Pay To is a Factoring Company | No |

---

**CONTACTS**                                                                close

**ACCOUNTSPAYABLE**

Rebekah Broom                               Phone:828-507-1604
Dispatch/Office Manager                     Fax:
mtl.of.nc@gmail.com                         Cell:

**AFTERHOURS**

Rebekah Broom                               Phone:828-507-1604
Dispatch/Office Manager                     Fax:
mtl.of.nc@gmail.com                         Cell:

**CLAIMS**

Rebekah Broom                               Phone:828-507-1604
Dispatch/Office Manager                     Fax:
mtl.of.nc@gmail.com                         Cell:

**CORPORATE**

Christopher Broom                           Phone:828-371-6197
owner                                       Fax: 828-586-2045
mtl.of.nc@gmail.com                         Cell: 828-371-6197

**DISPATCH**

Rebekah Broom                               Phone:828-507-1604
Dispatch/Office Manager                     Fax:
mtl.of.nc@gmail.com                         Cell:

**SALES**

Chris Broom                                 Phone:828-371-6197
owner                                       Fax: 828-586-2045
mtl.of.nc@gmail.com                         Cell: 828-371-6197

---

**CARRIER NOTES**                                                           close

No notes are on file.

**CERTIFICATE**                                                             close

No certificates were found.

**CORRECTIVE ACTION PLAN**                                                  close

No corrective action plan on file.

**ADDITIONAL FIELDS**                                                       close

ACH                                         Yes

| ClientContact | Heather Elston. |
| ComData | Yes |
| DrayageService | No |
| GovtApproved | No |
| LiquorLicensed | No |
| ProvidesCanadianService | No |
| TwoDayProgram | Yes |
| UIIA | No |
| WCWaiver | YES |

| REFERENCES | | | | close |
|---|---|---|---|---|
| Company Name | Contact | Phone | Email | |
| JTL Brokerage | Don Justus | 828-685-7179 | | |

| AFFILIATIONS | close |
|---|---|
| No affiliations on file. | |

5703 Corsa Avenue, 1st floor, Westlake Village, CA, 91362
Copyright © 2015 Registry Monitoring Insurance Services, Inc.
800-400-4924

If you no longer wish to receive these emails, click here for further instructions.

# Exhibit C

ATTN: MASTER B/L NO. MUST SHOW
ON FREIGHT BILL.

# BILL OF LADING
### Not Negotiable

SHIP DATE: 11/01/21

| MASTER B/L | 2068871220 | SCAC #: | CLLQ | CARRIER: | | VEHICLE NO: 5303 | SEAL NO: 10072154 |
| SHIPMENT B/L | PAGE 1 OF 1 | SCAC NAME: | COYOTE LOGISTICS LLC | | | FREIGHT TERMS ** | PREPAID |

STD. PT. LOC. CODE

FROM 456384000 KRAFT HEINZ FOODS CO.          AT     UNION CITY          GA          30291
6710 OAKLEY INDUSTRIAL BO

TO STOP 1   1 642182000 SAMS CLUB REF DC 6057          000-000-0000
955590       45346 PARKWAY BLVD          ROBERT          LA 70455

TO STOP 2

TO STOP 3

FOR FREIGHT COLLECT SHIPMENTS:
If this shipment is to be delivered to the consignee, without
recourse on the consignor, the consignor must sign the following
statement.

The carrier may decline to make delivery of the shipment without
payment of freight and all other lawful charges.

                    KHC
Signature of Consignor

KEEP TEMPERATURE
34 DEGREES

SEAL #10072154

| CONTINUOUS MOVE | CC | CARRIER LOAD & COUNT, | SC X | SHIPPER L&C, CONSIGNEE TO | SR | SHIPPER LOAD & COUNT, |

MATRICS SHIPMENT # 094-324439

## DESCRIPTION OF ARTICLE/STCC NO.
### (PRECEDES DESCRIPTION)

| CALL DISPATCHER IF SHIPMENT DELAYED OR REFUSED | STOP 1 PKGS. | GROSS WEIGHT | STOP 2 PKGS. | GROSS WEIGHT | STOP 3 PKGS. | GROSS WEIGHT |
|---|---|---|---|---|---|---|
| 0010004 CHEP (BLUE) PALLET WEIGHT | 1 | 70.0 | | | | *I 2* |
| 0010006 PECO PALLET WEIGHT | 46 | 3128.0 | | | | *11-1-21* |
| 2022030 REFRIGERATED PRODUCTS | 1620 | 29535.0 | | | | *11:25* |
| TOTALS FOR EACH STOP | 1620 | 32733.0 | | | | *OUT* |
| TOTAL WGT FOR ALL STOPS | | 32733.0 | | | | *NOV 1 PM 8:25* |

DELIVERY TIMES.............. 11/02/21 APPT
IF UNABLE TO ARRIVE ON TIME, PHONE THE CONSIGNEE
REPORT DISCREPANCIES/REFUSED TO NATIONAL CLAIMS CENTER AT: 1-800-238-6374

---- SEQ  1 COMMENTS ---- --- SEQ   COMMENTS ----  ---- SEQ   COMMENTS ----
--- STOP  1 COMMENTS ---- --- STOP   COMMENTS ----  --- STOP   COMMENTS ----
*0616322493                      *
*0616322464                      *
PO # 0616322464
PO # 0616322493
***DRIVER PLEASE NOTE: RECORDED  TIME        AM TIME        AM
   TURNAROUND TIME REQUIRED***   IN:        PM OUT:        PM
                                                              AM
*SCHEDULED DELIVERY APPOINTMENT* DATE:  /  /  TIME:       PM

| DELIVERY RECORD | SEAL NUMBERS: | | | SEAL INTACT: YES/NO | DATE | ACCEPTED | REFUSED |
|---|---|---|---|---|---|---|---|
| | PRODUCT OVER: | CASES | PROD. NO. | CASES | PROD. NO. | | |
| | SHORT: | CASES | PROD. NO. | CASES | PROD. NO. | | |
| | DAMAGES: | CASES | PROD. NO. | CASES | PROD. NO. | | |
| | WRONG PROD. | CASES | PROD. NO. | CASES | PROD. NO. | | |
| | TOTAL CASES RECV'D | DRIVER SIGNATURE: | | RECEIVER SIGNATURE: | | | |

Driver : 1.) This shipment MUST move following all Department of Transportation (D.O.T) rules and regulations. 2.) If
unable to deliver as scheduled, notify Consignor, Consignee, and your Dispatcher to reschedule delivery.

** MAIL PREPAID
FREIGHT BILLS TO:

KHC C/O US BANK
PO BOX 5001
NAPERVILLE, IL 60566-7001

By signing below, you, acting on behalf of the Carrier stated on this bill of lading, and the carrier whom you represent, are accepting
responsibility for the safe and timely transportation of the goods, described herein, to their final destination (as detailed by this Bill of
Lading). Carrier is to deliver the goods in the same condition which they were made available to, and lawful recieved by, Carrier, for
transportation. Unless otherwise noted, Consignor certifies the weight(s) of the goods provided for transportation herein to be true and
correct for all applicable modes of transportation. Carrier agrees that in the absence of a fully executed Contract for transportation service
between by Carrier for Consignee, the Consignor's Bill of Lading is the sole transportation agreement for this particular shipment.

KRAFT HEINZ FOODS CO.
BY MARK SNYDER

Per _____  Per _____

| PALLET RECORD | IN | OUT |
| EXCHANGEABLE | | |
| PALLETS TO BE RETAINED BY CONSIGNEE | | |
| CHEP | | |

**3**

PERMANENT POST-OFFICE ADDRESS OF SHIPPER   6710 OAKLEY INDUSTRIAL BOULEVARD GA

Carrier's Agent

FREIGHT PAYMENT COPY ( to be supplied with Carrier's Freight Invoice)

MountainTruck0018

# Exhibit D



**MISSISSIPPI FOOD NETWORK**

## DONATION RECEIPT

DATE: _11-3-21_

TO: _Mountain Truck Linos / Kraft_
_109 Jimmy Morris Rd_
_Sylva nc 28779_

PHONE #: _828 371 6197_

Thank you for your donation. It will be distributed to charitable organizations that serve needy people in our area. As a 501c3 organization, your donation will be used in compliance with clauses i and ii of section 170e3 on the Tax Reform Act of 1976. Our records are available to the IRS upon request. We will affirm that no goods or services were provided to you by us in exchange for the donation.

| PRODUCT ID | PRODUCT NAME | PRODUCT DESCRIPTION | NUMBER OF UNITS | UNIT WEIGHT | TOTAL WEIGHT |
|---|---|---|---|---|---|
| | Philadelphia Cream Cheese | 6-32oz | 1,006 | 15 lbs | 15,090 lbs |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL | | | | | |

We appreciate your contribution toward helping us fight food insecurity in MS.

Signature _Bryan Collins_

Title _____

TAX ID# 64-0676325

TEL 601-353-7286     P.O. BOX 411/440 W. BEATTY ST JACKSON, MS 39201    FAX 601-948-6710

MountainTruck0017

# Exhibit E

MCGRIFF INS SERVICES
7701 AIRPORT CTR 1800
GREENSBORO, NC 27409

**PROGRESSIVE**®
COMMERCIAL

Named insured

MOUNTAIN TRUCK LINES, INC
109 JIMMY MORRIS ROAD
SYLVA, NC 28779

**Policy number:  02607617**

Underwritten by:
Progressive Southeastern Ins Co
September 24, 2021
Policy Period: Sep 10, 2021 - Sep 10, 2022
Page 1  of  3

**progressiveagent.com**
**Online Service**
Make payments, check billing activity, print
policy documents, update your policy or
check the status of a claim.

**1-800-476-4339**
**MCGRIFF INS SERVICES**
Contact your agent for personalized service.

**1-800-444-4487**
For customer service if your agent is
unavailable or to report a claim.

# Commercial Auto
# Insurance Coverage Summary
This is your Declarations Page
Your coverage has changed

Your coverage began on September 10, 2021 at 12:01 a.m.  This policy expires on September 10, 2022 at 12:01 a.m.

This coverage summary replaces your prior one. Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for an auto may not be combined with the limits for the same coverage on another auto, unless the policy contract allows the stacking of limits. The policy contract is form 6912 (02/19). The contract is modified by forms 2852NC (02/19), 4757 (02/19), Z434NC (02/19), Z440 (06/10), MCS90 (99/99), MC1632 (06/04), 1198 (07/16), 4852NC (02/19) and 4881NC (02/19).

The named insured organization type is a corporation.

## Policy changes effective  September 23, 2021

| | |
|---|---|
| Changes processed on: | September 23, 2021 10:09 a.m. |
| Premium change: | -$21,584.00 |
| Changes: | The 2030 Non-owned Attached Trailer has been removed. |
| | The 2006 PETERBILT 379 has been removed. |
| | Your radius of operation information for 2030 Non-owned Attached Trailer has changed. |
| | Allen Varney has been removed from the policy. |
| | Freddie Varney has been removed from the policy. |

The changes shown above will not be effective prior to the time the changes were requested.


Continued

Form 6489 NC (07/20)

Policy number: 02607617
MOUNTAIN TRUCK LINES, INC
Page 2 of 3

## Outline of coverage

### Auto coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $16,667 |
| Bodily Injury and Property Damage Liability | $1,000,000 combined single limit | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 54 |
| Uninsured Motorist Property Damage | $50,000 each accident | $100 | 112 |
| Medical Payments | $5,000 each person | | 43 |
| Comprehensive | | | 283 |
| See Auto Coverage Schedule | Limit of liability less deductible | | |
| Collision | | | 2,300 |
| See Auto Coverage Schedule | Limit of liability less deductible | | |
| **Subtotal policy premium** | | | **$19,459** |

### Motor Truck Cargo coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Motor Truck Cargo | $100,000 | $1,000 | $7,303 |
| Refrigeration Breakdown | included in Motor Truck Cargo Limit | $2,500 | included |
| **Subtotal policy premium** | | | **$7,303** |
| Additional Insured Fee | | | 20 |
| **Total 12 month policy premium and fees** | | | **$26,782** |

## Rated drivers

1. CHRISTOPHER BROOM
2. WILLIAM T KOCH
3. Harold Givens

## Rated commodities

1. FOOD (FROZEN/NOT SEAFOOD)

## Auto coverage schedule

1. **1998 INTL 940**
   VIN: **2HSFHAMR1WC062789** Garaging Zip Code: 28779  Radius: 500 miles
   Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM/UIM Premium | UM PD Premium | Med Pay Premium | Auto Total |
|---|---|---|---|---|---|
| Liability Premium | $8766 | $27 | $56 | $22 | **$8,871** |

2. **2005 KW W90** Stated Amount: * $30,000 (including Permanently Attached Equip)
   VIN: **1XKWDB9X15J073605** Garaging Zip Code: 28779  Radius: 300 miles
   Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM/UIM Premium | UM PD Premium | Med Pay Premium | Auto Total |
|---|---|---|---|---|---|
| Liability Premium | $7416 | $27 | $56 | $21 | |

| | Comp Deductible | Comp Premium | Collision Deductible | Collision Premium | Auto Total |
|---|---|---|---|---|---|
| Physical Damage Premium | $2,500 | $283 | $2,500 | $2300 | **$10,103** |


Continued

Policy number: 02607617
MOUNTAIN TRUCK LINES, INC
Page 3 of 3

3.  **2030 Non-owned Attached Trailer** **
    VIN: **None**  Garaging Zip Code: 28779  Radius: 300 miles
    Personal use: N   Body type: 20

Liability
Premium

| Liability Premium | Auto Total |
|---|---|
| $222 | **$222** |

4.  **2030 Non-owned Attached Trailer** **
    VIN: **None**  Garaging Zip Code: 28779  Radius: 500 miles
    Personal use: N   Body type: 20

Liability
Premium

| Liability Premium | Auto Total |
|---|---|
| $263 | **$263** |

*A vehicle's stated amount should indicate its current retail value, including any special or permanently attached equipment.  In the event of a total loss, the maximum amount payable is the lesser of the Stated Amount or Actual Cash Value, less deductible.  Be sure to check stated amount at every renewal in order to receive the best value from your Progressive Commercial Auto policy.

**Non-Owned trailer but only while attached to a listed power unit specifically described on the declarations page.

## Premium discounts

| Policy | |
|---|---|
| 02607617 | CDL Experience and Multi-Product |

## Additional Insured information

| 1. Additional Insured | ENGS COMMERCIAL FIN |
|---|---|
| | PO BOX 128 |
| | ITASCA, IL 60143 |

## Company officers

President

Secretary

MCGRIFF INS SERVICES
7701 AIRPORT CTR 1800
GREENSBORO, NC 27409



**Policy number: 02607617**

Underwritten by:
Progressive Southeastern Ins Co
Insured:
MOUNTAIN TRUCK LINES, INC
July 12, 2021
Policy Period: Sep 10, 2021 - Sep 10, 2022

MOUNTAIN TRUCK LINES, INC
109 JIMMY MORRIS ROAD
SYLVA, NC 28779

**Mailing Address**

Progressive Southeastern Ins Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

ENGS COMMERCIAL FIN
PO BOX 128
ITASCA, IL 60143

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability
**Bodily Injury**                    Not applicable
**Property Damage**                  Not applicable
**Combined Liability**               $1,000,000 each **accident**

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 02607617

Issued to (Name of Insured): MOUNTAIN TRUCK LINES, INC

Effective date of endorsement: September 10, 2021       Policy expiration date: September 10, 2022

Form 1198 (07/16)

**FORM F**

**UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURANCE ENDORSEMENT**

It is agreed that:

1. The certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby; provided only that the insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except by reason of the obligation assumed in making such certification.

2. The Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance has been filed with the State Commissions indicated below.

3. This endorsement may not be cancelled without cancellation of the policy to which it is attached. Such cancellation may be effected by the company or the insured giving thirty (30) days notice in writing to the State Commission with which such certificate has been filed, such thirty (30) days notice to commence to run from the date the notice is actually received in the office of such Commission.

Attached to and forming part of policy No. CA 02607617-0 issued by Progressive Southeastern Ins Co, herein called Company, of PO BOX 94739, CLEVELAND, OH 44101 to MOUNTAIN TRUCK LINES, INC. of 109 JIMMY MORRIS ROAD, SYLVA, NC 28779-0000

Dated at MAYFIELD VILLAGE, OH 44143 this 23 rd day of September, 2020

Countersigned by _____

Authorized Representative

| X - - INDICATES STATE COMMISSIONS WITH WHOM UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY CERTIFICATE OF INSURANCE HAS BEEN FILED | | | | | | | |
|---|---|---|---|---|---|---|---|
| ALABAMA | | ILLINOIS | | MONTANA | | RHODE ISLAND | |
| ALASKA | | INDIANA | | NEBRASKA | | SOUTH CAROLINA | |
| ARIZONA | | IOWA | | NEVADA | | SOUTH DAKOTA | |
| ARKANSAS | | KANSAS | | NEW HAMPSHIRE | | TENNESSEE | |
| CALIFORNIA | | KENTUCKY | | NEW JERSEY | | TEXAS | |
| COLORADO | | LOUISIANA | | NEW MEXICO | | UTAH | |
| CONNECTICUT | | MAINE | | NEW YORK | | VERMONT | |
| DELAWARE | | MARYLAND | | NORTH CAROLINA | X | VIRGINIA | |
| DISTRICT OF COLUMBIA | | MASSACHUSETTS | | NORTH DAKOTA | | WASHINGTON | |
| FLORIDA | | MICHIGAN | | OHIO | | WEST VIRGINIA | |
| GEORGIA | | MINNESOTA | | OKLAHOMA | | WISCONSIN | |
| HAWAII | | MISSISSIPPI | | OREGON | | WYOMING | |
| IDAHO | | MISSOURI | | PENNSYLVANIA | | | |

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

OMB No: 2126-0008
Expiration: 3/31/2021
Form MCS-90 Revised 08/03/2020

USDOT Number: __2531608__     Date Received: _____

U.S. Department
of Transportation
Federal Motor Carrier
Safety Administration

## FORM MCS-90 ENDORSEMENT FOR
## MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY
## UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980

Issued to   MOUNTAIN TRUCK LINES, INC.
            (Motor Carrier name)

of   109 JIMMY MORRIS RD SYLVA, NC 28779-8022
     (Motor Carrier state or province)

Dated at Mayfield Village, Ohio on this __13TH__ day of __OCTOBER__, 2020

Amending Policy Number: CA __02607617-0__   Effective Date: __9/18/2020__

Name of Insurance Company: __PROGRESSIVE SOUTHEASTERN INS CO__

Countersigned by: _____
(Authorized company representative)

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown (check only one):

[X]   This insurance is primary and the company shall not be liable for amounts in excess of __$750,000__ for each accident.

[ ]   This insurance is excess and the company shall not be liable for amounts in excess of $____ for each accident in excess of the underlying limit of $____ for each accident.

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 1-800-444-4487.

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, D.C.).

## DEFINITIONS AS USED IN THIS ENDORSEMENT

ACCIDENT includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

MOTOR VEHICLE means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

BODILY INJURY means injury to the body, sickness, or disease to any person, including death resulting from any of these.

PROPERTY DAMAGE means damage to or loss of use of tangible property.

ENVIRONMENTAL RESTORATION means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release, or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

PUBLIC LIABILITY means liability for bodily injury, property damage, and environmental restoration.

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA). In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance, or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency, or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement. It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment. The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

## SCHEDULE OF LIMITS—PUBLIC LIABILITY

| Type of carriage | Commodity transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,00 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,000 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| **(4)** For-hire and Private (in interstate or foreign commerce, with a gross vehicle weight rating of less than 10,000 pounds). | Any quantity of Division 1.1, 1.2, or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

*The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

Form Z434 NC (02/19)

## MOTOR TRUCK CARGO LEGAL LIABILITY
## COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### INSURING AGREEMENT—LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1.  while **in due course of transit** in, on, or attached to an **insured auto**; or
2.  during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—LOSS TO BUSINESS EQUIPMENT

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **business equipment**. For this coverage to apply, the **business equipment** must, at the time of **loss**, be in **your** exclusive physical custody and control. Coverage applies for **loss** to **business equipment** only if the **loss** is caused by a **covered peril**.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for **business equipment** coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS

The following additional definitions apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

1.  "**Business equipment**" means computer and related computer hardware, used exclusively in the management of **your**

1

business, that **you** own or that is leased or loaned to **you**. **Business equipment** does not include computer, cell phone, smart phone, or any other electronic equipment, used or intended to be used for personal non-business use.

2.  "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through l. below as Excluded Perils.

    **Excluded Perils:** Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or **business equipment** caused by, resulting in or from, or arising out of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

    a.  **Civil Authority**
        Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property. However, **we** will pay for **loss** or damage caused by or resulting from acts of destruction ordered by any governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this endorsement.

    b.  **Nuclear Hazard, Pollutants**
        (i)   Any weapon employing atomic fission or fusion; or
        (ii)  Nuclear reaction or radiation, or radioactive contamination from any other cause. But **we** will pay for direct **loss** caused by resulting fire if the fire would be covered under this endorsement.
        (iii) The release, discharge, seepage, migration, dispersal, or escape of **pollutants**, unless the release, discharge, seepage, migration, dispersal, or escape is caused by a **specified peril**.

    c.  **War, Civil Commotion**
        (i)   **War**, including undeclared or civil war;
        (ii)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents;
        (iii) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority to hinder or defend against any of these; or
        (iv)  Strikers, locked-out workmen, or persons taking part in labor disturbances or riots, or civil commotions.

    d.  **Inherent Vice**
        Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the **covered property** or **business equipment** that causes it to damage or destroy itself.

    e.  **Criminal, Fraudulent, or Dishonest Acts**
        Criminal, fraudulent, dishonest, or illegal acts alone or in collusion with another, whether or not such acts occurred during regular hours of employment, by:
        (i)   **you**;
        (ii)  **your** partners, officers, directors, trustees, or joint ventures;
        (iii) others to whom **you**, **your** partners, officers, directors, trustees, or joint ventures entrust the property;
        (iv)  others who have an interest in the property; or
        (v)   the employees or agents of any party specified in (i) through (iv) above.
        This Excluded Peril does not apply to acts of destruction by **your** employees, but **we** will not pay for theft by employees.

f. **Consequential Loss**

Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property** or **business equipment**.

g. **Wetness**, **Breakdown, Temperature, Humidity**

(i) Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

(ii) Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.

However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

h. **Voluntary Parting, Nondelivery, Mysterious Disappearance**

(i) Voluntary parting with title to, or possession of, the property due to fraudulent scheme, trick, or false pretense;

(ii) Nondelivery or misdelivery; or

(iii) Mysterious or unexplained disappearance; shortage of any property upon taking inventory; or theft of a part of the contents of any shipping package.

i. **Fines, Penalties, and Costs**

Any costs, fines, punitive damages, assessments, attorney fees, court costs, or other penalties that **you** are required or liable to pay as a result of **your** violation of any law or regulation, or as a result of the violation of any law or regulation relating to any delay in the payment, denial, or settlement of any claim.

j. **Pre-existing Damage**

**We** will not pay for pre-existing damage to any **covered property** or **business equipment**.

With respect to auto haulers, **we** will not pay for pre-existing damage to vehicles being transported by the **insured**. For coverage to apply, the **insured** auto hauler must provide to **us** a signed inspection document attesting to the condition of **covered property** before loading.

k. **Installation Operations**

**Your** operation as rigger, hoister, erector, installer, or dismantler.

l. **Business Equipment Damage**

**We** will not pay for the following damage to **business equipment**:

(i) Wear and tear, any quality in the equipment that causes it to damage or destroy itself, hidden or latent defect, or gradual deterioration;

(ii) Structural, mechanical, or electrical failure or breakdown; or

(iii) Damage caused by maintenance or a software upgrade or download.

3. "**Covered property**" means lawful goods and merchandise of others, except for the items listed in a. through j. below as Excluded Properties. **Covered property** includes **goods and merchandise** owned by **you** while loaded for shipment in or on an **insured auto**, whether or not shipped under a bill of lading or shipping receipt. When used in this endorsement, **goods and merchandise** means products destined for market and/or sale. **Covered property** does not include any equipment **you** own that is being transported between work sites. **Covered property** also does not include **autos you** lease, hire, rent, or borrow.

3

**Excluded Properties:** Please read the following list of excluded properties carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for **loss** to these types of properties**.**

a. **Art, Jewelry, Metals, Money, Papers**

Objects of art, including paintings and statuary; jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; money and securities of any kind, including monies collected or not collected under a C.O.D., bill of lading, or shipping receipt; food stamps, lottery tickets, notes, money orders, traveler's checks, accounts, bills, deeds, or other evidences of debt; valuable papers of any kind, including passports, manuscripts, mechanical drawings, and blueprints.

b. **Contraband**

Contraband or property in the course of illegal transportation or trade.

c. **Live Animals**

Live animals, birds, or fish, including cattle or poultry, unless death results or is made necessary within 24 hours by a **specified peril**; or unless they escape or stray from the scene of **loss** and cannot be located, but only if the escape or straying is caused by a **specified peril**. **We** do not cover **your** liability for reduction in the market value or downgrading of live animals, birds, or fish due to minor injuries, scrapes, and bruises.

d. **Other Carrier**

Any property while in the physical custody of any other carrier.

e. **Property Not Under Bill of Lading**

Any property for which no bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage has been issued, or which is carried gratuitously or without charge. This exclusion does not include poultry cages owned by the shipper while being utilized in the transportation of **covered property**.

f. **Storage**

Any property in or on an **insured auto** after it has remained at any location for more than 72 hours. This includes locations **you** own or use. This exclusion does not apply to delays in transportation outside of **your** control due to severe weather, as long as transport resumes as soon as the weather emergency has ended.

g. **Transporting Vehicles and Equipment**

Any transporting vehicle or conveyance, including its equipment such as tarpaulins and fittings, chains, binders, and inter-modal shipping containers, unless specified on a bill of lading.

h. **Explosive or Radioactive Material**

Explosives, ammunition, fireworks, or radioactive material.

i. **Pharmaceuticals, Tobacco, Marijuana Products, Alcohol**

Prescription pharmaceuticals, tobacco products, marijuana products, or alcoholic beverages, other than beer or wine.

j. **Mobile/Modular Homes and Buildings**

**Mobile/Modular homes and buildings** whether carried on or attached to the **insured auto**.

4. "**Earned freight charges**" means freight charges from the point of departure to the point of **loss**.

5. "**In due course of transit**" means being shipped from the time **you** assume exclusive physical custody and control of the **covered property** for the purpose of the actual movement of **covered property** from the point of shipment bound for a specific destination and ending when one of the following first occurs:

   a. the **covered property** is accepted by, or on behalf of, the consignee at the intended destination;

   b. the **covered property** is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;

   c. 72 hours after arrival at destination; or

   d. any other stop that exceeds 72 hours.

   **In due course of transit** includes ordinary and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment.

6. "**Insured auto**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy, and includes **trailers** listed on the **declarations page**. In addition, as used in this endorsement, **insured auto** includes:

   a. Any **auto** specifically described on the **declarations page** that is not a **trailer**;

   b. An additional **auto** that is not a **trailer** on the date **you** become the owner if:

      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

      (ii) **we** insure all **autos** owned by **you** that are used in **your** business;

      (iii) no other insurance policy provides coverage for that **auto**; and

      (iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it.

   c. Any replacement **auto** that is not a **trailer** on the date **you** become the owner if:

      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

      (ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable;

      (iii) no other insurance policy provides coverage for that **auto**; and

      (iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it.

   d. A **trailer** designed primarily for travel on public roads, only when the **trailer** is attached to a power unit that is an **insured auto** or while it is **in due course of transit** by a power unit that is an **insured auto**; and

   e. Any **temporary substitute auto** that is not a **trailer**.

   With respect to this endorsement, if **we** provide coverage for an additionally acquired **auto**, **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **declarations page**.

7. "**Loading or unloading**" means the direct physical process of hoisting, lifting, or moving **covered property**:

   a. onto an **insured auto** from the ground or loading docks adjacent to such **insured auto**; or

   b. off of an **insured auto** to the place where it is finally delivered.

   However, for auto haulers, **loading or unloading** means moving **covered property** onto or off of **your insured auto**, including moving a motor vehicle under its own power solely for the purpose of **loading or unloading** it from the **insured auto**, but no more than one road mile from the **insured auto**.

8. "**Mobile/Modular Homes and Buildings**" means prefabricated housing units and buildings, factory-built homes and buildings, mobile homes, and modular homes and buildings. The term does not include motor homes or travel trailers designed for use on public roads.

9. "**Pollutant**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy. Additionally, as used in this endorsement, it includes electrical or magnetic emissions, whether visible or invisible, and sound emissions.

10. "**Specified peril**" means:

    a.  fire, lightning, or explosion;

    b.  smoke, but this cause of **loss** does not include smoke from exhaust fumes or gases of the transporting vehicle, agricultural smudging, or industrial operations;

    c.  windstorm or hail, but this cause of **loss** does not include **loss** caused by or resulting from:

        (i)  heat, cold, or change in or extremes of temperature; or

        (ii)  ice (other than hail), snow, or sleet, whether driven by wind or not;

    d.  collision, overturn, or derailment of a transporting conveyance. With respect to live animals, birds, or fish, this cause of **loss** does not include **loss** caused by or resulting from the **insured auto** coming in contact with:

        (i)  the roadbed;

        (ii)  curbing;

        (iii)  rails or ties of railways; or

        (iv)  a stationary object while backing for **loading or unloading** purposes;

    e.  collapse of a bridge, wharf, dock, platform, or culvert;

    f.  stranding, sinking, burning, or collision on any ferry;

    g.  flood, meaning the rising of any natural body of water; and

    h.  theft, but excluding pilferage by **you** or **your** employees, anyone with a financial interest in the cargo or their employees, authorized representatives or anyone else entrusted with the cargo. Theft does not include **loss** caused by or resulting from:

        (i)  wrongful conversion; or

        (ii)  acceptance of counterfeit money, fraudulent post office or express money orders, or checks or promissory notes not paid upon presentation.

    With respect to live animals, birds, or fish, **we** will extend this theft coverage to pay for direct physical **loss** to live animals, birds, or fish caused by theft of:

        (i)  the entire load of live animals, birds, or fish; or

        (ii)  the **insured auto** in or on which the live animals, birds, or fish are loaded.

    However, this coverage extension does not apply to the loss of individual animals or less than the entire load of live animals, birds, or fish unless the entire **insured auto** is first stolen.

11. "**Trucker**" means any person, organization, or motor carrier engaged in the business of transporting property for hire.

## ADDITIONAL PAYMENTS

In addition to the applicable limit of liability:

1. **Earned Freight**

    **We** will pay **earned freight charges** that are due to **you** if **you** are unable to collect them from others because of a **loss** to **covered property** that is caused by a **covered peril**. The most **we** will pay under this additional coverage for all freight charges in any one **loss** is $10,000.

2. **Removal Expenses**

    a.  **We** will pay removal expenses incurred to remove debris of **covered property**, which results from a **loss** caused by a **covered peril** that occurs during the policy period. The term "debris" does not include **pollutants**.

    b.  **We** will also pay removal expenses incurred to extract **pollutants** from land or water, if the discharge, dispersal, migration, or release of the **pollutants** is caused by or results from **loss** to **covered property**, and if such **loss** is caused by a **covered peril** during the policy period.

    **We** do not pay for:

    (i)   the cost of testing; evaluating; observing; or recording the existence, level, or effects of **pollutants**. However, **we** will pay the cost of testing that is necessary for the extraction of **pollutants** from land or water.

    (ii)  any damage to **your insured auto** from **pollutants**.

c.  The most **we** will pay for all removal expenses described in a. or b. above arising out of any one **loss** is $25,000.

d.  The expenses for removal of **covered property** debris and **pollutants** will be paid only if they are reported to **us** in writing within 180 days of the earlier of:

    (i)   the date of the direct physical **loss**; or

    (ii)  the end of the policy period.

3.  **Expenses in Defense or Settlement of Claims**

**We** will pay, with respect to any claim **we** investigate or settle, or with respect to any lawsuit against any insured **we** defend:

a.  all expenses **we** incur.

b.  the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. However, **we** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds.

c.  all reasonable expenses incurred by **you** at **our** request, including actual loss of earnings up to $250 per day because of time off from work.

d.  all costs taxed against the insured in any lawsuit against the insured **we** defend.

e.  interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. This does not apply if **we** have not been given notice of suit or the opportunity to defend an insured. **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

f.  interest accruing before entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. **Our** offer to pay that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after **our** offer.

4.  **Sue and Labor**

a.  **We** will pay the necessary expenses **you** incur to prevent further **loss** to **covered property** if that expense is incurred within a 12-hour period after the **covered peril** occurs.

b.  If, in the event of an occurrence, it becomes necessary to move the **covered property** in order to avoid a **loss** to the **covered property**, **we** will pay the reasonable and necessary costs incurred by **you** to move the **covered property** away from the location of the occurrence.

c.  The most **we** will pay for the aggregate of all expenses incurred under subparts a. and b. above is $7,500.

**LIMITS OF LIABILITY**

1.  **Amount of Payment**

a.  Subject to subsections 2., 3., and 4. below, in the event of a **loss** to **covered property**, **we** will pay the least of the following:

    (i)   **Your** legal liability for the direct physical **loss** to the **covered property**;

    (ii)  The declared value of the **covered property** shown in the bill of lading, tariff documents, rate confirmation sheet, shipping receipt, or contract of carriage;

    (iii)  For household goods, the amount specified in any advice of coverage, or other document evidencing an agreed valuation for property in transit;

    (iv)  The actual cost to the shipper to repair or replace the **covered property** with material of like kind and quality, not including any claim for diminution of value to the **covered property**; or

    (v)  The "Cargo" limit shown on the **declarations page**.

b. Regardless of the number of **insured autos** or **trailers** involved, insureds, premiums paid, policies issued by **us**, claims made, or lawsuits brought, the most **we** will pay for **loss** to **covered property** in any one occurrence is the limit of liability shown on the **declarations page** for "Cargo Liability" coverage.

c. With respect to **business equipment**, subject to subsections 2., 3., and 4. below, in the event of a **loss**, **we** will pay the lower of:

(i) the amount necessary to replace the **business equipment**; or

(ii) the amount necessary to repair the **business equipment**.

**We** will not pay the amount necessary to repair or replace **business equipment** unless the equipment has been, or is actually going to be, repaired or replaced. Subject to the limit of liability for this coverage, **we** will pay only the amount **you** are required to spend to repair or replace the **business equipment**.

The most **we** will pay for **loss** to **business equipment** in any one occurrence is the $5,000 limit of liability for this **business equipment** coverage.

2. **Deductible**

For each **loss** to **covered property** that qualifies for coverage under this endorsement, the deductible shown on the **declarations page** for this "Cargo Liability" coverage will be applied to reduce the **loss** payable on the **covered property**. A $250 deductible will apply to each **business equipment loss**. For each **loss** to **business equipment** that qualifies for coverage under this endorsement, the **business equipment** deductible will be applied to reduce the **loss** payable on the **business equipment**.

If there is other **loss** arising out of a single occurrence that applies under this endorsement, or under the associated Commercial Auto Policy, and/or any other endorsement attached thereto, only one deductible will be applied to the aggregate of all **loss** components. The highest deductible applicable to any single coverage implicated in the **loss** will apply.

If **we** pay for any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

3. **Insurable Interest**

**We** will not cover more than **your** insurable interest in any **covered property** or **business equipment**.

4. **Sets or Parts**

a. Sets

The **loss** to an article that is part of a set will not be considered a **loss** to the entire set. Therefore, if there is a **loss** to **covered property** or **business equipment** that is part of a set, **we** at **our** option may choose to:

(a) repair or replace any part to restore the pair or set to its value before the **loss** or damage; or

(b) pay the difference between the value of the pair or set before and after the **loss** or damage.

b. Parts

If **loss** is to a part of **covered property** or **business equipment** that consists of several parts, **we** will pay for only the lost or damaged part.

**DUTIES IN CASE OF A LOSS**

The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1. **You** must take all reasonable steps to protect **covered property** and **business equipment** at the time of and after a **loss** to

avoid further damage.

2. **You** must allow **us** to have all property involved in an **accident** or **loss** inspected and appraised before its repair or disposal.

3. **You** must give **us** a copy of the descriptions and schedules from all insurance policies applicable to the **covered property** or **business equipment**, whichever the case may be, that was destroyed or damaged.

4. **You** must send **us** a signed, sworn proof of loss containing all the information **we** request to settle the claim. **You** must do this within 60 days after **our** request. **We** will supply **you** with the necessary forms.

5. **You** must, as often as **we** reasonably require, submit, and so far as is within **your** power, cause all other persons interested in the **covered property** or **business equipment**, whichever the case may be, and members of their households and employees to submit, to examination under oath by any person **we** name, and, in connection with any claim made, to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as **we** may designate, and permit extracts and copies thereof to be made.

6. Unless **we** give **our** permission, **you** may not dispose of the carcass(es) of animals, birds, or fish until **we** inspect or examine such carcass(es). However, this clause does not apply if such disposal is required by law or ordinance.

**GENERAL PROVISIONS**

1. When used in this endorsement, subsection 3—Other Insurance of the General Provisions section of **your** Commercial Auto Policy is deleted in its entirety and replaced by the following:

   a. **Other Insurance**
      (i) **You** may have other insurance subject to the same terms, conditions, and provisions as the insurance provided by this endorsement. If **you** do, **we** will pay **our** share of the covered **loss**. **Our** share is the proportion that the applicable limit of liability under this endorsement bears to the total of the limits of liability of all policies covering on the same basis.
      (ii) If there is other insurance covering the same **loss**, other than that described in paragraph (i) above, **we** will pay only for the amount of the covered **loss** in excess of the amount due from that other insurance, whether **you** can collect on it or not. However, **we** will not pay more than **our** applicable limit of liability.

   b. **Insurance Under Two or More Coverages**
      If two or more of this endorsement's coverages apply to the same **loss**, **we** will not pay more than the amount of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement, or the limit of liability applicable to the most specific coverage, whichever is less.

2. The following additional General Provisions apply to this Motor Truck Cargo Legal Liability Coverage endorsement:

   a. **Payment of Loss**
      (i) A covered **loss** will be payable 30 days after a satisfactory proof of loss is received or a final judgment award has been entered.

      **We** may make payment for a **loss** either to **you** or the owner of the property. **We** will not pay the owner more than their financial interest in the property. If **we** make a payment to the owner of the property, this shall be in full satisfaction of any claim by **you** for which such payment has been made.

If a **loss** has been paid or made good by others, **we** will not be liable for any part of the **loss**. Payment for a **loss** is required only if **you** have fully complied with all the terms of this policy.

(ii) With respect to **covered property**, **we** have the following options:
    (a) pay the value of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement;
    (b) pay the cost of repairing or replacing the **covered property**;
    (c) rebuild, repair, or replace the **covered property** with property of like kind and quality, to the extent practicable, and within a reasonable time; or
    (d) take all or any part of the damaged property at an agreed value.

(iii) With respect to **business equipment**, **we** will pay the loss as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement.

b. **Abandonment**
**We** may keep all or part of the property at the agreed or appraised value, but **you** may not abandon any property to **us** without **our** written consent.

c. **Conformity with Statute**
When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

d. **Recovered Property**
If **you** or **we** recover any **covered property** or **business equipment** for which **we** have made payment under this policy, **you** or **we** will promptly notify the other of the recovery. At **your** option, the property will be returned to or retained by **you** or it will become **our** property. If **you** keep the property, **you** must return to **us** the amount **we** paid to **you** for the **covered property** or **business equipment**, whichever the case may be. **We** will pay recovery expenses and the expenses to repair the recovered **covered property** and **business equipment**, subject to the limit of liability.

If **we** have already paid **you** the **loss** amount at the time of any salvage or recovery, the amount **you** receive for the recovered **covered property** will accrue entirely to **our** benefit until **you** have paid any amounts owed to **us** as a result of the adjustment to the **loss** amount.

e. **Salvage**
Any recovery of salvage on a **loss** will accrue entirely to **our** benefit until the sum **we** paid has been replaced. If **our** benefit of salvage recovery exceeds the sum that **we** paid, **we** will return the difference to **you**, less any salvage recovery expenses.

f. **Policy Period and Territory**
Coverage under this endorsement applies only to **losses** that occur during the policy period shown on the **declarations page** and which occur within the United States or Canada.

g. **Coverage Required by Filings**
If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:
(i) **we** are required to pay any judgment entered against **you**; or
(ii) **we** agree to settle a claim or lawsuit;
arising out of a **loss** that is covered solely because of the existence of such certificate of insurance, **we** will be obligated to

pay no more than the minimum amount required by that agency or any applicable law. If any payment is based solely on the existence of such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

h.   **No Benefit to Bailee**

No person or organization other than **you**, having custody of **covered property** or **business equipment**, will benefit from this insurance.

i.   **Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom **we** make payment under this endorsement has rights to recover damages from another, those rights are transferred to **us** to the extent of **our** payment. That person or organization must do everything necessary to secure **our** rights and must do nothing after **loss** to impair them. But **you** may waive **your** rights against another party in writing:

(i)   Prior to a **loss** to the **covered property** or **business equipment**.

(ii)   After a **loss** to the **covered property** or **business equipment**, but only if, at the time of **loss**, that party is one of the following:

(a)   someone insured by this insurance; or

(b)   a business firm:

(1)   owned or controlled by **you**; or

(2)   that owns or controls **you**.

j.   **Legal Action Against Us**

No one may bring a legal action against **us** under this endorsement unless:

(i)   there has been full compliance with all the terms of this policy; and

(ii)   the action is brought within three years after **you** first have knowledge of the direct **loss** or damage.

k.   **Premiums**

The first named insured shown on the **declarations page**:

(i)   is responsible for the payment of all premiums; and

(ii)   will be the payee for any return premiums **we** pay.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

**2364 0111**

# CARGO FORMS

**PLEASE READ YOUR POLICY AGREEMENT CAREFULLY.**
**Provisions of this Agreement and its endorsements restrict coverage. Be certain you understand all of the coverage terms, the exclusions, and your rights and duties.**

**All forms in the endorsement section do not automatically pertain to your policy.** **Please refer to your declarations page for form numbers associated with your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy. All other parts of the policy that have not been modified by an endorsement will remain unchanged.**

**This booklet contains Endorsement Form Z434 (01/11) and a section of other optional endorsements.**



**All forms appearing in this endorsement section do not automatically pertain to your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy.**

**Form No./Description**                        **Page**

Z434 (01/11)

**Motor Truck Cargo Legal Liability Coverage Endorsement** . . . . . . . . . . . . . . . . . . **1**

2369 (01/11)

**Courier Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2370 (06/10)

**Mobile/Modular Homes Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Z440 (09/09)

**Refrigeration Breakdown Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . 16

Form Z434 (01/11)

**MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT**

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

**INSURING AGREEMENT**

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1. while **in due course of transit** in, on, or attached to an **insured auto**; or
2. during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

**ADDITIONAL DEFINITIONS**

The following additional definitions apply throughout this Motor Truck Cargo Legal Liability Coverage endorsement whenever the defined term appears in boldface type, whether in the singular, plural, or possessive:

1. "**Covered peril**" means any external risks of direct physical **loss** to **covered property**, except for those listed in a. through k. below as Excluded Perils.

   **Excluded Perils: Please read the following list of Excluded Perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. We will not pay for any losses to covered property caused by, resulting in or from, or arising out of these Excluded Perils regardless of any other cause or event that contributes concurrently or in any sequence to the loss.**

1

a. **Civil Authority**

Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property. However, **we** will pay for **loss** or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this endorsement.

b. **Nuclear Hazard, Pollutants**
   (i) Any weapon employing atomic fission or fusion; or
   (ii) Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct **loss** caused by resulting fire if the fire would be covered under this endorsement.
   (iii) The release, discharge, seepage, migration, dispersal, or escape of **pollutants**, unless the release, discharge, seepage, migration, dispersal, or escape is caused by a **specified peril**.

c. **War, Civil Commotion**
   (i) **War**, including undeclared or civil war;
   (ii) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or agents;
   (iii) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority to hinder or defend against any of these; or
   (iv) Strikers, locked out workmen, or persons taking part in labor disturbances or riots, or civil commotions.

d. **Inherent Vice**

Contamination or deterioration, including corrosion; decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the **covered property** that causes it to damage or destroy itself.

e. **Criminal, Fraudulent, or Dishonest Acts**

Criminal, fraudulent, dishonest, or illegal acts alone or in collusion with another, whether or not such acts occurred during regular hours of employment, by:
   (i) **you**;
   (ii) **your** partners, officers, directors, trustees, or joint ventures;
   (iii) others to whom **you**, **your** partners, officers, directors, trustees, or joint ventures entrust the property;
   (iv) others who have an interest in the property; or
   (v) the employees or agents of any party specified in (i) through (iv) above.

This Excluded Peril does not apply to acts of destruction by **your** employees, but **we** will not pay for theft by employees.

f. **Consequential Loss**

Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property**.

2

**Breakdown, Temperature, Humidity**

    (i)   Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

    (ii)  Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to a transporting vehicle caused by a **covered cause of loss**.

    However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

h. **Voluntary Parting, Nondelivery, Mysterious Disappearance**

    (i)   Voluntary parting with title to, or possession of, the property due to fraudulent scheme, trick, or false pretense;

    (ii)  Nondelivery or misdelivery; or

    (iii)  Mysterious or unexplained disappearance; shortage of any property upon taking inventory; or theft of a part of the contents of any shipping package.

i. **Fines, Penalties, and Costs**

    Any costs, fines, punitive damages, assessments, attorney fees, court costs, or other penalties that **you** are required or liable to pay as a result of **your** violation of any law or regulation, or as a result of the violation of any law or regulation relating to any delay in the payment, denial, or settlement of any claim.

j. **Pre-existing Damage**

    With respect to auto haulers, **we** will not pay for pre-existing damage to vehicles being transported by the **insured**. For coverage to apply, the **insured** must provide to **us** a signed inspection document attesting to the condition of covered property before loading.

k. **Installation Operations**

    **Your** operation as rigger, hoister, erector, installer, or dismantler.

2.  "**Covered property**" means lawful goods and merchandise of others, except for the items listed in a. through j. below as Excluded Properties. **Covered property** includes **goods and merchandise** owned by **you** while loaded for shipment in or on an **insured auto**, whether or not shipped under a bill of lading or shipping receipt. When used in this endorsement, **goods and merchandise** means products destined for market and/or sale. **Covered property** does not include any equipment **you** own that is being transported between work sites. **Covered property** also does not include **autos you** own, lease, hire, rent, or borrow.

    **Excluded Properties: Please read the following list of excluded properties carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for loss to these types of properties.**

3

a. **Art, Jewelry, Metals, Money, Papers**

Objects of art, including paintings and statuary; jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; money and securities of any kind including monies collected or not collected under a C.O.D., bill of lading, or shipping receipt; food stamps, lottery tickets, notes, money orders, traveler's checks, accounts, bills, deeds, or other evidences of debt; valuable papers of any kind including passports, manuscripts, mechanical drawings, and blueprints.

b. **Contraband**

Contraband or property in the course of illegal transportation or trade.

c. **Live Animals**

Live animals, birds, or fish, including cattle or poultry, unless death results or is made necessary within 24 hours by a **specified peril**; or unless they escape or stray from the scene of **loss** and cannot be located, but only if the escape or straying is caused by a **specified peril**. **We** do not cover **your** liability for reduction in the market value or downgrading of live animals, birds, or fish due to minor injuries, scrapes, and bruises.

d. **Other Carrier**

Any property while in the custody of any other carrier.

e. **Property Not Under Bill of Lading**

Any property for which no bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage has been issued, or which is carried gratuitously or without charge.

f. **Storage**

Any property in or on an **insured auto** after it has remained at any location for more than 72 hours. This includes locations **you** own or use. This exclusion does not apply to delays in transportation outside of **your** control due to severe weather, as long as transport resumes as soon as the weather emergency has ended.

g. **Transporting Vehicles**

Any transporting vehicle or conveyance, including its equipment such as tarpaulins, shipping containers, chains, or binders.

h. **Explosive or Radioactive Material**

Explosives, ammunition, fireworks, or radioactive material.

i. **Pharmaceuticals, Tobacco, Alcohol**

Prescription pharmaceuticals; tobacco products; or alcoholic beverages, other than beer or wine.

j. **Mobile/Modular Homes**

**Mobile/Modular Homes** whether carried on or attached to the **insured auto**.

4

3. "**Earned freight charges**" means freight charges from the point of departure to the point of **loss**.

4. "**In due course of transit**" means being shipped from the time **you** assume care, custody, or control of the **covered property** for the purpose of the actual movement of **covered property** from the point of shipment bound for a specific destination and ending when one of the following first occurs:
   a. the **covered property** is accepted by, or on behalf of, the consignee at the intended destination;
   b. the **covered property** is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;
   c. 72 hours after arrival at destination; or
   d. any other stop that exceeds 72 hours.

   **In due course of transit** includes ordinary, reasonable, and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment.

5. "**Insured auto**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy, and includes **trailers** listed on the **declarations page**. In addition, as used in this endorsement, **insured auto** includes:
   a. Non-owned **trailers** designed primarily for travel on public roads while **in due course of transit**; and
   b. Any **temporary substitute auto**.

   With respect to this endorsement, if **we** provide coverage for an additionally acquired **auto**, **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **declarations page**.

6. "**Loading or unloading**" means the direct physical process of hoisting, lifting, or moving **covered property**:
   a. onto an **insured auto** from the ground or loading docks adjacent to such **insured auto**; or
   b. off of an **insured auto** to the place where it is finally delivered.

   However, for auto haulers, **loading or unloading** means moving **covered property** onto or off of **your insured auto**, including moving a motor vehicle under its own power solely for the purpose of **loading or unloading** it from the **insured auto**, but no more than one road mile from the **insured auto**.

7. "**Mobile/Modular Homes**" means prefabricated housing units, factory built homes, mobile homes, and modular homes. The term does not include motor homes or travel trailers designed for use on public roads.

8. "**Pollutant**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy. Additionally, as used in this endorsement, it includes electrical or magnetic emissions, whether visible or invisible, and sound emissions.

9. "**Specified peril**" means:
   a. fire, lightning, or explosion;

5

b. smoke, but this cause of **loss** does not include smoke from exhaust fumes or gases of the transporting vehicles, agricultural smudging, or industrial operations;

c. windstorm or hail, but this cause of **loss** does not include **loss** caused by or resulting from:
   (i) heat, cold, or change in or extremes of temperature; or
   (ii) ice (other than hail), snow, or sleet, whether driven by wind or not;

d. collision, overturn, or derailment of a transporting conveyance. With respect to live animals, birds, or fish, this cause of **loss** does not include **loss** caused by or resulting from the **insured auto** coming in contact with:
   (i) the roadbed;
   (ii) curbing;
   (iii) rails or ties of railways; or
   (iv) a stationary object while backing for **loading or unloading** purposes;

e. collapse of a bridge, wharf, dock, platform, or culvert;

f. stranding, sinking, burning, or collision on any ferry;

g. flood, meaning the rising of any natural body of water; and

h. theft, but excluding pilferage by **you** or **your** employees, anyone with a financial interest in the cargo or their employees, authorized representatives or anyone else entrusted with the cargo. Theft does not include **loss** caused by or resulting from:
   (i) Wrongful conversion; or
   (ii) Acceptance of counterfeit money, fraudulent post office or express money orders, or checks or promissory notes not paid upon presentation.

   With respect to live animals, birds, or fish, **we** will extend this theft coverage to pay for direct physical loss to live animals, birds, or fish caused by theft of:
   (i) The entire load of live animals, birds, or fish; or
   (ii) The **insured auto** in or on which the live animals, birds, or fish are loaded. However, this coverage extension does not apply to the loss of individual animals or less than the entire load of live animals, birds, or fish unless the entire **insured auto** is first stolen.

10. "**Trucker**" means any person, organization, or motor carrier engaged in the business of transporting property for hire.

## ADDITIONAL PAYMENTS

In addition to the applicable limit of liability:

### 1. **Earned Freight**

**We** will pay **earned freight charges** that are due to **you** if **you** are unable to collect them from others because of a **loss** to **covered property** that is caused by a **covered peril**. The most **we** will pay under this additional coverage for all freight charges in any one **loss** is $10,000.

6

2. **Removal Expenses**

   a. **We** will pay removal expenses incurred to remove debris of **covered property**, which results from a **loss** caused by a **covered peril** that occurs during the policy period. The term "debris" does not include **pollutants**.

   b. **We** will also pay removal expenses incurred to extract **pollutants** from land or water, if the discharge, dispersal, migration, or release of the **pollutants** is caused by or results from **loss** to **covered property**, and if such **loss** is caused by a **covered peril** during the policy period.

      **We** do not pay for:

      (i) the cost of testing; evaluating; observing; or recording the existence, level, or effects of **pollutants**. However, **we** will pay the cost of testing that is necessary for the extraction of **pollutants** from land or water.

      (ii) any damage to **your insured auto** from **pollutants**.

   c. The most **we** will pay for all removal expenses described in a. or b. above arising out of any one **loss** is $25,000.

   d. The expenses for removal of **covered property** debris and **pollutants** will be paid only if they are reported to **us** in writing within 180 days of the earlier of:

      (i) the date of the direct physical **loss**; or

      (ii) the end of the policy period.

3. **Expenses in Defense or Settlement of Claims**

   **We** will pay, with respect to any claim **we** investigate or settle, or with respect to any lawsuit against any insured **we** defend:

   a. all expenses **we** incur.

   b. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. However, **we** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds.

   c. all reasonable expenses incurred by **you** at **our** request, including actual loss of earnings up to $250 per day because of time off from work.

   d. all costs taxed against the insured in any lawsuit against the insured **we** defend.

   e. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. This does not apply if **we** have not been given notice of suit or the opportunity to defend an insured. **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

   f. interest accruing before entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. **Our** offer to pay that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after **our** offer.

4. **Sue and Labor**

   a. **We** will pay the necessary expenses **you** incur to prevent further **loss** to **covered property** if that expense is incurred within a 12-hour period after the **covered peril** occurs.

7

b. If, in the event of an **occurrence**, it becomes necessary to move the **covered property** in order to avoid a **loss** to the **covered property**, **we** will pay the reasonable and necessary costs incurred by **you** to move the **covered property** away from the location of the occurrence.

c. The most **we** will pay for the aggregate of all expenses incurred under subparts a. and b. above is $7,500.

## LIMITS OF LIABILITY

1. **Amount of Payment**
   a. Subject to subsections 2., 3., and 4. below, in the event of a **loss**, **we** will pay the least of the following:
      (i) **Your** legal liability for the direct physical **loss** to the **covered property**;
      (ii) The declared value of the **covered property** shown in the bill of lading, tariff documents, rate confirmation sheet, shipping receipt, or contract of carriage;
      (iii) For household goods, the amount specified in any advice of coverage, or other document evidencing an agreed valuation for property in transit;
      (iv) The actual cost to the shipper to repair or replace the **covered property** with material of like kind and quality, not including any claim for diminution of value to the **covered property**; or
      (v) The "Cargo" limit shown on the **declarations page**.
   b. Regardless of the number of **insured autos** or **trailers** involved, insureds, premiums paid, policies issued by **us**, claims made, or lawsuits brought, the most **we** will pay for **loss** to **covered property** in any one occurrence is the limit of liability shown on the **declarations page** for "Cargo Liability" coverage.

2. **Deductible**
   For each **loss** that qualifies for coverage under this endorsement, the deductible shown on the **declarations page** for this "Cargo Liability" coverage will be applied to reduce the **loss** payable on the **covered property**. If there is other **loss** arising out of a single occurrence that applies under this endorsement, or under the associated Commercial Auto Policy, and/or any other endorsement attached thereto, only one deductible will be applied to the aggregate of all **loss** components. The highest deductible applicable to any single coverage implicated in the **loss** will apply.

3. **Insurable Interest**
   **We** will not cover more than **your** insurable interest in any **covered property**.

4. **Sets or Parts**
   a. Sets
      The **loss** to an article that is part of a set will not be considered a **loss** to the entire set. Therefore, if there is a **loss** to **covered property** that is part of a set, **we** at **our** option may choose to:
      (a) repair or replace any part to restore the pair or set to its value before the **loss** or damage; or
      (b) pay the difference between the value of the pair or set before and after the **loss** or damage.

8

b. **Parts**

   If **loss** is to a part of **covered property** that consists of several parts, **we** will pay for only the lost or damaged part.

## DUTIES IN CASE OF A LOSS

The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1. **You** must take all reasonable steps to protect **covered property** at the time of and after a **loss** to avoid further damage.

2. **You** must allow **us** to have all property involved in an **accident** or **loss** inspected and appraised before its repair or disposal.

3. **You** must give **us** a copy of the descriptions and schedules from all insurance policies applicable to the **covered property** that was destroyed or damaged.

4. **You** must send **us** a signed, sworn proof of loss containing all the information **we** request to settle the claim. **You** must do this within 60 days after **our** request. **We** will supply **you** with the necessary forms.

5. **You** must, as often as **we** reasonably require, submit, and so far as within **your** power, cause all other persons interested in the **covered property** and members of their households and employees to submit, to examination under oath by any person **we** name, and in connection with such claim to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as **we** may designate, and permit extracts and copies thereof to be made.

6. Unless **we** give **our** permission, **you** may not dispose of the carcass(es) of live animals, birds, or fish until **we** inspect or examine such carcass(es). However, this clause does not apply if such disposal is required by law or ordinance.

## GENERAL PROVISIONS

1. When used in this endorsement, subsection 3 - Other Insurance of the General Provisions section of **your** Commercial Auto Policy is deleted in its entirety and replaced by the following:

   a. **Other Insurance**
      (i) **You** may have other insurance subject to the same terms, conditions, and provisions as the insurance provided by this endorsement. If **you** do, **we** will pay **our** share of the covered **loss**. **Our** share is the proportion that the applicable limit of liability under this endorsement bears to the total of the limits of liability of all policies covering on the same basis.

9

(ii) If there is other insurance covering the same **loss**, other than that described in paragraph (i) above, **we** will pay only for the amount of the covered **loss** in excess of the amount due from that other insurance, whether **you** can collect on it or not. However, **we** will not pay more than **our** applicable limit of liability.

b. **Insurance Under Two or More Coverages**

If two or more of this endorsement's coverages apply to the same **loss**, **we** will not pay more than the amount of the **loss** as determined under subsection 1 - Amount of Payment in the Limits of Liability section of this endorsement, or the limit of liability applicable to the most specific coverage, whichever is less.

2. The following additional General Provisions apply to this Motor Truck Cargo Legal Liability Coverage endorsement:

a. **Payment of Loss**

(i) A covered **loss** will be payable 30 days after a satisfactory proof of loss is received or a final judgment award has been entered.

**We** may make payment for a **loss** either to **you** or the owner of the property. **We** will not pay the owner more than their financial interest in the property. If **we** make a payment to the owner of the property, this shall be in full satisfaction of any claim by **you** for which such payment has been made.

If a **loss** has been paid or made good by others, **we** will not be liable for any part of the **loss**. Payment for a **loss** is required only if **you** have fully complied with all the terms of this policy.

(ii) **We** have the following options:
   (a) pay the value of the **loss** as determined under subsection 1 - Amount of Payment in the Limits of Liability section of this endorsement;
   (b) pay the cost of repairing or replacing the **covered property**;
   (c) rebuild, repair, or replace the **covered property** with property of like kind and quality, to the extent practicable, and within a reasonable time; or
   (d) take all or any part of the damaged property at an agreed value.

b. **Abandonment**

**We** may keep all or part of the property at the agreed or appraised value, but **you** may not abandon any property to **us** without **our** written consent.

c. **Conformity with Statute**

When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

d. **Recovered Property**

If **you** or **we** recover any **covered property** for which **we** have made payment under this policy, **you** or **we** will promptly notify the other of the recovery. At **your** option, the property will be returned to or retained by **you** or it will become **our**

10

property. If **you** keep the property, **you** must return to **us** the amount **we** paid to **you** for the **covered property**. **We** will pay recovery expenses and the expenses to repair the recovered **covered property**, subject to the limit of liability.

If **we** have already paid **you** the **loss** amount at the time of any salvage or recovery, the amount **you** receive for the recovered **covered property** will accrue entirely to **our** benefit until **you** have paid any amounts owed to **us** as a result of the adjustment to the **loss** amount.

e. **Salvage**

Any recovery of salvage on a **loss** will accrue entirely to **our** benefit until the sum **we** paid has been replaced. If **our** benefit of salvage recovery exceeds the sum that **we** paid, **we** will return the difference to **you**, less any salvage recovery expenses.

f. **Policy Period and Territory**

Coverage under this endorsement applies only to **losses** that occur during the policy period shown on the **declarations page** and which occur within the United States or Canada.

g. **Coverage Required by Filings**

If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:

(i) **we** are required to pay any judgment entered against **you**; or

(ii) **we** agree to settle a claim or lawsuit;

arising out of a **loss** that is covered solely because of the existence of such certificate of insurance, **we** will be obligated to pay no more than the minimum amount required by that agency or any applicable law. If any payment is based solely on the existence of such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

h. **No Benefit to Bailee**

No person or organization other than **you**, having custody of **covered property**, will benefit from this insurance.

i. **Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom **we** make payment under this endorsement has rights to recover damages from another, those rights are transferred to **us** to the extent of **our** payment. That person or organization must do everything necessary to secure **our** rights and must do nothing after **loss** to impair them. But **you** may waive **your** rights against another party in writing:

(i) Prior to a **loss** to the **covered property**.

(ii) After a **loss** to the **covered property**, but only if, at the time of **loss**, that party is one of the following:

(a) someone insured by this insurance; or

11

(b) a business firm.

    (1)  owned or controlled by **you**; or

    (2)  that owns or controls **you**.

j.  **Legal Action Against Us**

No one may bring a legal action against **us** under this endorsement unless:

(i)   There has been full compliance with all the terms of this policy; and

(ii)  The action is brought within two years after **you** first have knowledge of the direct **loss** or damage.

k.  **Premiums**

The first named insured shown on the **declarations page**:

(i)   Is responsible for the payment of all premiums; and

(ii)  Will be the payee for any return premiums **we** pay.

## **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

Form 2369 (01/11)

## **COURIER COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

Subject to the Limits of Liability, if "business documents/non-negotiable securities" appears on **your declarations page**, **we** agree with **you** that **your** Motor Truck Cargo Endorsement is modified as follows.

### **INSURING AGREEMENT**

The following paragraph is deleted:

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1.  while **in due course of transit** in, on, or attached to an **insured auto**; or

2.  during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

12

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **carrier for hire** under a written bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1. while **in due course of transit** in, on, or attached to an **insured auto**; or
2. during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**ADDITIONAL DEFINITIONS**

2. "**Excluded properties**":

The following section is deleted in its entirety:

a. **Art, Jewelry, Metals, Money, Papers**
   Objects of art, including paintings and statuary; jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; money and securities of any kind, including monies collected or not collected under a C.O.D., bill of lading, or shipping receipt; food stamps, lottery tickets, notes, money orders, traveler's checks, accounts, bills, deeds, or other evidences of debt; valuable papers of any kind, including passports, manuscripts, mechanical drawings, and blueprints.

and replaced by:

a. **Jewelry, Metals, Money**
   Jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; or money and securities that are in negotiable form.

The following section is deleted in its entirety:

i. **Pharmaceuticals, Tobacco, Alcohol**
   Prescription pharmaceuticals; tobacco products; or alcoholic beverages, other than beer or wine.

and replaced by:

i. **Controlled Drugs, Tobacco, Alcohol**
   **Controlled drugs**; tobacco products; or alcoholic beverages, other than beer or wine. **Controlled drugs** means substances listed in either Schedule 1 or Schedule 2 of the Comprehensive Drug Abuse and Control Act of 1970, as amended.

13

The following is added:

11. "**Carrier for hire**" means any person or organization engaged in the business of transporting property for hire.

12. "**Documents**" means papers (including checks, drafts, money orders, notes, and securities in non-negotiable form) and/or data processing media that contain information.

## LIMITS OF LIABILITY

The following is added:

    5. **Documents** will be valued at the lesser of the following:

      a. the necessary cost to **you** or **your** customer to reconstruct documents (including checks, drafts, money orders, notes, and securities), including the expense of stop payment on checks if necessary; or

      b. the cost of replacement with substantially identical property, including premiums for loss instrument bonds if such expense is required to effect replacement or reconstruction.

    In the event that a document cannot be reconstructed or replaced with substantially identical property, it will be valued at its cost *in blank* plus any transcription costs actually incurred.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 2370 (06/10)

## MOBILE/MODULAR HOMES COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

Subject to the Limits of Liability, if "mobile/modular homes" appears on **your declarations page**, we agree with **you** that **your** Motor Truck Cargo Legal Liability Coverage Endorsement is modified as follows.

## ADDITIONAL DEFINITIONS

1. The following Excluded Perils, under the definition "**Covered peril**", are modified as follows:

    (a) Excluded Perils k. Installation Operations is deleted and replaced by the following:

14

k. **Installation Operations**

**Your** operation as rigger, hoister, erector, installer, dismantler, including setting up of **mobile/modular homes**.

(b) The following is added to Excluded Perils:

l. **Frame Collapse or Damage**
   (i) **Loss** from the collapse or failure of the frame, undercarriage, or suspension system of a **mobile/modular home**, trailer, container, or other vehicle being towed as covered cargo by the **insured auto**, including but not limited to axles, wheels, tongue, and tires;
   (ii) **Loss** from sagging, warping, twisting, or loss of windows or doors from their frames unless caused directly by fire, collision or upset;

m. **Personal Property**
   Loss to personal property that is not an integral part of a **mobile/modular home**.

n. **Collision with Insured Auto**
   **Loss** due to any collision between the **insured auto** and the **mobile/modular home**, unless such collision is the result of a **covered cause of loss**.

o. **Collision with Roadway**
   **Loss** due to any collision between the **mobile/modular home** with any portion of the road or pathway being traveled by the **insured auto**, or collision with adjacent curbing, or with the rails or ties of street, steam or other railroad, unless such collision is the result of a **covered cause of loss**.

2. "**Excluded properties**" is modified as follows:

   Exclusion j. is deleted in its entirety.

**LIMITS OF LIABILITY**

4. **Sets or Parts**

   The following is added:

   c. In the event of a total loss to one section of a multi-section **mobile/modular home** while on or attached to an **insured auto** and it is not possible to repair or replace the damaged section, **we** at our option may agree to pay for all sections of the **mobile/modular home** and take the title to the undamaged section(s).

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

15

Form Z440 (06/10)

## **REFRIGERATION BREAKDOWN COVERAGE ENDORSEMENT**

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

### **INSURING AGREEMENT**

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

### **ADDITIONAL DEFINITIONS**

Under the definition of "**covered peril**," Excluded Peril "g." is deleted and replaced by:

g. **Breakdown, Temperature, Humidity**
   (i)   Humidity, dampness, dryness, or changes in or extremes of temperature, other than such **loss** caused by the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**; or
   (ii)  Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

### **ADDITIONAL PAYMENTS**

The following is added to the Additional Payments section:

5. **Additional Expense to Temporarily Store Covered Property**
   In addition to the applicable limit of liability for the Refrigeration Breakdown Coverage, **we** will pay any reasonable additional expenses that **you** incur to temporarily store **covered property** in a controlled-temperature environment in order to avoid or minimize **loss** to such property due to spoilage or change in temperature. Such

16

temporary storage must be directly made necessary by the sudden and accidental breakdown of a refrigeration or heating unit of **your insured auto**. However, under this Additional Expense to Temporarily Store Covered Property coverage, **we** will not pay for:

a. Expenses incurred to repair or replace the refrigeration or heating unit;
b. Costs or penalties incurred for detention or delay of vehicles, **trailers**, or containers to which the refrigeration or heating unit is attached; or
c. Additional lodging or meal expenses for the driver of the **insured auto** that exceed $150 per day or $300 total.

The most **we** will pay with respect to any one occurrence under this Additional Expense to Temporarily Store Covered Property coverage is $2,500.

## LIMITS OF LIABILITY

The following is added to subsection 2, Deductible:

For each **loss** that qualifies for coverage under the Refrigeration Breakdown Coverage endorsement, a deductible of $2,500 will be applied to reduce the **loss** payable with respect to the **covered property**.

## EXCLUSIONS

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:

1. Failure to provide adequate fuel supply;
2. Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3. Intentional destruction or damage to automatic temperature control units by an employee; or
4. Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's specifications.

## DUTIES IN CASE OF A LOSS

The following are added to the Duties in Case of a Loss section:

7. **You** must take all reasonable steps to protect **covered property** at the time of and after a **loss** to avoid further damage, including but not limited to storage of the cargo in a properly temperature controlled facility or alternate trailer;
8. **You** must allow **us** access to the refrigeration or heating equipment prior to its repair unless a delay in repair would imperil the cargo;
9. **You** must provide **us** access to all maintenance and repair records for the failed refrigeration or heating unit; and

17

16. **You** must allow **us** access to all records establishing the proper use of the equipment, including any and all electronic records or logs generated by the unit.

**GENERAL PROVISIONS**

The following is added to the General Provisions section:

I. Refrigeration/Heating Equipment Maintenance.
   1. **You**, or **your** employee, must check the refrigeration and heating equipment every 12 hours while it is being operated; and
   2. At least once a month, **you** must:
      a. Have the refrigeration and heating equipment inspected by a manufacturer-authorized representative, or other trained refrigeration specialist, which may include **you** or **your** employee;
      b. Promptly perform the proper maintenance according to manufacturer's specifications;
      c. Make any appropriate or necessary repairs; and
      d. Keep and update written records with respect to item 1. and items 2.a. through 2.c. above. **You** must allow **us** to inspect these records as often as **we** may reasonably require. If **you** fail to maintain these records, coverage will be void under this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT REMAIN UNCHANGED.**

18



1781 NC 0219

# NORTH CAROLINA
## COMMERCIAL AUTO FORMS

**PLEASE READ YOUR POLICY AGREEMENT CAREFULLY.**
**Provisions of this Agreement and its endorsements restrict coverage. Be certain you understand all of the coverage terms, the exclusions, and your rights and duties.**

**All forms in the endorsement section do not automatically pertain to your policy.**
**Please refer to your declarations page for form numbers associated with your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy. All other parts of the policy that have not been modified by an endorsement will remain unchanged.**

**This booklet contains Form 6912 (02/19) and a section of optional endorsements.**



Form 6912 (02/19)

## **COMMERCIAL AUTO POLICY**

---

## **INDEX OF POLICY PROVISIONS**

**PAGE**

**DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS**. . . . . . . . . . . . . . . . . . . .1

**GENERAL DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**PART I—LIABILITY TO OTHERS**
Insuring Agreement—Liability To Others . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . . .6
Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Out-Of-State Coverage Extension. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

**PART II—DAMAGE TO YOUR AUTO**
Insuring Agreement—Collision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . .15
Insuring Agreement—Comprehensive Coverage . . . . . . . . . . . . . . . . . . . . . .15
Insuring Agreement—Fire and Theft with Combined
 Additional Coverage (CAC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Additional Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Additional Definition Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . . .17
Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
Deductible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
Salvage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
No Benefit to Bailee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
Payment of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
Loss Payee Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**GENERAL PROVISIONS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**COMMERCIAL AUTO POLICY**

If **you** pay **your** premium when due, **we** will provide the insurance described in this policy.

## DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each **accident** or **loss** even if **you** or the person seeking coverage is not at fault. Refer to your policy documents for the claims phone number.

**You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the **accident** or **loss**, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the **accident**, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable. However, for purposes of uninsured motorist coverage when the owner or operator of a vehicle involved in the accident cannot be identified, **you** or the person seeking coverage must notify the police no more than 30 days after the accident.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of **loss we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you**, a **relative**, or any person claiming coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call **us** to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to any claim or lawsuit;
5. attend hearings and trials as **we** require;
6. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require;
7. authorize **us** to obtain medical and other records;
8. take reasonable steps after a **loss** to protect the **insured auto** from further **loss**. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
9. allow **us** to have access to an **insured auto** or other **auto** involved in an **accident** or **loss** and to have it inspected and appraised before its repair or disposal; and
10. authorize **us** access to **your** business or personal records as often as **we** may reasonably require.

1

**GENERAL DEFINITIONS**

**The words and phrases below, whether in the singular, plural or possessive, have the following special meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.**

1. "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

2. "**Auto**" means a land motor vehicle or **trailer** designed for travel on public roads, or any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. It does not include **mobile equipment**. Self-propelled vehicles with the following types of permanently attached equipment are **autos**, not **mobile equipment**:
   a. equipment designed and used primarily for:
      (i) snow removal;
      (ii) road maintenance, but not construction or resurfacing;
      (iii) street cleaning;
   b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
   c. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

4. "**Declarations**" or "**declarations page**" means the document prepared by **us** listing **your** policy information, which may include the types of coverage **you** have elected, the limit for each coverage, the cost for each coverage, the specifically described **autos** covered by this policy, and the types of coverage for each specifically described **auto**.

5. "**Employee**" includes a **leased worker** and a statutory employee. **Employee** does not include a **temporary worker**.

6. "**Insured auto**" or "**your insured auto**" means:
   a. Any **auto** specifically described on the **declarations page**; or
   b. An additional **auto** for Part I—Liability To Others and/or Part II—Damage To Your Auto on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

2

(ii) **we** insure all **autos** owned by **you** that are used in **your** business;

(iii) no other insurance policy provides coverage for that **auto**; and

(iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it for that coverage.

If **you** add any coverage, increase **your** limits, or make any other changes to this policy during the 30-day period after **you** acquire an additional **auto**, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes for the additional **auto**. **We** may charge premium for the additional **auto** from the date **you** acquire the **auto**.

With respect to Part I—Liability To Others, if **we** provide coverage for an additionally acquired **auto** in accordance with this paragraph b., **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **declarations page**.

With respect to Part II—Damage To Your Auto, if **we** provide coverage for an **auto you** acquire in addition to any **auto** specifically described on the **declarations page**, and the additional **auto** is:

(i) a **private passenger auto**, **we** will provide the broadest coverage **we** provide for any **auto** shown on the **declarations page**; or

(ii) any **auto** other than a **private passenger auto**, and **you** have purchased Physical Damage coverage for at least one **auto** other than a **private passenger auto**, **we** will provide the broadest coverage for which the newly acquired **auto** is eligible.

c. Any replacement **auto** on the date **you** become the owner if:

(i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

(ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable; and

(iii) no other insurance policy provides coverage for that **auto**.

If **we** provide coverage for a replacement **auto**, **we** will provide the same coverage for the replacement **auto** as **we** provide for the replaced **auto**. **We** will provide that coverage for a period of 30 days after **you** become the owner of such replacement **auto**. **We** will not provide any coverage after this 30-day period unless within this period **you** ask **us** to insure the replacement **auto**. If **you** add any coverage, increase **your** limits, or make any other changes to **your** policy during this 30-day period, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes.

3

7. **Insured contract** means:

    a. A lease of premises;

    b. A sidetrack agreement;

    c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    e. That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability that is vicariously imposed on another for **your** negligence or that of **your employees** or agents; or

    f. That part of any contract or agreement, entered into as part of **your** business, for the rental of an **insured auto**. However, such contract or agreement shall not be considered an **insured contract** to the extent that it obligates **you** or any of **your employees** to pay for **property damage** to any **auto** rented or leased to **you** or any of **your employees**.

An "**insured contract**" does not include that part of any contract or agreement:

1. That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass, or crossing; or

2. That pertains to the loan, lease or rental of an **auto** to **you** or any of **your employees**, if the **auto** is loaned, leased or rented with a driver; or

3. That holds a person or organization engaged in the business of transporting property by **auto** for hire harmless for **your** use of an **insured auto** over a route or territory that person or organization is authorized to serve by public authority.

8. "**Leased worker**" means a person leased to **you** by a labor leasing firm under an agreement between **you** and the labor leasing firm to perform duties related to the conduct of **your** business. **Leased worker** does not include a **temporary worker**.

9. "**Loss**" means sudden, direct and accidental loss or damage.

10. "**Mobile equipment**" means any of the following types of land vehicles, including, but not limited to, any attached machinery or equipment:

    a. Bulldozers, farm implements and machinery, forklifts, and other vehicles designed for use principally off public roads;

    b. Vehicles **you** use solely on premises **you** own or rent and on accesses to public roads from these premises, unless specifically described on the **declarations page** and not defined as **mobile equipment** under other parts of this definition;

4

c. Any vehicle that travels on crawler-treads, or that does not require licensing in the state in which **you** reside or **your** business is licensed;

d. Vehicles, whether self-propelled or not, used primarily to provide mobility to permanently attached:
   (i) Power cranes, shovels, loaders, diggers, or drills; or
   (ii) Road construction or resurfacing equipment, such as graders, scrapers or rollers.

e. Vehicles not described in Paragraphs a., b., c., or d. above that are not self-propelled and are used primarily to provide mobility to permanently attached equipment of the following types:
   (i) Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or
   (ii) Cherry pickers and similar devices used to raise or lower workers.

f. Vehicles not described in Paragraphs a., b., c., or d. above that are self-propelled and used primarily for purposes other than transportation of persons or cargo.

However, **mobile equipment** does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

11. "**Occupying**" means in, on, entering or exiting.

12. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of **private passenger autos** for use by individuals, businesses, or other entities.

13. "**Pollutants**" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14. "**Private passenger auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, **private passenger auto** does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

15. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

16. "**Relative**" means any person residing in the household in which the named insured resides who is related to the named insured by blood, marriage, or

5

adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

17. "**Temporary substitute auto**" means any **auto you** do not own while used with the permission of its owner as a temporary substitute for an **insured auto** that has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction. However, **temporary substitute auto** does not include any **auto** available for the regular or frequent use of **you**, a **relative**, or **your employees** unless that **auto** is insured under a separate policy of insurance that provides at least the minimum required limits of financial responsibility under the applicable state and federal laws.

18. "**Temporary worker**" means:
    a. a person who is furnished to **you** to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions; or
    b. a day laborer.

19. "**Trailer**" includes a semi-trailer and any piece of equipment used to convert a semi-trailer to a full trailer while it is attached to the semi-trailer.

20. "**We**", "**us**" and "**our**" mean the company providing this insurance as shown on the **declarations page**.

21. "**You**", "**your**" and "**yours**" refer to the named insured shown on the **declarations page**.

## PART I—LIABILITY TO OTHERS

### INSURING AGREEMENT—LIABILITY TO OTHERS

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of that **insured auto**. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS USED IN THIS PART ONLY

A. When used in Part I—Liability To Others, **insured** means:
   1. **You** with respect to an **insured auto**.

6

2. Any person while using, with **your** permission, and within the scope of that permission, an **insured auto you** own, hire, or borrow except:

   (a) Any person while he or she is working in a business of selling, leasing, repairing, parking, storing, servicing, delivering or testing **autos**, unless that business is **yours** and it was so represented in **your** application.

   (b) Any person while he or she is moving property to or from an **insured auto**, other than one of **your employees**, partners (if you are a partnership), members (if you are a limited liability company), or officers or directors (if you are a corporation).

   (c) The owner or anyone else from whom the **insured auto** is leased, hired, or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

   (d) The employees or agents of an owner or anyone else from whom the **insured auto** is leased, hired or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

For purposes of this subsection A.2., an **insured auto you** own includes any **auto** specifically described on the **declarations page**.

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. If **we** make a filing or submit a certificate of insurance on **your** behalf with a regulatory or governmental agency, the term "**insured**" as used in such filing or certificate, and in any related endorsement, refers only to the person or organization named on such filing, certificate or endorsement.

B. When used in Part I—Liability To Others, **insured auto** also includes:

1. **Trailers** designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;

2. **Mobile equipment** while being carried or towed by an **insured auto**;

3. Any **temporary substitute auto**; and

4. **Mobile equipment** that is:

   a. owned by **you**;

   b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

   c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

However, **mobile equipment** meeting any of those three criteria will qualify only if at the time of **loss** it is being:

   a. used in **your** business;

   b. operated on a public highway; and

   c. operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

7

C. When used in Part C – Liability To Others, "**covered pollution cost or expense**" means any cost or expense arising out of:
1. Any request, demand, order, or statutory or regulatory requirement; or
2. Any claim or suit by or on behalf of a governmental authority demanding that the **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, **pollutants**.

**Covered pollution cost or expense** does not include any cost or expense arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:
a. That are, or that are contained in any property that is:
   (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
   (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
   (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;
b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or
c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this definition does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the **insured auto** or its parts if:
(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and
(2) The **bodily injury**, **property damage** or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this definition do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:
(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned or damaged as a result of the maintenance or use of an **insured auto**; and
(2) The discharge, dispersal, release or escape of the **pollutants** is caused directly by such upset, overturn or damage.

8

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:

1. all expenses that **we** incur in the settlement of any claim or defense of any lawsuit;

2. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest which accrues after the date of **our** payment, written offer, or deposit;

3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

4. up to $2,000 for cost of bail bonds required because of an **accident we** cover. **We** have no duty to apply for or furnish these bonds;

5. reasonable expenses incurred by an **insured** at **our** request, including loss of earnings up to $250 a day; and

6. all court costs taxed against the **insured** in any "suit" against the **insured** we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the **insured**.

### OUT-OF-STATE COVERAGE EXTENSION

If an **accident** to which this Part I applies occurs in any state, territory, or possession of the United States of America, Puerto Rico, or any province or territory of Canada, other than the state in which an **insured auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limit; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the Limits of Liability under this policy.

This extension does not apply to the limit or limits specified by any law governing commercial carriers of passengers or property.

**We** will not pay anyone more than once for the same elements of **loss** because of this extension.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART I—LIABILITY TO OTHERS.**

Coverage under this Part I, including **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

2. **Contractual**
   Any liability assumed by an **insured** under any contract or agreement, unless the agreement is an **insured contract** that was executed prior to the occurrence of any **bodily injury** or **property damage**.

   However, this exclusion does not apply to liability for damages that an **insured** would have in the absence of the contract or agreement.

3. **Worker's Compensation**
   Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

4. **Nuclear Energy Liability**
   An **accident** for which any person is insured under nuclear energy liability insurance. This exclusion applies even if the limits of that insurance are exhausted.

5. **Employee Indemnification and Employer's Liability**
   **Bodily injury** to:
   a. An **employee** of any **insured** arising out of or within the course of:
      (i) That **employee's** employment by any **insured**; or
      (ii) Performing duties related to the conduct of any **insured's** business; or
   b. The spouse, child, parent, brother or sister of that **employee** as a consequence of Paragraph a. above.

   This exclusion applies:
   a. Whether the **insured** may be liable as an employer or in any other capacity; and
   b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

10

But this exclusion does not apply to **bodily injury** to a domestic **employee** if benefits are neither paid nor required to be provided under any workers' compensation, disability benefits, or similar law, or to liability for **bodily injury** assumed by the **insured** under an **insured contract**. For the purposes of this policy, a domestic **employee** is a person engaged in household or domestic work performed principally in connection with a residence premises.

6. **Fellow Employee**
   **Bodily injury** to:
   a. a fellow **employee** of an **insured** injured while within the course of their employment or while performing duties related to the conduct of **your** business.
   b. the spouse, child, parent, brother, or sister of that fellow **employee** as a consequence of Paragraph a. above.

7. **Care, Custody or Control**
   **Property damage** to, towing or removal expense for, or **covered pollution cost or expense** involving, any property owned by, rented to, being transported by, used by, or in the care, custody or control of any **insured**, including any motor vehicle operated or being towed. But this exclusion does not apply to liability assumed under a sidetrack agreement.

8. **Movement of Property by Mechanical Device**
   **Bodily injury** or **property damage** resulting from or caused by the movement of property by a mechanical device, other than a hand truck, not attached to an **insured auto**.

9. **Handling of Property**
   **Bodily injury** or **property damage** resulting from or caused by the handling of property:
   a. before it is moved from the place where it is accepted by the **insured** for movement into or onto **your insured auto**; or
   b. after it has been moved from **your insured auto** to the place where it is finally delivered by the **insured**.

10. **Pollution**
    **Bodily injury** or **property damage** resulting from or caused by the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of any **pollutants**:
    a. That are, or that are contained in any property that is:
       (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
       (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
       (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;

11

b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or

c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this exclusion does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic, or mechanical functioning of the **insured auto** or its parts if:

(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed, or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive, or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and

(2) The **bodily injury**, **property damage**, or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this exclusion do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:

(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned, or damaged as a result of the maintenance or use of an **insured auto**; and

(2) The discharge, dispersal, seepage, migration, release, or escape of the **pollutants** is caused directly by such upset, overturn, or damage.

11. **Racing**
    **Bodily injury** or **property damage** arising out of **you** or an **insured** participating in, or preparing for, a prearranged or organized racing, speed or demolition contest, stunting activity, or performance contest.

12. **War**
    **Bodily injury** or **property damage** arising directly or indirectly out of:
    a. War, including undeclared or civil war;
    b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
    c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

13. **Operations**
    **Bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of the operation of:
    a. any equipment listed in Paragraphs b. and c. of the definition of **auto**; or

b. machinery or equipment that is on, attached to, or part of, a land vehicle that meets the definition of **mobile equipment**.

14. **Completed Operations**
**Bodily injury** or **property damage** arising out of, or caused by, **your** work after that work has been completed or abandoned.

For purposes of this exclusion, **your** work means:
a. Work or operations performed by **you** or on **your** behalf;
b. Materials, parts, or equipment furnished in connection with such work or operations; and
c. The delivery of liquids.

**Your** work includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in Paragraphs a., b., or c. above.

**Your** work will be deemed completed at the earliest of the following times:
a. When all of the work called for in **your** contract has been completed.
b. When all of the work to be done at a particular site has been completed if **your** contract calls for work at more than one site.
c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.
Work that may need service, maintenance, correction, repair, or replace-ment, but which is otherwise complete, will be treated as completed.

15. **Criminal Acts**
**Bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of an **insured**. This exclusion applies regardless of whether that **insured** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

16. **Vehicle Sharing—Private Passenger Autos**
**Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

**LIMIT OF LIABILITY**

**We** will pay no more than the Limit of Liability shown on the **declarations page** for this coverage for the **insured auto** involved in the **accident** regardless of:
1. the number of premiums paid;
2. the number of **insured autos** or trailers shown on the **declarations page**;

13

3. the number of policies issued by **us**;
4. the number of vehicles or **insureds** involved in an **accident**; or
5. the number of claims or lawsuits arising out of an **accident**;

subject to the following:

1. **Coverage Required by Filings**

    If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:
    (i) **we** are required to pay any judgment entered against **you**; or
    (ii) **we** agree to settle a claim or lawsuit;
    for **bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of an **accident** or **loss** otherwise not covered under the terms of this policy solely because of such certificate of insurance, **we** will be obligated to pay no more than the minimum amount required by that agency or applicable law. If any payment is based solely on such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

2. **Combined Bodily Injury and Property Damage Limits**

    Subject to the terms of Section 1 above, if **your declarations page** indicates that combined **bodily injury** and **property damage** limits apply for "each accident" or "combined single limit" applies, the most **we** will pay for the aggregate of all damages and **covered pollution cost or expense** combined, resulting from any one **accident**, is the combined liability insurance limit shown on the **declarations page** for the **insured auto** involved in the **accident**.

3. **Separate Bodily Injury Liability and Property Damage Liability Limits**

    Subject to the terms of Section 1 above, if **your declarations page** indicates that separate **bodily injury** liability and **property damage** liability limits apply:

    a. The "each person" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for **bodily injury** sustained by any one person in any one **accident**, and that "each person" maximum limit will apply to the aggregate of claims made for such **bodily injury** and any and all claims derived from such **bodily injury**, including, but not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.
    b. Subject to the **bodily injury** liability limit for "each person", the "each accident" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for

**bodily injury** sustained by two or more persons in any one **accident**, including all derivative claims which include, but are not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

c. The "each accident" **property damage** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for the aggregate of all **property damage** and **covered pollution cost or expense** combined, sustained in any one **accident**.

For the purpose of determining **our** Limit of Liability under Sections 1., 2., and 3. above, all **bodily injury**, **property damage**, and **covered pollution cost or expense**, resulting from continuous or repeated exposure to substantially the same event, shall be considered as resulting from one **accident**.

An **insured auto** and any **trailer** or **trailers** attached thereto shall be deemed to be one **auto** with respect to **our** Limit of Liability.

When coverage is afforded for an **accident** involving an **insured auto** that, at the time of loss:

a. is a **trailer** specifically described on the **declarations page**; and
b. is attached to any power unit that is not an **insured auto** specifically described on the **declarations page**;

the maximum amount we will pay will be limited to the lesser of an amount not to exceed the applicable compulsory or financial responsibility law limits of the state identified in **your** address as shown on the **declarations page** or the Limit of Liability shown on the **declarations page**.

Any amount payable under Part I—Liability To Others to or for an injured person will be reduced by any payment made to that person under any Uninsured Motorist Coverage, Underinsured Motorist Coverage, Personal Injury Protection Coverage, or Medical Payments Coverage provided by this policy.

## PART II—DAMAGE TO YOUR AUTO

### INSURING AGREEMENT—COLLISION COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Collision Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** when it collides with another object or overturns.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Comprehensive Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** from any cause other than those covered under Collision Coverage.

Any **loss** caused by missiles, falling objects, fire, theft, collision with an animal, or accidental glass breakage shall be deemed a Comprehensive **loss**. However, **you** have the option of having glass breakage caused by a covered **auto's** collision or overturn considered a **loss** under Collision Coverage.

### INSURING AGREEMENT—FIRE AND THEFT WITH COMBINED ADDITIONAL COVERAGE (CAC)

Subject to the Limits of Liability, if **you** pay the premium for Fire and Theft with Combined Additional Coverage (CAC), **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** caused by:

1. fire, lightning or explosion;
2. theft;
3. windstorm or hail;
4. earthquake;
5. flood or rising water;
6. malicious mischief or vandalism;
7. the stranding, sinking, burning, collision, or derailment of any conveyance in or upon which **your insured auto** is being transported; or
8. collision with a bird or animal.

No **losses** other than those specifically described above will be covered under Part II of this policy.

### ADDITIONAL COVERAGE

1. **Transportation Expenses**

   **We** will pay up to $30 per day, up to a maximum of $900, for temporary transportation expenses incurred by **you** because of the theft of an **insured auto** that is a **private passenger auto**. This coverage applies only to those **insured autos** for which **you** carry Comprehensive Coverage. **We** will pay for temporary transportation expenses incurred during the period beginning 48 hours after **you** report the theft to **us**, and ending when the **insured auto** is returned to use, or **we** pay for its **loss**.

2. **Coverage for Temporary Substitute Autos**

   If a **temporary substitute auto** is involved in a **loss**, **we** will provide the same coverage and deductible that would have applied to the **insured auto** for which it is a substitute. The most **we** will pay for **loss** to a **temporary substitute auto** is the lesser of the Actual Cash Value at the time of **loss** or the cost of repairing or replacing the damaged or stolen property with like kind and quality, less the applicable deductible.

16

### 3. **Pet Injury Coverage**

If **you** have purchased Collision Coverage for at least one **insured auto** listed on the **declarations page**, Pet Injury Coverage is included in **your** policy.

#### **Insuring Agreement**

If a **pet** sustains injury or death while inside an **insured auto** at the time of a **loss** covered under Collision, Comprehensive, or Fire & Theft with Combined Additional Coverage, **we** will pay:
1. for reasonable and customary veterinary fees incurred by **you** or the owner of the **pet** if the **pet** is injured in, or as a direct result of, the covered **loss**; or
2. a death benefit if the **pet** dies in, or as a direct result of, the covered **loss**.

In the event of a covered **loss** due to the theft of an **insured auto**, **we** will provide the death benefit provided the **pet** is not recovered.

#### **Limits of Liability**

The following additional Limits of Liability apply to Pet Injury Coverage:
1. The most **we** will pay for all damages in any one **loss** is a total of $1,000 regardless of the number of **pets** involved.
2. If the **pet** dies in, or as a direct result of, a covered **loss**, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for the **pet**.
3. No deductible shall apply to this coverage.

## **ADDITIONAL PAYMENTS**

If **you** have paid the premium for Comprehensive Coverage, Collision Coverage, or Fire and Theft with Combined Additional Coverage, then in addition to **our** Limit of Liability, **we** will pay:

1. All reasonable expenses necessary to return a stolen **insured auto** to **you**, unless **we** determine the **auto** to be a total loss.
2. All reasonable expenses necessary to remove an **insured auto** from the site of an **accident** or **loss** and transport it to a repair facility.

## **ADDITIONAL DEFINITIONS USED IN THIS PART ONLY**

When used in Part II—Damage To Your Auto:

1. "**Finance agreement**" means a written lease or loan contract, entered into as a part of **your** business, pertaining to the lease or purchase by **you** of an

17

**insured auto**, and subject to a valid promissory note or written payment ob-
ligation contained in a lease, and security agreement or other written agree-
ment establishing a security interest, executed concurrently with a purchase
or lease of the **insured auto** that is commensurate with fair market value.

2. "**Permanently attached equipment**" or **PAE** means equipment and devices
   that are permanently installed or attached to **your insured auto**. **Perma-
   nently attached equipment** also includes:
   a. accessories designed to work as part of the equipment or devices;
   b. load securing equipment and devices; and
   c. custom paint or decals.

3. "**Pet**" means a dog or cat occupying an **insured auto** with **your** express or
   implied consent.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFUL-
LY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS
WILL NOT BE AFFORDED UNDER THIS PART II—DAMAGE TO YOUR AUTO.**

1. **We** will not pay for loss caused by or resulting from any of the following. Such
   **loss** is excluded regardless of any other cause or event that contributes con-
   currently or in any sequence to the **loss**.
   a. **War or Military Action**
      (1) war, including undeclared or civil war;
      (2) warlike action by a military force, including action in hindering or
          defending against an actual or expected attack, by any government,
          sovereign or other authority using military personnel or agents;
      (3) insurrection, rebellion, revolution, usurped power, or action taken by
          governmental authority in hindering or defending against any of these.
   b. **Nuclear Hazard**
      (1) the explosion of any weapon employing atomic fission or fusion; or
      (2) nuclear reaction or radiation, or radioactive contamination, however
          caused.

2. **We** will not pay for **loss** to any sound equipment, video equipment, or trans-
   mitting equipment not permanently installed in **your insured auto**, or to
   tapes, records, compact discs, DVDs, or similar items used with sound or
   video equipment.

3. **We** will not pay for **loss** to radar detectors or to any other equipment or device
   designed or used to detect speed measuring equipment, or to any equipment
   designed or used to jam or disrupt any speed measuring equipment.

4. **We** will not pay for **loss** due and confined to:
   a. wear and tear, freezing, mechanical or electrical breakdown, or struc-
      tural failure caused by material fatigue, decomposition, or corrosion.

18

b. blowouts, punctures, flat spots, or other road damage to tires.

But, coverage does apply if the damage is the result of other **loss** covered by the policy.

5. **We** will not pay for **loss** incurred while **your insured auto** is used in any illicit trade or transportation, or due to **your insured auto's** destruction or confiscation by governmental or civil authorities because **you**, or, if **you** are a natural person, any **relative**, engaged in illegal activities.

6. **We** will not pay for **loss** caused by **you** or an insured participating in or preparing for a prearranged or organized racing, speed or demolition contest, stunting activity or performance contest.

7. **We** will not pay for **loss** to an **insured auto** for diminution of value.

8. If **we** pay **your** financial obligation under a **finance agreement**, **we** will not pay:
   a. Overdue **finance agreement** payments including any type of late fees or penalties;
   b. Financial penalties imposed under a **finance agreement** for excessive use, abnormal wear and tear, or high mileage;
   c. Security deposits not normally refunded by the lessor or lender;
   d. Cost of **finance agreement** related products such as, but not limited to, Credit Life Insurance, Health, Accident or Disability insurance purchased by **you**;
   e. Carryover balances from previous **finance agreements** or other amounts not associated with the **insured auto**; or
   f. Unpaid principal included in the outstanding **finance agreement** balance that was not used by **you** to purchase the **insured auto**.

9. **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

## LIMIT OF LIABILITY

1. If the **declarations page** shows actual cash value for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality; or
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, or the cost to replace, rather than repair, the **insured auto**.

19

**Permanently attached equipment (PAE)** is covered to the limit shown on the **declarations page**. This limit includes transfer of undamaged **PAE** to another **insured auto**, but will not increase the **PAE** limit shown on the **declarations page**.

2. If the **declarations page** shows Stated Amount for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality;
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, Stated Amount, or the cost to replace, rather than repair, the **insured auto**; or
   d. the applicable Stated Amount of the property as shown on the **declarations page**.

   However, if there is a **finance agreement** in place for the **insured auto**, the most **we** will pay for a total loss where the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss** is:
   a. greater than the actual cash value of the **insured auto** at the time of **loss**; and
   b. the Stated Amount shown on the **declarations page** is greater than the actual cash value of the **insured auto** at the time of **loss**;
   is the lesser of:
   a. the applicable Stated Amount of the **insured auto** as shown on the **declarations page**; or
   b. the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss**.

   **PAE** is included in the value of the **insured auto**, but only to the extent the value of the equipment has been included in the Stated Amount shown on the **declarations page**. The transfer of undamaged **PAE** to another **insured auto** will be covered if the aggregate of all damage and cost to move is within the Stated Amount shown on the **declarations page**.

3. Payments for **loss** covered under Collision Coverage, Comprehensive Coverage, or Fire and Theft with Combined Additional Coverage are subject to the following provisions:
   a. in determining the amount necessary to repair damaged property to its pre-loss physical condition, the amount to be paid by **us**:
      (i) shall not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired, and the cost of repair or

20

replacement parts and equipment, as reasonably determined by **us**; and

(ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured, or used, including, but not limited to:
(a) original manufacturer parts or equipment; and
(b) non-original manufacturer parts or equipment;

b. the actual cash value is determined by the market value, age and condition of the **auto** at the time the **loss** occurs; and

c. duplicate recovery for the same elements of damages is not permitted.

4. To determine the amount necessary to repair the damaged property to its pre-loss physical condition as referred to in Paragraph 1.c., the total cost of necessary repairs will be reduced by:

a. the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the **accident** and that is eliminated as a result of the repair or replacement of property damaged in the **loss**. This adjustment for physical condition includes, but is not limited to, broken, cracked or missing parts, rust, dents, scrapes, gouges, and peeling paint;

b. an amount for depreciation (also referred to as betterment) that represents a portion of the cost of mechanical parts (parts that wear out over time and have a useful life typically shorter than the life of the **auto** as a whole) that are installed as replacements for existing mechanical parts that were defective, inoperable or nonfunctional prior to the **accident**, which **we** deem necessary to replace in the course of repair; and

c. an amount for depreciation (also referred to as betterment) on high-wear parts that have a measurable life, such as tires, batteries, engine or transmission, determined by the proportional increase in the useful life of the replacement part when compared to the replaced part. For example, if **we** replace a 24-month old battery that had a manufacturer's rated life of 60 months with a new 60-month rated battery, **our** payment for the battery is reduced by 40 percent and **you** are responsible to pay that 40 percent portion of the cost of the battery.

## DEDUCTIBLE

For each **loss** that qualifies for coverage under Comprehensive, Collision, or Fire and Theft with Combined Additional Coverage, the deductible shown on the **declarations page** for the **insured auto** will be applied. A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to this policy, only one deductible will apply to the entire **loss** event.

if **your insured auto** is an additional **auto** that **you** have requested to be added to **your** policy within 30 days of **your** acquisition of the **auto**, and no deductible has been designated for the additional **auto** prior to the **loss**, then:

1.  when the **insured auto** is a **private passenger auto**, **we** will apply the lowest deductible listed for any one **auto** listed on the **declarations page**; or
2.  when the **insured auto** is an **auto** other than a **private passenger auto**, **we** will apply the highest deductible listed for any one **auto** listed on the **declarations page**.

No deductible will apply to a **loss** to window glass when the glass is repaired instead of replaced.

No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **insured auto** to **you**.

## SALVAGE

If **we** pay the actual cash value of **your insured auto** less the deductible, or if **we** pay the amount necessary to replace **your insured auto** less the deductible, **we** are entitled to all salvage. If **your insured auto** is a total loss and **we** pay the applicable Limit of Liability or Stated Amount as shown on the **declarations page** less the deductible, **we** are entitled to the same percent of salvage as **our** payment bears to the actual cash value of **your insured auto**.

## NO BENEFIT TO BAILEE

No bailee or carrier shall benefit, directly or indirectly, from this Part II—Damage To Your Auto.

## APPRAISAL

If **we** cannot agree with **you** on the amount of **your loss**, then **you** or **we** may demand an appraisal of the **loss**. Each party shall appoint a competent and disinterested appraiser. If the appraisers agree on the amount of the **loss**, they shall submit a written report to **us** and this shall be deemed to be the amount of the **loss**.

If the appraisers cannot agree on the amount of the **loss** within a reasonable time, they shall then choose a competent, impartial umpire, provided that if they cannot agree on an umpire within 15 days, either **you** or **we** may petition a judge of a court having jurisdiction to choose an umpire. The disagreement of the appraisers shall then be submitted to the umpire. Subject to the provisions of the policy, a written agreement signed by both appraisers or by one appraiser and the umpire will be the amount of the **loss**.

**You** must pay **your** fees and expenses and those of **your** appraiser. **We** will pay **our** fees and expenses and those of **our** appraiser. All other expenses of the

appraisal, including payment of the umpire if one is necessary, will be shared equally by **you** and **us**.

By agreeing to an appraisal, **we** do not waive any of **our** rights under any other part of this policy, including **our** right to deny the claim.

## PAYMENT OF LOSS

At **our** option, **we** may pay the **loss** in money, or repair or replace the damaged or stolen property. **We** may, at any time before the **loss** is paid or the property is replaced, return, at **our** expense, any stolen property either to **you** or to the address shown on the **declarations page**, with payment for the resulting damage less any applicable deductibles. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

**We** may make payment for a **loss** either to **you** or the owner of the property. Payment for a **loss** is required only if **you** have fully complied with the terms of this policy.

**You** must convey title to and possession of the damaged, destroyed, or stolen property to **us** if **we** pay the actual cash value of **your insured auto** less the deductible or if **we** pay the amount necessary to replace **your insured auto** less the deductible.

## LOSS PAYEE AGREEMENT

**We** will pay the Loss Payee named in the policy for **loss** to **your insured auto**, as the interest of the Loss Payee may appear.

This insurance covers the interest of the Loss Payee unless:
1. the **loss** results from fraudulent acts or omissions on **your** part; or
2. the **loss** is otherwise not covered under the terms of this policy.
Cancellation, nonrenewal, termination, or voiding ends this agreement as to the Loss Payee's interest.

If **we** make any payment to the Loss Payee, **we** will obtain the Loss Payee's rights against any other party.

### GENERAL PROVISIONS

1. **Policy Period and Territory**

   This policy applies only to **accidents** and **losses** occurring during the policy period shown on the **declarations page** and that occur within a state, territory, or possession of the United States of America, or a province or territory of Canada, or while an **insured auto** is being transported between their ports.

2. **Policy Changes**

This policy, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, as amended, and endorsements to this policy issued by **us** contain all the agreements between **you** and **us**. Subject to the following, its terms may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** have received from **you** or other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and **you** will notify **us** if it changes during the policy period. If this information is incorrect, incomplete, or changes during the policy period, **you** agree that **we** may adjust **your** premium during the policy period, or take other appropriate action.

Changes that may result in a premium adjustment include, but are not limited to, changes in:
a. the number, type, or use classification of **insured autos**;
b. operators using **insured autos**, their ages, driving histories, license status, state or country of license issuance, or marital status;
c. the place of principal garaging of any **insured auto**;
d. coverage, deductibles, or limits of liability; or
e. rating territory or discount eligibility.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

Nothing contained in this section will limit **our** right to void this policy for fraud, misrepresentation or concealment of any material fact by **you**, or anyone acting on **your** behalf.

3. **Other Insurance**

   a. For any **insured auto** that is specifically described on the **declarations page**, this policy provides primary coverage. For an **insured auto** which is not specifically described on the **declarations page**, coverage under this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent. However, if the **insured auto** that is specifically described on the **declarations page** is a **trailer**, this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent, unless the **trailer** is attached to an **insured auto** that is a power unit **you** own and that is specifically described on the **declarations page**.

   b. If coverage under more than one policy applies on the same basis, either excess or primary, **we** will pay only **our** proportionate share. **Our** pro-

portionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

4. **Two or More Policies Issued By Us**

   If any applicable insurance other than this policy is issued to **you** by **us**, or any company affiliated with **us**, and applies to the same **accident** or **loss**, the total amount payable among all such policies shall not exceed the limits provided by the single policy with the highest limits of liability.

5. **Legal Action Against Us**

   **We** may not be sued unless there is full compliance with all the terms of this policy.

   **We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured under Part I to pay is finally determined either by judgment against that insured after actual trial or by written agreement of the insured, the claimant, and **us**. No one will have any right to make us a party to a lawsuit to determine the liability of an insured.

6. **Our Recovery Rights**

   In the event of any payment under this policy, **we** are entitled to all the rights of recovery of the person or organization to whom payment was made. That person or organization must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after the **loss** or **accident** to harm **our** rights.

   When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

   In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

7. **Assignment**

   Interest in this policy may not be assigned without **our** written consent. If the policyholder named on the **declarations page** is a natural person and that person dies, the policy will cover:
   a.  any other named insured on the policy;

b. the legal representative of the deceased person while acting within the scope of duty of a legal representative; and
c. any person having proper custody of **your insured auto** until a legal representative is appointed, but in no event for more than 30 days after the date of death.

8. **Waiver**

Notice to any agent or knowledge possessed by any agent or other person shall not change or effect a waiver on any portion of this policy nor prevent **us** from exercising any of **our** rights under this policy.

9. **Bankruptcy**

**We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

10. **Inspection and Audit**

**We** shall have the right to inspect **your** property and operations at any time. This includes, but is not limited to, the right to inspect and audit the maintenance of any **autos** covered hereunder, the identity of **your** drivers and their driving records, and **your** radius of operations. In doing so, **we** do not warrant that the property or operations are safe and healthful, or are in compliance with any law, rule or regulation.

**We** shall also have the right to examine and audit **your** books and records at any time during the policy period and any extensions of that period and within three years after termination of the policy, as far as they relate to the subject matter of this insurance.

11. **Fraud or Misrepresentation**

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an **accident** or **loss**, if **you**:
1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or
3. engaged in fraudulent conduct;
at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;

26

2. conceal or misrepresent any material fact or circumstance, or

3. engage in fraudulent conduct;

in connection with a requested change, **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an **accident** or **loss**.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an **accident** or **loss** if **you**, in connection with the policy application, or in connection with any requested change, have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an **accident** or **loss** if **you** or any other insured knowingly concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct in connection with the presentation or settlement of a claim. **We** reserve all rights to indemnity against a person committing fraud or misrepresentation for all payments made and costs incurred.

12. **Liberalization**

If **we** make a change that broadens a coverage **you** have under this edition of **your** policy without additional charge, **you** will receive the broadened coverage. The broadened coverage applies on the date the coverage change is implemented in **your** state. This provision does not apply to a general program revision or **our** issuance of a subsequent edition of **your** policy. Otherwise, this policy can be changed only by endorsement issued by **us**.

13. **Severability**

Except with respect to the Limit of Liability, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or lawsuit is brought.

14. **Settlement of Claims**

**We** may use estimating, appraisal, or injury evaluation systems to adjust claims under this policy and to determine the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

15. **Automatic Termination**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at

27

the end of the current policy period at 12:01 a.m. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on an **insured auto**, any similar insurance provided by this policy will terminate as to that **insured auto** on the effective date and at the effective time of the other insurance.

If an **insured auto** is sold or transferred, any insurance provided by this policy will terminate as to that **insured auto** on the effective date of the sale or transfer.

16. **Duty to Report Changes**

**You** must promptly notify **us** when:
1. **your** mailing or business address changes;
2. the principal garaging address of an **insured auto** changes;
3. there is any change with respect to the persons who operate an **insured auto**;
4. there is a change in the driver's license status, or state or country of license issuance, of any person using an **insured auto**; or
5. **you** acquire, sell, or dispose of **autos**.

17. **Terms of Policy Conformed to Statutes**

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** business location, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** business location.

Form 6912 (02/19)

28

# INDEX OF ENDORSEMENTS

**All forms appearing in this endorsement section do not automatically pertain to your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy.**

**Form No./Description**           **Page**

1797 (02/19)
**Contingent Liability Endorsement—Limited Liability Coverage For Non-Trucking Use Of An Automobile**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

1890 (02/19)
**Employer's Non-Ownership Liability Endorsement** . . . . . . . . . . . . . . . . . . . . . . . .31

1891 (02/19)
**Hired Auto Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

2366 (02/11)
**Blanket Additional Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

2367 (06/10)
**Blanket Waiver of Subrogation Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . .34

2368 (06/10)
**Loan/Lease Gap Coverage Endorsement**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

2852 NC (02/19)
**Uninsured/Underinsured Motorist Coverage Endorsement** . . . . . . . . . . .36

4717 (02/19)
**Trailer Interchange Coverage Endorsement**. . . . . . . . . . . . . . . . . . . . . . . . . .42

4757 (02/19)
**Medical Payments Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . .44

4852 NC (02/19)
**Cancellation and Nonrenewal Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . .47

4881 NC (02/19)
**North Carolina Amendatory Endorsement**. . . . . . . . . . . . . . . . . . . . . . . . . . .50

5701 (02/19)
**Individual Named Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

Z226 (01/11)
**Mobile Equipment As Insured Autos Endorsement**. . . . . . . . . . . . . . . . . . .52

Z438 (02/19)
**Garage Operations Physical Damage Legal Liability
Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

Z439 (02/19)
**Non-Owned Trailer Physical Damage Coverage Endorsement**. . . . . . . . .60

Z442 (02/19)
**Any Automobile Legal Liability Coverage Endorsement** . . . . . . . . . . . . . .63

Form 1797 (02/19)

## CONTINGENT LIABILITY ENDORSEMENT—LIMITED LIABILITY COVERAGE FOR NON-TRUCKING USE OF AN AUTOMOBILE

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### PART I—LIABILITY TO OTHERS

A. Under the Additional Definitions Used In This Part Only section:

Subsection A.3. is deleted and replaced by the following:

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. However, **insured** does not include anyone engaged in the business of transporting property by auto for hire that is liable for **your** conduct.

B. Under the Exclusions of Part I, the following exclusion is added:

**Trucking Use**
Coverage under this Part I, including **our** duty to defend, does not apply to an **insured auto** or any attached **trailer** while operated, maintained, or used:
a. To carry property or while such property is being loaded or unloaded from the **insured auto** or an attached **trailer**; or
b. In any business or for any business purpose.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 1890 (02/19)

## EMPLOYER'S NON-OWNERSHIP LIABILITY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

31

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT

If **you** pay a premium for this Employer's Non-Ownership Liability coverage, then the following definition is added:

"**Non-owned auto**" means an **auto** that **you** do not own, lease, hire, rent, or borrow, and that is used in connection with **your** business. This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

### CHANGES TO PART I—LIABILITY TO OTHERS

The definition of **insured auto** is modified to include a **non-owned auto** when used in connection with **your** business by **you** or any of **your employees**. The definition of **insured** does not include the owner of a **non-owned auto**.

### EXCLUSIONS

The insurance provided by this endorsement does not apply to **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any **non-owned auto** in the conduct of any partnership or joint venture of which **you** are a partner or member and which is not shown as the named insured on the **declarations page**.

### OTHER INSURANCE

The insurance provided by this endorsement is excess over any other valid and collectible insurance.

### PREMIUM AGREEMENT

**We** may audit the number of employees and charge appropriately for additional premium up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

32

Form 1891 (02/19)

## **HIRED AUTO COVERAGE ENDORSEMENT**

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### **Additional definitions used in this endorsement**

If **you** pay a premium for this Hired Auto Coverage, then the following definitions are added:
1. "**Hired auto**" means an **auto**:
   a. **you** lease, hire, rent or borrow; or
   b. **your employee** leases, hires or rents:
      i. under a contract in that individual **employee's** name;
      ii. at **your** direction and with **your** express permission; and
      iii. only while being used in the conduct of **your** business.

   This does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.
2. "**Cost of hire**" means the total amount paid by **you** for the hire of **autos**.

### **Changes to Part I—Liability To Others**

When used in Part I—Liability To Others, the definition of **insured auto** is amended to include **hired auto**.

### **Other Insurance**

The insurance provided by this Hired Auto Coverage endorsement is excess over any other valid and collectible insurance, whether primary, excess, or contingent.

### **Premium agreement**

The premium for this Hired Auto Coverage is based on the **cost of hire**, and is subject to a minimum **cost of hire**. **We** may audit the **cost of hire** and charge appropriately for additional premium for up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

### **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2366 (02/11)

## BLANKET ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Liability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Additional Insured Endorsement, **we** agree with **you** that any person or organization with whom **you** have executed a written agreement prior to any **loss** is added as an additional **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to such additional **insured** only as a person or organization liable for **your** operations and then only to the extent of that liability. This endorsement does not apply to acts, omissions, products, work, or operations of the additional **insured**.

Regardless of the provisions of paragraph a. and b. of the "Other Insurance" clause of this policy, if the person or organization with whom **you** have executed a written agreement has other insurance under which it is the first named **insured** and that insurance also applies, then this insurance is primary to and non-contributory with that other insurance when the written contract or agreement between **you** and that person or organization, signed and executed by **you** before the **bodily injury** or **property damage** occurs and in effect during the policy period, requires this insurance to be primary and non-contributory.

In no way does this endorsement waive the "Other Insurance" clause of the policy, nor make this policy primary to third parties hired by the **insured** to perform work for the **insured** or on the **insured's** behalf.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 2367 (06/10)

## BLANKET WAIVER OF SUBROGATION ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Liability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Waiver of Subrogation Endorsement, **we** agree to waive any and all subrogation claims against any person or organization with whom a written waiver agreement has been executed by the named insured, as required by written contract, prior to the occurrence of any **loss**.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2368 (06/10)

## LOAN/LEASE GAP COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

### INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **insured auto** for which this coverage was purchased is deemed by **us** to be a **total loss**, **we** will pay, in addition to any amounts otherwise payable under Part II of **your** policy, the difference between:
1. the actual cash value of the **insured auto** at the time of the **total loss**; and
2. any greater amount the owner of the **insured auto** is legally obligated to pay under a written loan or lease agreement to which the **insured auto** is subject at the time of the **total loss**, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **insured auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **insured auto** and the loss is covered under one of those coverages.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

35

Form 2852 NC (02/19)

## UNINSURED/UNDERINSURED
## MOTORIST COVERAGE ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy, and related endorsements, is modified as follows:

### INSURING AGREEMENT—UNINSURED MOTORIST COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Uninsured Motorist Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is legally entitled to recover from the **owner** or operator of an **uninsured auto** because of **bodily injury** or due to **property damage**:
1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto**.

### INSURING AGREEMENT—UNDERINSURED MOTORIST COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Underinsured Motorist Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is legally entitled to recover from the **owner** or operator of an **underinsured auto** because of **bodily injury**:
1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **underinsured auto**.

**We** will pay for damages caused by an **underinsured auto** under this endorsement only after payments from an applicable bodily injury liability bond or policy has been made and the payment matches or exceeds the applicable limit of liability shown for Uninsured/Underinsured Motorist Coverage on the **declarations page** of this policy and applicable to a single person.

### ADDITIONAL DEFINITIONS

When used in this endorsement, whether in the singular, plural, or possessive:
1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** or a **relative**;

36

      (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and

      (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or

  b. if the named insured shown on the **declarations page** is a corporation, partnership, organization, or any other entity that is not a natural person:

      (i) any person **occupying your insured auto** or a **temporary substitute auto**; and

      (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

For purposes of this definition, **insured auto** includes **mobile equipment** that is:

a. owned by **you**;

b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:

  i. used in **your** business;

  ii. operated on a public highway; and

  iii. operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** by or furnished for the regular use of the named insured's spouse or **relative**.

3. "**Owned**" means the person or organization:

  a. holds legal title to the vehicle;

  b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or

  c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:

  a. holds legal title to the vehicle;

  b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or

  c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

5. "**Underinsured auto**" means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the **acci-**

**dent**, but the sum of all applicable limits of liability for **bodily injury**:

   a. is less than the coverage limit for Underinsured Motorist Coverage shown on the **declarations page**; or

   b. has been reduced by payments for **bodily injury** to persons injured in the accident, other than an **insured person**, to less than the coverage limit for Underinsured Motorist Coverage shown on the **declarations page**.

An "**underinsured auto**" does not include any motorized vehicle or equipment:

   a. designed mainly for use off public roads, while not on public roads;

   b. while being used as a residence or premises; or

   c. that is an **uninsured auto**.

6. "**Uninsured auto**" means an **auto** or trailer of any type:

   a. to which no bodily injury liability bond or policy applies at the time of the **accident**;

   b. to which a **bodily injury** liability bond or policy applies at the time of the **accident**, but the bonding or insuring company:

      (i) denies coverage; or

      (ii) is or becomes insolvent;

   c. to which a **bodily injury** liability bond or policy applies at the time of the **accident**, but its limit of liability for **bodily injury** is less than the minimum limit of liability for **bodily injury** specified by the financial responsibility law of the state in which the **insured auto** is principally garaged;

   d. that is a hit-and-run vehicle whose operator or **owner** cannot be identified and which strikes:

      (i) an **insured auto** or **temporary substitute auto**; or

      (ii) if the named insured is a natural person:

         (a) **you** or a **relative**; or

         (b) a motor vehicle that **you** or a **relative** are occupying,

      provided that the **insured**, or someone on his or her behalf, reports the **accident** to the police or civil authority within 24 hours or as soon as practicable after the **accident**; or

   e. to which a **bodily injury** liability bond or policy applies at the time of the **accident**, but the sum of all applicable limits of liability for **bodily injury** is less than the coverage limit for Underinsured Motorist Coverage shown on the **declarations page**.

An "**uninsured auto**" does not include any motorized auto or equipment:

   a. **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**;

   b. **owned** or operated by a self-insurer under any applicable vehicle law, except a self-insurer that is or becomes insolvent;

   c. **owned** by any governmental unit or agency;

   d. designed mainly for use off public roads, while not on public roads; or

   e. while being used as a residence or premises.

38

**EXCLUSIONS – READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

1. Coverage under this endorsement is not provided for **bodily injury** or **property damage** sustained by any person while using or **occupying**:
   a. an **insured auto** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;
   b. a **non-owned auto** without the express or implied permission of the **owner**; or
   c. an **auto** or device of any type designed to be operated on the public roads that is **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto** or **temporary substitute auto**.
2. Coverage under this endorsement is not provided for **property damage**:
   a. resulting from any prearranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
   b. due to a nuclear reaction or radiation;
   c. for which insurance is afforded under a nuclear energy liability insurance contract;
   d. to a trailer;
   e. when the property is contained in or struck by a vehicle **owned** by **you** or a **relative**, other than an **insured auto**; or
   f. caused by a hit-and-run vehicle whose operator cannot be identified.
3. Coverage under this endorsement will not apply directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

**LIMITS OF LIABILITY**

Regardless of the number of premiums paid, or the number of **insured autos** or trailers shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in the **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown for Uninsured/Underinsured Motorist Coverage on the **declarations page**.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all **bodily injury** damages resulting from any one **accident**; except that without changing the total limit of insurance, **we** will apply the limit shown in the **declarations page** to first provide the separate limits required by North Carolina Law as follows:
1. $30,000 for **bodily injury** to any one person caused by any one **accident**;
2. $60,000 for **bodily injury** to two or more persons caused by any one **accident**; and
3. $25,000 for **property damage** caused by any one **accident**.

If **your declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to a **bodily injury** to one person;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one **accident**; and
3. the amount shown for "property damage" on the **declarations page** is the most **we** will pay for the aggregate of all **property damage** caused by any one **accident**.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

**Our** Limit of Liability under this endorsement for **property damage** to an **insured auto** arising out of one **accident** is the lowest of:

1. the actual cash value of the **insured auto** at the time of the **accident**, reduced by the deductible shown on the **declarations page**, and by its salvage value if **you** or the **owner** retain the salvage;
2. the amount necessary to replace the **insured auto**, reduced by the deductible shown on the **declarations page**, and by its salvage value if **you** or the **owner** retain the salvage;
3. the amount necessary to repair the **insured auto** to its pre-loss condition, reduced by the deductible shown on the **declarations page**; or
4. any Limit of Liability shown on the **declarations page** for "property damage" under this endorsement, reduced by the salvage value of the **insured auto** if **you** or the **owner** retain the salvage.

Payments for **property damage** under this endorsement are subject to the following provisions:

1. any amount payable under this endorsement for **property damage** shall be subject to the deductible shown on the **declarations page**;
2. no more than one deductible shall be applied to any one **accident**; and
3. an adjustment for depreciation and physical condition will be made in determining the Limit of Liability at the time of the **accident**.

The Limits of Liability under this endorsement for **bodily injury** shall be reduced by all sums:

1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability To Others;
2. paid or payable under any applicable Medical Payments Coverage Endorsement; and

40

3. paid, payable, or that should apply, because of **bodily injury** under any of the following or similar laws:
   a. disability benefits law; or
   b. workers' compensation law. However, this reduction does not apply to the extent that an employer's lien is required to be paid under North Carolina's workers' compensation law.

The Limits of Liability under this endorsement for **property damage** shall be reduced by all sums paid:
1. because of **property damage** by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability To Others; and
2. under Part II—Damage To Your Auto for loss to the **auto**.

Any payment made to a person under this endorsement shall reduce any amount that the person is entitled to recover under Part I—Liability To Others.

No one will be entitled to duplicate payments for the same elements of damages.

Any settlement for damages against an operator or **owner** of an **uninsured auto** without **our** written consent is not binding on **us**.

### OTHER INSURANCE

If there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. However, any insurance **we** provide shall be excess over any other uninsured or underinsured motorist coverage, except for **bodily injury** to **you** and, if the named insured is a natural person, a **relative** when **occupying** an **insured auto**.

Regardless of the number of policies involved, coverage under this endorsement shall be limited to the extent that the total limits available cannot exceed the highest limits of any single applicable policy.

**We** will not pay for any damages that would duplicate any payment made for damages under other insurance.

### ARBITRATION

If **we** and an **insured** cannot agree on:
1. the legal liability of the operator or **owner** of an **uninsured auto**; or
2. the amount of the damages sustained by the **insured**;
this will be determined by arbitration if **we** or the **insured** make a written demand for arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the **accident** occurred.

41

If a written demand for arbitration is made, each party shall select an arbitrator. The two arbitrators will select a third. If the two arbitrators cannot agree on a third arbitrator within thirty (30) days, then on joint application by the **insured** and **us**, the third arbitrator will be appointed by a court having jurisdiction.

Each party will pay the costs and fees of its arbitrator and any other expenses it incurs. The costs and fees of the third arbitrator will be shared equally.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured** resides. Local rules of procedure and evidence will apply.

A decision agreed to by two of the arbitrators will be binding with respect to a determination of:
1. the legal liability of the operator or **owner** of an **uninsured auto**; and
2. the amount of the damages sustained by the **insured**.

The arbitrators shall have no authority to award an amount in excess of the limit of liability. The decision of the arbitrators is binding only if the amount of the award does not exceed the minimum limit of liability specified by the financial responsibility laws of the state listed on **your** application as **your** residence. If the award of the arbitrators is in an amount which exceeds this minimum limit, either party may demand the right to a trial. This demand must be made in writing within 60 days of the arbitrators' decision. If the demand is not made within 60 days, the amount of damages agreed to by the arbitrators will be binding.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 4717 (02/19)

### TRAILER INTERCHANGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

#### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Trailer Interchange Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession. The **trailer** must be in **your** possession under a written trailer or equipment interchange agreement in which **you** assume liability for **loss** to the **trailer** while in **your** possession.

**We** will pay for a **loss** to the **trailer** and its equipment under the coverages de-

42

scribed below, as reflected on **your declarations page**.

   a. Collision Coverage. For **loss** caused by:
      (i)  The **trailer's** collision with another object; or
      (ii) The **trailer's** overturn.
   b. Comprehensive Coverage. For any **loss** except one caused by:
      (i)  The **trailer's** collision with another object; or
      (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

## ADDITIONAL DEFINITION

"**Trailer**", when used in this endorsement, includes a shipping container.

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:
   a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
   b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.
   c. the premiums on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;
   d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;
   e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and
   f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

## EXCLUSIONS

   a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
      (i)  Nuclear Hazard.
          (1) The explosion of any weapon employing atomic fission or fusion; or
          (2) Nuclear reaction or radiation, or radioactive contamination, however caused.

43

(ii) War or Military Action:

    (1) War, including undeclared or civil war;

    (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or

    (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.

b. **We** will not pay for loss of use.

c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;

    (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion; or

    (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:

a. The actual cash value of the damaged or stolen property at the time of the **loss**;

b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;

c. The amount necessary to repair the damaged property to its pre-loss condition; or

d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 4757 (02/19)

### MEDICAL PAYMENTS COVERAGE ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Medical Payments Coverage, **we** will pay the **usual and customary charge** for reasonable and necessary expenses, incurred within three years from the date of an **accident**, for medical and funeral services because of **bodily injury**:
1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance or use of a motor vehicle or **trailer**.

Any dispute as to the **usual and customary charge** will be resolved between the service provider and **us**.

### ADDITIONAL DEFINITIONS

When used in this endorsement, whether in the singular, plural, or possessive:
1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
      (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
      (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
      (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
   b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

      For purposes of this definition, **insured auto** includes **mobile equipment** that is:
      (i) owned by **you**;
      (ii) leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or
      (iii) not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

      However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:
      (i) used in **your** business;
      (ii) operated on a public highway; and

45

(iii) operated in a state or province where it is subject to a compulsory financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** by or furnished for the regular use of the named insured's spouse or a **relative**.

3. "**Owned**" means the person or organization:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

5. "**Usual and customary charge**" means an amount which **we** determine represents a customary charge for services in the geographical area in which the service is rendered. **We** shall determine the usual and customary charge through the use of independent sources of **our** choice.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.

Coverage under this endorsement does not apply to **bodily injury**:

1. sustained while **occupying** any **auto** or **trailer** while being used as a residence or premises;
2. occurring during the course of employment if workers' compensation coverage should apply;
3. arising out of an **accident** involving an **auto** or **trailer** while being used by a person while employed or engaged in the business of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles, unless that business is **yours**;
4. resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
5. due to a nuclear reaction or radiation;
6. for which insurance is afforded under a nuclear energy liability insurance contract;
7. for which the United States Government is liable under the Federal Tort Claims Act;
8. sustained by any person while **occupying** an **insured auto**, **temporary substitute auto**, or **trailer** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;

46

9. sustained by any person while **occupying** a **non-owned auto** without the express or implied permission of the **owner**;

10. that is intentionally inflicted on an **insured** at that person's request or self-inflicted; or

11. sustained while **occupying** any vehicle that has less than four wheels or is not designed for operation principally upon public roads.

## LIMITS OF LIABILITY

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown for Medical Payments Coverage on the **declarations page**.

Any amount payable to an **insured** under this endorsement will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or any applicable Uninsured/Underinsured Motorist Coverage Endorsement.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

## OTHER INSURANCE

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the medical and funeral services. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured occupying**:

1. an **auto**, other than an **insured auto** or **temporary substitute auto**; or

2. a **trailer**, other than a **trailer** while connected to an **insured auto**;

will be excess over any other **auto** or **trailer** insurance providing payments for medical or funeral expenses.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 4852 NC (02/19)

## CANCELLATION AND NONRENEWAL ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with you that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## CANCELLATION

I.  **You** may cancel this policy by writing **us**, and stating the future date that **you** wish the cancellation to be effective.

II. To the extent that this policy cannot be ceded to the North Carolina Reinsurance Facility:

A.  **We** may cancel this policy by providing notice as follows:

1.  Within the first 59 days of the initial policy period, **we** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records at least:

(a) fifteen days before the effective date of cancellation if **we** cancel for nonpayment of premium; or

(b) thirty days before the effective date of cancellation if **we** cancel for any other reason.

2.  After this policy is in effect for more than 59 days, **we** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records at least 15 days before the effective date of cancellation if **we** cancel for any reason.

B.  **We** may cancel this policy for the following reasons:

1.  **We** may cancel this policy for any reason within the first 59 days of the initial policy period.

2.  After this policy is in effect for more than 59 days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:

(a) **you** do not pay the required premium for this policy when due;

(b) material misrepresentation or omission by **you** or **your** representative of any material fact in the procurement or renewal of this policy or in the submission of any claim under this policy;

(c) increased hazard or material change in the risk assumed that could not have been reasonably contemplated by the parties at the time of assumption of the risk;

(d) substantial breach of contractual duties, conditions, or warranties that materially affects the insurability of the risk;

(e) a fraudulent act against **us** by **you** or **your** representative that materially affects the insurability of the risk;

(f) willful failure by **you** or **your** representative to institute reasonable **loss** control measures that materially affect the insurability of the risk after written notice by **us**;

(g) loss of facultative reinsurance, or loss of or substantial changes in applicable reinsurance as provided in G.S. 58-41-30;

(h) **you** are convicted of a crime arising out of acts that materially affect the insurability of the risk;

48

     (i) a determination by the Commissioner that the continuation of this policy would place **us** in violation of the laws of North Carolina; or

     (j) any other reason specified by law.

III. To the extent that this policy can be ceded to the North Carolina Reinsurance Facility:

  A. **We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records at least 15 days before the effective date of cancellation if **we** cancel for any reason.

  B. **We** may cancel this policy for the following reasons:
1. Nonpayment of premium;
2. **You** become a nonresident of North Carolina and are not otherwise entitled to insurance through the Reinsurance Facility;
3. **Our** contract with the agent through whom this policy is written is terminated for reasons other than the quality of the agent's insureds; or
4. This policy is canceled pursuant to a power of attorney given a company licensed according to the provisions of G.S.58-56.

IV. With respect to cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverage for all persons and all **autos**.

V. If this policy is canceled, coverage will not be provided as of the effective date and time shown in the notice of cancellation.

**CANCELLATION REFUND**

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is canceled, any refund due will be computed on a daily pro-rata basis.

**NONRENEWAL**

If **we** decide not to renew or continue this policy, **we** will mail notice of nonrenewal to the first named insured shown on the **declarations page** at the last known address appearing in **our** records. Notice will be mailed at least 45 days before the end of the policy period.

To the extent that this policy can be ceded to the North Carolina Reinsurance Facility, **we** may nonrenew this policy for only one or more of the following reasons:
1. Nonpayment of premium;
2. **You** become a nonresident of North Carolina and are not otherwise entitled to insurance through the Reinsurance Facility;
3. **Our** contract with the agent through whom this policy is written is terminated for reasons other than the quality of the agent's insureds; or
4. This policy is canceled pursuant to a power of attorney given a company licensed according to the provisions of G.S. 58-56.

49

**PROOF OF NOTICE**

Proof of mailing of any notice will be sufficient proof of notice.

**ALL OTHER TERMS, LIMITS AND PROVISIONS OF THE POLICY REMAIN UN-CHANGED.**

Form 4881 NC (02/19)

## NORTH CAROLINA AMENDATORY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### PART I—LIABILITY TO OTHERS

### EXCLUSIONS

The following is added as an additional paragraph at the end of the Exclusions section:

Pollution Exclusion Buy Back—If a payment is made subject to the MCS90 endorsement, the reimbursement language in the MCS90 endorsement is removed for a claim that is not covered under **covered pollution cost or expense** or is excluded under Exclusion 7 or 10 under Part I—Liability to Others.

### GENERAL PROVISIONS

The following Subsection 8—Waiver is deleted in its entirety:

8. **Waiver**

Notice to any agent or knowledge possessed by any agent or other person shall not change or effect a waiver on any portion of this policy nor prevent **us** from exercising any of **our** rights under this policy.

The following is added to Subsection 11—Fraud or Misrepresentation:

This provision does not apply to coverage under Part I—Liability To Others up to the minimum limits required by the financial responsibility laws of North Carolina.

**ALL OTHER TERMS, LIMITS AND PROVISIONS OF THE POLICY REMAIN UN-CHANGED.**

Form 5701 (02/19)

## INDIVIDUAL NAMED INSURED ENDORSEMENT

Not all customers are eligible for this coverage. This endorsement applies to **your** policy only if the form number appears on **your declarations page**. In no event will this coverage apply if the named insured is a corporation, partnership, organization, or any other entity that is not a natural person.

This endorsement changes **your** policy. Please read it carefully.

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

### ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

As used in this endorsement:
1. "**You**" and "**yours**" include **your** spouse, if a resident of the same household, except for notice of cancellation.
2. "**Non-owned auto**" means any **private passenger auto**, pickup, van, or **trailer** not owned by or furnished or available for the regular use of **you** or any **relative**, while it is in the custody of or being operated by **you** or any **relative**, with the permission of its owner.

### CHANGES IN PART I—LIABILITY TO OTHERS

A. If **you** are an individual, Exclusion 6 does not apply to **bodily injury** to **your** or any **relative's** fellow **employees**.

B. If any **private passenger auto you** own is an **insured auto** under Part I—Liability To Others and that **auto** is not used for any business purpose other than ranching or farming:
   1. **Relatives** are **insureds** for any **insured auto you** own that is a **private passenger auto** and is not used for any business purpose other than ranching or farming, and for any other **auto** described in paragraph B.2. of this endorsement.
   2. Any **auto you** do not own is an **insured auto** while being used, with the permission of its owner, by **you** or by any **relative** except:
      a. Any **auto** owned by any **relative**.
      b. Any **auto** furnished or available for **your** or any **relative's** regular use, including any **auto** rented for a period of more than 30 days.
      c. Any **auto** used by **you** or by any of **your relatives** while working in a business of selling, servicing, repairing, or parking **autos**.
      d. Any **auto** other than a **private passenger auto** used by **you** or any of **your relatives** while working in any business or occupation.

51

3. Exclusion 10 does not apply to any **insured auto** that is a **private passenger auto** and is not used for any business purpose other than ranching or farming.

4. Exclusion 16 is deleted and replaced by the following:
   **Vehicle Sharing—Private Passenger Autos**
   **Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## CHANGES IN PART II—DAMAGE TO YOUR AUTO

A. If any **private passenger auto you** own is an **insured auto** under Part II—Damage To Your Auto, and that **auto** is not used for any business purpose other than ranching or farming, then a **non-owned auto** will also be considered an **insured auto**. However, the most **we** will pay for **loss** to a **non-owned auto** that is a **trailer** is $500.

B. Exclusion 9 is deleted and replaced by the following:
   **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

Form Z228 (01/11)

## MOBILE EQUIPMENT AS INSURED AUTOS ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## PART I—LIABILITY TO OTHERS

**ADDITIONAL DEFINITIONS USED IN THIS PART ONLY** is modified as follows:

B. When used in PART I—LIABILITY TO OTHERS, **insured auto** also includes:
   1. **Trailers**, designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;
   2. **Mobile equipment** while being carried or towed by an **insured auto**;

52

3. Any **temporary substitute auto**; and
4. Any **mobile equipment** owned by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. This does not change the effect of exclusion 13 concerning the operation of **mobile equipment**.

## MEDICAL PAYMENTS COVERAGE

If **you** pay the premium for Medical Payments Coverage, that endorsement is modified as follows:

### ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:
a. if the named insured shown on the **Declarations Page** is a natural person:
   (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
   (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
   (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
   (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

## UNINSURED MOTORIST AND UNDERINSURED MOTORIST COVERAGES

If **you** pay the premium for Uninsured Motorist Coverage and/or Underinsured Motorist Coverage, that endorsement is modified as follows:

### ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:
a. if the named insured shown on the **Declarations Page** is a natural person:

(i) **you** or a **relative**;
    (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
    (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or
b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person:
    (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
    (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form Z438 (02/19)

### GARAGE OPERATIONS PHYSICAL DAMAGE
### LEGAL LIABILITY COVERAGE ENDORSEMENT

This endorsement modifies **your** Commercial Auto Policy. Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

THIS ENDORSEMENT APPLIES ON A LEGAL LIABILITY BASIS UNLESS ONE OF THE DIRECT COVERAGE OPTIONS LISTED BELOW IS SHOWN ON **YOUR DECLARATIONS PAGE**.

**DIRECT COVERAGE OPTIONS**

**Direct Excess Insurance.** If this "Direct Excess" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto** or **towed property**, and is excess over any other collectible insurance regardless of whether the other insurance covers **your** or any other **insured's** interest or the interest of the owner of the **customer's auto** or **towed property**.

**Direct Primary Insurance.** If this "Direct Primary" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto**, or **towed property**, and is primary insurance.

### INSURING AGREEMENT—ON-HOOK TOWING PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this On-Hook Towing Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "On-Hook Legal Liability", **we** will pay all sums for which an **insured** is legally liable to pay for **property damage** for **loss** to **towed property**. **We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—GARAGEKEEPERS STORAGE LOCATION PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this Garagekeepers Storage Location Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "Garagekeepers Legal Liability", **we** will pay all sums for which an **insured** is legally liable to pay as **property damage** for **loss** to a **customer's auto** or **customer's auto** equipment left in the **insured's** care while the **insured** is attending, servicing, repairing, parking, or storing it in **your garage operations** under:

1. Comprehensive Coverage.
   From any cause except:
   a. Collision of the **customer's auto** with another object; or
   b. Overturn of the **customer's auto**.

2. Collision Coverage.
   Caused by:
   a. Collision of the **customer's auto** with another object; or
   b. Overturn of the **customer's auto**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We**

may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

**We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**, and only for the locations listed on **your declarations page**.

### ADDITIONAL DEFINITIONS

The following additional definitions apply throughout this Garage Operations Physical Damage Legal Liability Coverage endorsement whenever the defined term appears in boldface type, whether in the singular, plural, or possessive:

1.  "**Customer's auto**" means a customer's land motor vehicle, **trailer**, or **watercraft**, including a **customer's auto** left with **you** for service, repair, storage, or safekeeping. Customers include **your employees** and their **relatives** who pay for services performed.

2.  "**Garage operations**" means the ownership, maintenance, or use of the locations shown on **your declarations page** for the purpose of a business of selling, servicing, repairing, parking, or storing **customers' autos**, and that portion of the roads or other accesses that adjoin such locations. **Garage operations** also includes all operations necessary or incidental to the performance of **garage operations**.

3.  "**Insured**" means:
    a.  **you**; and
    b.  **your** partners (if **you** are a partnership), members (if **you** are a limited liability company), employees, directors, or shareholders, but only while acting within the scope of their duties.

4.  "**Loaded in or on**" means connected to.

5.  "**Towed property**" means tangible property, not owned by or registered to **you**, in transit while **loaded in or on**, or conveyed by, an **insured auto**. **Towed property** also means property when it is moved from the place where **you** accept it for movement by or onto **your insured auto** and after it is moved from **your insured auto** to the place where it is finally delivered by **you**. **Towed property** includes a towed **auto** or **watercraft**.

6.  "**Watercraft**" means any craft, boat, vessel, or ship designed to transport persons or property by water.

7.  "**Work you performed**" includes:
    a.  Work that someone performed on **your** behalf; and
    b.  The providing of, or the failure to provide, warnings or instructions.

**ADDITIONAL PAYMENTS**

In addition to **our** limit of liability, **we** will pay for an **insured** under this endorsement:

1. All expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. The premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
3. Reasonable expenses incurred by that **insured** at **our** request, including loss of earnings up to $250 per day;
4. All costs taxed against the **insured** in any lawsuit against that **insured we** defend; and
5. Interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**.

**Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE PROVIDED.**

1. The On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages under this endorsement do not apply to any of the following:
   a. Liability resulting from any contract or agreement by which the **insured** accepts responsibility for **loss**. This exclusion does not apply to an agreement that is an **insured contract** that was executed prior to the occurrence of any **property damage**;
   b. **Loss** due to theft or conversion caused in any way by **you** or **your** employees, partners, members, directors, or shareholders;
   c. Defective parts or materials;
   d. Faulty **work you performed**;
   e. **Loss** to any of the following:
      (i) Tape decks or other sound-reproducing equipment unless permanently installed in a **customer's auto**;
      (ii) Tapes, records, or other sound-reproducing devices designed to be used with sound-reproducing equipment;
      (iii) Sound-receiving equipment designed for use as a citizens band radio, two-way mobile radio, or telephone or scanning monitor receiver, including its antennas and other accessories, unless permanently installed in the dash or console opening normally used by the **customer's auto** manufacturer for the installation of a radio; or

57

(iv) Any device designed or used to detect speed measurement equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment;

f. **Loss** caused by:
   (i) War, including undeclared or civil war;
   (ii) Warlike action by a military force, including any action to hinder or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents;
   (iii) Insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these; or
   (iv) Nuclear reaction or radioactive contamination.

   This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**;

g. **Loss** caused by strikes, lockouts, riots, civil commotion, or disorder; or

h. **Loss** due to inherent vice, delay, loss of profit, loss of market, loss of market value, or loss of use.

2. On-Hook Towing Physical Damage Legal Liability Coverage does not apply to:
   a. **Loss** to tarpaulins, tools, repair equipment, or materials and equipment for loading or unloading, which are carried in or on the **insured auto**;
   b. **Loss** to any **towed property** while it is in the custody of anyone other than an **insured**;
   c. **Loss** to objects of art, including paintings and statuary;
   d. **Loss** to jewelry; precious or semi-precious stones; gold, silver, platinum, or other precious metals or alloys;
   e. **Loss** to live animals;
   f. **Loss** to papers of any kind, including, but not limited to, money, securities, accounts, bills, currency, food stamps, notes, tickets, any other evidences of debt, passports, deeds, mechanical drawings, blueprints, manuscripts, or exhibits;
   g. Debris removal, including extraction of pollutants from land or water; or removal, restoration, or replacement of polluted land or water;
   h. **Loss** caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property;
   i. **Loss** to contraband or property in the course of illegal transportation or trade;
   j. **Loss** to property caused by contamination or deterioration, including corrosion; decay; fungus; mildew; mold; rot; rust; any quality, fault, or weakness in the property that causes it to damage or destroy itself; or humidity, dampness, dryness, or changes in or extremes of temperature;
   k. **Loss** caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of **pollutants**;
   l. **Loss** caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by an **insured**, anyone to whom **you** entrust the **towed property**, or anyone who has an interest in the property;

58

m. **Loss** caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense;

n. **Loss** caused by the explosion of explosives; or

o. **Loss** to computers and electronic goods, including, but not limited to, computer hardware and component parts, televisions, DVD players, stereo or other sound reproduction equipment, or any other electronic equipment, antennas, and other devices used exclusively to send or receive audio, visual, or data signals, or to store or play back recorded media.

## LIMITS OF LIABILITY

1. **On-Hook Towing Physical Damage Legal Liability Coverage.**
   Regardless of the number, amount, or units of **towed property** or **insured autos**, **insureds**, premiums paid, claims made or lawsuits brought, the most **we** will pay for each **loss** is the aggregate amount of damages to all **towed property** while being **loaded in or on** or conveyed by one **insured auto**, not to exceed the limit of liability shown on the **declarations page** for this "On-Hook Legal Liability" coverage.

   The most **we** will pay for **loss** to any **towed property** is the least of the following amounts:
   a. The actual cash value of the damaged or stolen property at the time of **loss**;
   b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
   c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

2. **Garagekeepers Storage Location Physical Damage Legal Liability Coverage.**
   Regardless of the number of **customer's autos** or **insured autos**, **insureds**, premiums paid, claims made, or lawsuits brought, the most **we** will pay for each **loss** at each location is the "Garagekeepers Legal Liability" coverage limit shown on the **declarations page** for that location.

   The most **we** will pay for a **loss** to any one **customer's auto** or all **customer's auto** equipment is the least of the following amounts:
   a. The actual cash value of the damaged or stolen property at the time of **loss**;
   b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
   c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

59

If the repair or replacement results in better than like kind and quality, **we** will not pay for the amount of the betterment.

An adjustment for depreciation or physical condition will be made in determining actual cash value in the event of a total loss.

In the event of payment of actual cash value for a total loss, **we** are entitled to all salvage, or credit for salvage, resulting from such **loss**.

3. **Deductibles.**

   For each **loss** that qualifies for coverage under the On-Hook Towing Physical Damage Legal Liability Coverage, the deductible shown on the **declarations page** will be applied.

   For each **loss** that qualifies for coverage under the Garagekeepers Storage Location Physical Damage Legal Liability Coverage, the "Each auto" deductible shown on the **declarations page** will be applied separately to each **customer's auto** or **towed property** sustaining **loss** as a result of a single **loss** event. The maximum aggregate deductible applied for a single **loss** event will not exceed the "Each occurrence" deductible shown on the **declarations page**.

   If **we** pay all or any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form Z439 (02/19)

## NON-OWNED TRAILER PHYSICAL DAMAGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Non-Owned Trailer Physical Damage Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession.

**We** will pay for a **loss** to the non-owned **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:

a. Collision Coverage. For **loss** caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.
b. Comprehensive Coverage. For any **loss** except one caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:

a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**.

   **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit;
c. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;
d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;
e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and
f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

## ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT

The following definition applies to this endorsement only:

"**Trailer**", when used in this endorsement, includes a shipping container.

## EXCLUSIONS

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contrib-

61

(i) Nuclear Hazard.
  (1) The explosion of any weapon employing atomic fission or fusion; or
  (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
(ii) War or Military Action.
  (1) War, including undeclared or civil war;
  (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
  (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.
b. **We** will not pay for loss of use.
c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
  (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.
  (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:
a. The actual cash value of the damaged or stolen property at the time of the **loss**;
b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;
c. The amount necessary to repair the damaged property to its pre-loss condition; or
d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## OTHER INSURANCE

The insurance provided for a **loss** to a non-owned **trailer** is primary.

If coverage under more than one policy applies on the same basis, **we** will pay only **our** proportionate share. **Our** proportionate share is the proportion that the

Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

---

Form Z442 (02/19)

### ANY AUTOMOBILE LEGAL LIABILITY COVERAGE ENDORSEMENT

---

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### CHANGES TO PART I—LIABILITY TO OTHERS

I. The following changes are made to the Additional Definitions Used in This Part Only section:

   A. The definition of "**insured auto**" is modified to include:

   1. **Hired autos**;
   2. **Non-owned autos**; and
   3. Any other **autos** owned by **you**:
      a. only while being used in the conduct of **your** business; and
      b. that do not qualify as either **hired autos** or as **non-owned autos**.

   However, this modification to the definition of **insured auto** does not apply to any **auto** acquired prior to the current policy period. But, for any type of **auto** that **you** acquire during the current policy period, this modification extends coverage to that **auto** during the remainder of the policy period.

   B. The following definitions are added:

   1. "**Hired auto**" means an **auto**:
      a. **you** lease, hire, rent or borrow; or
      b. **your employee** leases, hires or rents:
         i. under a contract in that individual **employee's** name;
         ii. at **your** direction and with your express permission; and
         iii. only while being used in the conduct of **your** business.
      However, this does not include any **auto you** or an **employee** leas-

63

es, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.

   2. "**Non-owned auto**" means an **auto**:
     a. that **you** do not own;
     b. that is not a **hired auto**; and
     c. that is being used by **you** in connection with **your** business.
     This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

II.  The first paragraph under the Limit of Liability section is deleted and replaced by the following:

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown on the **declarations page** for the coverage provided by this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**





1781 NC 0219